FILED
2018 Dec-21  PM 03:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

ALABAMA ONE CREDIT UNION,

      Plaintiff,

v.

      CIVIL ACTION NO.

PAUL TOPPINS, et al.,

      Defendants.

## NOTICE OF REMOVAL

COMES NOW the United States of America, by and through Jay E. Town, United States Attorney for the Northern District of Alabama, and Jack Hood, Assistant U.S. Attorney, and gives notice of removal of the above-captioned civil action pursuant to 28 U.S.C. §§ 1442(a)(1) and 1442(d)(1), and shows as follows:

1.    The National Credit Union Administration ("NCUA") is an independent agency of the United States of America, with a national office located 1775 Duke Street, Alexandria, VA   22314. The NCUA was established as an independent agency in 1970, but grew out of the Federal Credit Union Act of 1934, and it is defined in 12 U.S.C. § 1752a.

2.    The NCUA was made a party to the Alabama One Credit Union (AOCU) litigation by a third-party complaint filed by Hutto and Carver (AOCU's

outside auditors) (Exhibit 1) and an Order dated December 6, 2018, in the above-captioned civil action now pending in the Circuit Court of Tuscaloosa County, Alabama, in Civil Action No. 63-CV-2015-901234.00 (Exhibit 2), and the NCUA is the subject of the Circuit Court's discovery order dated July 13, 2016 (Exhibit 3). The original action was filed on or about November 17, 2015, and the case is now proceeding under Plaintiff's First Amended Complaint dated July 27, 2018 (Exhibit 4). The case has not yet gone to trial. Counsel for the United States received first notice that the NCUA had been joined as a party of the said pending action on or about December 6, 2018, and was formally served with process on December 11, 2018.

3.     The United States and its independent agency, the NCUA, have not waived sovereign immunity to permit any alleged cause of action, civil proceeding, or civil discovery to be taken with regard to confidential records of NCUA by any party in state court. Further, no such action would be proper in state court because federal regulations govern the disclosure and use of NCUA records in litigation to which it is not a party.

4.     Under 28 U.S.C. § 1442, actions commenced in state court against federal officers or agencies can be removed to federal district court for proper disposition. *See City of Jacksonville v. Department of Navy*, 348 F. 3d 1307, 1310-

2

1311 (11th Cir. 2003) (28 U.S.C. § 1442(a)(1) authorizes removal by the United States and its agencies to assert sovereign immunity).

5.     The Defendant United States of America, on behalf of its agency, the NCUA, files herewith a copy of the civil pleadings in *Alabama One Credit Union v. Paul Toppins*, et. al., Civil Action No. 63-CV-2015-901234.00, Circuit Court of Tuscaloosa County, Alabama (Exhibits 1, 2, 3, and 4), which is all that it has received by way of process, pleadings, or orders to date forming the basis of removal.

WHEREFORE, the aforesaid action is hereby removed from the Circuit Court of Tuscaloosa County, Alabama to the U.S. District Court for the Northern District of Alabama, Western Division.

Respectfully submitted,

JAY E. TOWN
UNITED STATES ATTORNEY

s/ Jack Hood
Jack Hood
Assistant United States Attorney
U.S. Attorney's Office
State Bar No. D41J
1801 Fourth Avenue North
Birmingham, Alabama 35203
(205) 244-2103
(205) 244-2181 (fax)
jack.hood@usdoj.gov

# CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2018, I filed the foregoing with the

Clerk of Court and served same by email and by Federal Express of such filing to:

Andrew P. Campbell
A Todd Campbell
John Guin
Stephen Wadsworth
CAMPBELL, GUIN, WILLIAMS,
    GUY & GIDIERE, LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
205/224-0755
Andy.campbell@campbellguin.com
todd.campbell@campbellguin.com
john.guin@campbellguin.com
stephen.wadsworth@campbellguin.com
Attorneys for Plaintiff

Thomas E. Baddley, Jr.
Jeffery P. Mauro
John Parker Yates
BADDLEY & MURO, LLC
850 Shades Creek Parkway, Suite 310
Birmingham, AL 35209
205/939-0090
jpy@baddleymauro.com
tbaddley@baddleymauro.com
jpmauro@baddleymauro.com
Attorneys for Plaintiff

William J. Gamble, Jr.
A Grady Williams, IV

Joseph M. Aguirre
PHELPS, DUNBAR, LLP
101 Dauphin Street, Suite 1000
Mobile, AL 36602
251/441-8205
Will.gamble@phelps.com
Bo.williams@phelps.com
Joseph.Aguirre@phelps.com
Attorneys for Defendants Hutto &
    Carver

Barry V. Frederick
Brandi B. Frederick
THE FREDERICK LAW FIRM
5409 Trace Ridge Lane
Birmingham, AL 35244
205/739-0043
barry@frederickfirm.net
brandi@frederickfirm.net
Attorneys for Defendants
    Frederick & Frederick

David R. Wells
K. Phillip Luke
WHITAKER, MUDD, LUKE & WELLS, LLC
2011-4th Avenue North
Birmingham, AL 35203
205/639-5300
dwells@wmslawfirm.com
Attorneys for Watson and Greene and
    Company Appraisers

Michael A. Vercher
Jonathan M. Hooks
CHRISTIAN & SMALL, LLP

505-20th Street North, Suite 1800
Birmingham, AL 35203
205/795-6588
mavercher@csattorneys.com
jmhooks@csattorneys.com
Attorneys for Maloy Defendants

James D. Turner
TURNER & TURNER
1426-22nd Avenue
Tuscaloosa, AL 35401
205/752-1502
Jturner003@aol.com
Attorney for Dick Holley &
    West Alabama Appraisal

Jeven Sloan
LOEWINSOHN, FLEGLE, DEARY, LLP
420-20th Street North, Suite 2000
Birmingham, AL 35203
jevens@lfdlaw.com

Gregory A. Brockwell
LEITMAN, SIEGAL & PAYNE, P.C.
420 20th Street N., Suite 2000
Birmingham, AL 35203
205/251-5900
gbrockwell@lsppc.com
Attorney for Jeven Sloan

Joseph E. Stott
STOTT & HARRINGTON, P.C.
2637 Valleydale Road
Birmingham, AL 35244
205/573-0500

joe@stottharrington.com
Attorney for Paul Toppins

s/Jack Hood
Jack Hood
Assistant United States Attorney

**GOVERNMENT EXHIBIT 1**

**THIRD PARTY COMPLAINT BY HUTTO & CARVER (2018)**



AlaFile E-Notice

63-CV-2015-901234.00

Judge: ALLEN W. MAY, JR

To:  WILLIAMS ARTHUR GRADY IV
     Bo.Williams@phelps.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF TUSCALOOSA COUNTY, ALABAMA

ALABAMA ONE CREDIT UNION V. PAUL TOPPINS ET AL
63-CV-2015-901234.00

The following matter was FILED on 11/13/2018 9:24:48 AM

**D002 HUTTO & CARVER PA**

MOTION TO ADD PARTY

[Filer: GAMBLE WILLIAM JORDAN JR.]

Notice Date:     11/13/2018 9:24:48 AM

MAGARIA HAMNER BOBO
CIRCUIT COURT CLERK
TUSCALOOSA COUNTY, ALABAMA
714 GREENSBORO AVENUE
TUSCALOOSA, AL, 35401

205-349-3870
magaria.bobo@alacourt.gov

| | | | |
|---|---|---|---|
| **STATE OF ALABAMA** | Revised 3/5/08 | Cas | ELECTRONICALLY FILED 11/13/2018 9:24 AM 63-CV-2015-901234.00 CIRCUIT COURT OF |
| Unified Judicial System | | | |
| 63-TUSCALOOSA | ☐ District Court ☑ Circuit Court | CV2 | TUSCALOOSA COUNTY, ALABAMA MAGARIA HAMNER BOBO, CLERK |

| | |
|---|---|
| ALABAMA ONE CREDIT UNION V. PAUL TOPPINS ET AL | **CIVIL MOTION COVER SHEET** *Name of Filing Party:*D002 - HUTTO & CARVER PA |

| | |
|---|---|
| *Name, Address, and Telephone No. of Attorney or Party. If Not Represented.* William J. Gamble Jr. P.O. Box 2727 Mobile, AL 36652 *Attorney Bar No.:* GAM019 | ☑ Oral Arguments Requested |

**TYPE OF MOTION**

| Motions Requiring Fee | Motions Not Requiring Fee |
|---|---|
| ☐ Default Judgment ($50.00) | ☑ Add Party |
| ☐ Joinder in Other Party's Dispositive Motion (i.e.Summary Judgment, Judgment on the Pleadings, orother Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Amend |
| | ☐ Change of Venue/Transfer |
| ☐ Judgment on the Pleadings ($50.00) | ☐ Compel |
| | ☐ Consolidation |
| ☐ Motion to Dismiss, or in the Alternative SummaryJudgment($50.00) | ☐ Continue |
| | ☐ Deposition |
| ☐ Renewed Dispositive Motion(Summary Judgment,Judgment on the Pleadings, or other DispositiveMotion not pursuant to Rule 12(b)) ($50.00) | ☐ Designate a Mediator |
| | ☐ Judgment as a Matter of Law (during Trial) |
| ☐ Summary Judgment pursuant to Rule 56($50.00) | ☐ Disburse Funds |
| ☐ Motion to Intervene ($297.00) | ☐ Extension of Time |
| ☐ Other _____ | ☐ In Limine |
| pursuant to Rule _____ ($50.00) | ☐ Joinder |
| | ☐ More Definite Statement |
| *Motion fees are enumerated in §12-19-71(a). Fees pursuant to Local Act are not included. Please contact the Clerk of the Court regarding applicable local fees. | ☐ Motion to Dismiss pursuant to Rule 12(b) |
| | ☐ New Trial |
| | ☐ Objection of Exemptions Claimed |
| ☐ Local Court Costs $   0 | ☐ Pendente Lite |
| | ☐ Plaintiff's Motion to Dismiss |
| | ☐ Preliminary Injunction |
| | ☐ Protective Order |
| | ☐ Quash |
| | ☐ Release from Stay of Execution |
| | ☐ Sanctions |
| | ☐ Sever |
| | ☐ Special Practice in Alabama |
| | ☐ Stay |
| | ☐ Strike |
| | ☐ Supplement to Pending Motion |
| | ☐ Vacate or Modify |
| | ☐ Withdraw |
| | ☐ Other _____ |
| | pursuant to Rule _____  (Subject to Filing Fee) |

| | | |
|---|---|---|
| Check here if you have filed  or are filing contemporaneously with this motion an Affidavit of Substantial Hardship or if you are filing on behalf of an agency or department of the State, county, or municipal government. (Pursuant to §6-5-1 Code of Alabama (1975), governmental entities are exempt from prepayment of filing fees)  ☐ | Date: 11/13/2018 9:19:12 AM | Signature of Attorney or Party /s/ William J. Gamble Jr. |

*This Cover Sheet must be completed and submitted to the Clerk of Court upon the filing of any motion. Each motion should contain a separate Cover Sheet.
**Motions titled 'Motion to Dismiss' that are not pursuant to Rule 12(b) and are in fact Motions for Summary Judgments are subject to filing fee.

ELECTRONICALLY FILED
11/13/2018 9:24 AM
63-CV-2015-901234.00
CIRCUIT COURT OF
TUSCALOOSA COUNTY, ALABAMA
MAGARIA HAMNER BOBO, CLERK

DOCUMENT 005

### IN THE CIRCUIT COURT OF TUSCALOOSA COUNTY, ALABAMA

ALABAMA ONE CREDIT UNION,  　　*

　　　　Plaintiff,　　　　　　　*

　　　　　　　　　　　　　　*

　　　　　　　　　　　　　　*

PAUL TOPPINS, et al.,　　　　　*

　　　　Defendants.　　　　　　*

**ORAL ARGUMENT REQUESTED**

**CV-2015-901234**

### HUTTO & CARVER'S
### MOTION TO ADD THE NCUA AS A NECESSARY PARTY

COMES NOW Defendant Hutto & Carver, PC ("Hutto & Carver"), and pursuant to

Alabama Rule of Civil Procedure 19 or 20, moves this Court to add the National Credit Union

Administration ("NCUA") as a necessary party.  As grounds for this Motion, Hutto & Carver

shows unto the Court as follows:

### INTRODUCTION

The NCUA should be added to this action as a necessary party.  In November 2008,

Hutto & Carver flagged the concentration of loans to Danny Butler as an area of concern.

Thereafter, the NCUA is believed to have participated in numerous regulatory actions that were

issued in response to the Danny Butler loan concentration.  Specifically, it is believed that there

were more than a dozen actions taken by the regulators relating to the Danny Butler loans from

2009 to the time of the filing of this lawsuit in November 2014.  The NCUA has a material

interest in how information relating to its administrative actions is dispersed, and thus is a

necessary party to this action to speak to same.

Furthermore, Alabama One's trade secrets, business confidential information, and client confidential information will necessarily be central to *all* aspects of the claims against Hutto & Carver. The NCUA's role is to protect the credit union institutions as a whole. Thus, the NCUA will be necessarily concerned with the oversight of the dissemination of that important information.

Finally, the NCUA has already opined that it should have the right to speak to any Orders issued by this Court. See Motion to Quash filed in Federal Court attached hereto as Exhibit "1".

In short, the NCUA is needed in this case to protect itself, its purpose, the Plaintiff Alabama One, and the members of Alabama One, and to ensure Hutto & Carver has the full right to fully defend itself without issue since its documents are regulated by the NCUA.

## GENERAL BACKGROUND

### I.       General Background of Credit Unions.

A credit union is a "cooperative society, incorporated for the twofold purpose of promoting thrift among its members and creating a source of credit for them at legitimate rates of interest…." Ala. Code § 5-17-1. Credit Unions were created as an alternative to banks for members of trades, organizations, and communities far from banking services. Id. In contrast with banks, which are owned and operated by shareholders, credit unions are owned and operated by their members. See 12 U.S.C.A. § 1757; Ala. Code § 5-17-5. Like banks, credit unions offer a similar range of checking and savings accounts, CDs, business and personal loans, and credit cards. See 12 U.S.C.A. § 1757; Ala. Code § 5-17-4.

Credit unions are created by statute. Federally chartered credit unions receive their mandate to operate from 12 U.S.C.A. § 1753, which allows "[a]ny seven or more natural persons who desire to form a Federal credit union" to form an organization subject to a set of federal

regulations. There are state chartered credit unions as well, which in Alabama are created by Ala. Code § 5-17-2, which provides the process by which applicants may form a credit union.

Like banks, credit unions have requirements for their reserves, lending, and record-keeping practices. See e.g. 12 U.S.C.A. § 85, 12 U.S.C.A. § 1757a.  Like banks, credit unions handle sensitive personal and financial information for their members. See 12 C.F.R. 1016 (which applies to both banks and credit unions).  Statutes regulate how that information is kept and disseminated. See 12 C.F.R. 1016; Ala. Code §5-3A-3&11.   Credit unions are responsible for their own compliance with these statutes, but to monitor their success, 12 U.S.C.A. § 1752a establishes a regulatory agency, the NCUA, which is responsible for credit unions.

## II.     The NCUA and its Purpose.

The NCUA is an independent agency within the executive branch of the United States Government. 12 C.F.R. §790.2. The NCUA is managed by the National Credit Union Administration Board ("the NCUA Board"), made up of three members appointed by the President. 12 U.S.C.A. § 1752a. The NCUA was founded by Congress in 1970 with the statutory purpose of ensuring that credit unions remain available to provide loans, improve commerce, and facilitate savings in areas that require alternative banking services.  Federal Credit Union Act Amendments of 1970, Pub. L. No. 91-206, § 3, 89 Stat. 49. To protect the American financial infrastructure, as the NCUA aptly noted, the NCUA's "primary mission is to regulate, insure, and charter credit unions pursuant to its authority under the Federal Credit Union Act, 12 U.S.C. §1751, et seq." (Ex. "1," Motion to Quash, at page 2).

The NCUA directly supervises Federally chartered credit unions. See 12 U.S.C.A. § 1766. For state chartered credit unions, the NCUA maintains its oversight if the credit union is federally insured. See 12 C.F.R. § Pt. 701, App. B. The NCUA has jurisdiction over this case

- 3 -

because the "Alabama One Credit Union"[1] was historically a federal credit union, and still to date is federally insured.  (See NCUA website information on Alabama One noting "FISCU" status ("Federally Insured State Credit Union"), a copy of which is attached as Exhibit "2").

To fulfill its mission, the NCUA possesses authority to audit credit unions and periodically review a credit union's records. See 12 U.S.C.A. § 1766(2). This "second set of eyes" helps ensure that a credit union remains healthy.  Through its investigations, the NCUA generates reports for future use by credit unions and professionals associated with them (lawyers, accountants, etc.) in complying with statutory obligations.  Id. As noted above, the central purpose of the NCUA is the help ensure that  credit unions are an integral part of maintaining a healthy economy.  See discussion, supra.

### III.     Confidential business practices and confidential consumer information.

Recognizing that financial institutions, such as banks and credit unions, have very sensitive financial information on its account holders (both deposit and loan accounts), and recognizing the need  for financial institutions to guard themselves against those trying to take advantage of the financial institutions,  the internal workings of banks and credit unions are highly protected.   For example, the NCUA and the credit unions must exchange records and reports, but must also protect those records from public disclosure.  As noted by the NCUA in its filing: "the regulations contained in 12 C.F.R. Part 792 "provide the requirements to obtain information from the NCUA generally or to obtain NCUA records or testimony of NCUA employees in legal proceedings where the NCUA is not a party." (Ex. 1, Motion to Quash at

---

[1] The Alabama One Credit Union was previously known as the B.F. Goodrich Credit Union and then was later briefly known as The Credit Union of Alabama.  Upon information and belief, the purported transition from federal to state chartered credit union occurred during the brief time it was known as The Credit Union of Alabama.

page 3). The NCUA has a duty to screen some of the information it handles and generates from

public disclosure, even upon receipt of Freedom of Information Act requests, as the NCUA

noted:

> The NCUA regulations for Freedom of Information Act, 5 U.S.C. § 552, purposes,
>
> provide in 12 C.F.R. Part 792, Subpart A, as follows:
>
> §792.11 What kind of records are exempt from public disclosure?
>
> ...
>
> **(4) Records which contain trade secrets and commercial or financial information which relate to the business, personal or financial affairs of any person or organization, are furnished to NCUA, and are confidential or privileged. This exemption includes, but is not limited to, various types of confidential sales and cost statistics, trade secrets, and names of key customers and personnel. Assurances of confidentiality given by staff are not binding on NCUA.**
>
> ...
>
> (8) Contained in or related to examination, operating or condition reports prepared by, or on behalf of, **or for the use of NCUA** or any agency responsible for the regulation or supervision of financial institutions. **This includes all information, whether in formal or informal report form, the disclosure of which would harm the financial security of credit unions** or would interfere with the relationship between NCUA and credit unions.
>
> ...
>
> Release of Exempt Information
>
> ...
>
> §792.30 Is there a prohibition against disclosure of exempt records?
>
> Except those authorized officials listed in 792.14, or as provided in §§792.31-792.32, and subpart C of this part, no officer, employee, or agent of NCUA or of any federally-insured credit union shall disclose or permit the disclosure of any exempt records of NCUA to any person other than those NCUA or credit union officers, employees, or agents properly entitled to such information for the performance of their official duties.

(Ex. 1, Motion to Quash, at pages 3-6) (emphasis added).

Similarly, the regulations also address the use of sensitive credit union information in legal proceedings.   As the NCUA further noted:

The NCUA's disclosure regulations (called the *Touhy* Regulations after the Supreme Court's case of *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951)), provide in 12 C.F.R. Part 792 as follows:

Subpart C—Production of Nonpublic Records and Testimony of NCUA Employees in Legal Proceedings

§792.40 What does this subpart prohibit?

This subpart prohibits the release of nonpublic records or the appearance of an NCUA employee to testify in legal proceedings except as provided in this subpart. Any person possessing nonpublic records may release them or permit their disclosure only as provided in this subpart.

...

(b) Duty of persons who are not NCUA employees. (such as Hutto & Carver)

(1) If you are not an NCUA employee but have custody of nonpublic records and are served with a subpoena requiring you to appear as a witness or produce records, you must promptly notify the NCUA about the subpoena. Also, you must notify the issuing court or authority and the person or entity for whom the subpoena was issued of the contents of this subpart. Notice to the NCUA is made by sending a copy of the subpoena to the General Counsel of the NCUA, Office of General Counsel, 1775 Duke Street, Alexandria, Virginia 22314-3428. After receiving notice, the NCUA may advise the issuing court or authority and the person or entity for whom the subpoena was issued that this subpart applies and, in addition, may intervene, attempt to have the subpoena quashed or withdrawn, or register appropriate objections.

(2) After notifying the Office of General Counsel, you should respond to a subpoena by appearing at the time and place stated in the subpoena. Unless authorized by the General Counsel, you should decline to produce any records or give any testimony, basing your refusal on this subpart. If the issuing court or authority orders the disclosure of records or orders you to testify, you should continue to decline to produce records or testify and should advise the Office of General Counsel.

§792.46 What will the NCUA do with my request?

(a) Factors the NCUA will consider. The NCUA may consider various factors in reviewing a request for nonpublic records or testimony of NCUA employees, including:

PD.24801882.1

. . .

[T]he *Touhy* Regulation makes clear that it is solely within the discretion of NCUA to determine what nonpublic records or testimony may be disclosed in legal proceedings." 12 C.F.R. §792.40(b).

(Ex. 1, Motion to Quash, at pages 7-9).

IV.   **Credit Union Rules and Obligations.**

Credit Unions are highly regulated in their operations.  For example, credit unions *must be* governed by member-elected Boards of Directors.  See Ala. Code § 5-17-10; 12 U.S.C.A. § 1761.  A Board of Directors' duties are statutory.  See Ala. Code § 5-17-11(b) ("It shall be the duty of the directors to have general management of the affairs of the credit unions, particularly...");  12 C.F.R 701.4 ("While a Federal credit union board of directors may delegate the execution of operational functions to Federal credit union personnel, the ultimate responsibility of each Federal credit union's board of directors for that Federal credit union's direction and control is non-delegable").  A credit union must also have a Supervisory Committee of the Board of Directors, which has legal obligations provided in part by 12 C.F.R. §715.3:

> **(a) Basic. The supervisory committee is responsible for ensuring that the board of directors and management of the credit union—**
>
> (1) Meet required financial reporting objectives and
>
> (2) Establish practices and procedures sufficient to safeguard members' assets.
>
> (b) Specific. To carry out the responsibilities set forth in paragraph (a) of this section, **the supervisory committee must determine whether:**
>
> **(1) Internal controls are established and effectively maintained to achieve the credit union's financial reporting objectives which must be sufficient to satisfy the requirements of the supervisory committee audit, verification of members' accounts and its additional responsibilities;**
>
> **(2) The credit union's accounting records and financial reports are promptly prepared and accurately reflect operations and results;**

DOCUMENT 603

(3) The relevant plans, policies, and control procedures established by the board of directors are properly administered; and

**(4) Policies and control procedures are sufficient to safeguard against error, conflict of interest, self-dealing and fraud.**

(c) Mandates. In carrying out the responsibilities set forth in paragraphs (a) and (b) of this section, the Supervisory Committee must:

(1) Ensure that the credit union adheres to the measurement and filing requirements for reports filed with the NCUA Board under § 741.6 of this chapter;

(2) Perform or obtain a supervisory committee audit, as prescribed in § 715.4 of this part;

(3) Verify or cause the verification of members' passbooks and accounts against the records of the credit union, as prescribed in § 715.8 of this part;

(4) Act to avoid imposition of sanctions for failure to comply with the requirements of this part, as prescribed in §§ 715.11 and 715.12 of this part.

12 C.F.R. §715.3 (Emphasis added). See also Ala. Code §§ 5-17-13, 5-17-29, 5-17-30, 5-17-31, & 5-17-32. Alabama Credit Unions (such as Alabama One) also have credit committees of which "at least a majority of the members of the credit committee still pass on all loans…" Ala. Code § 5-17-12.

**V.     Role of an Outside Auditor.**

The Supervisory Committee is further obligated to have an annual audit by a neutral third-party performed pursuant to 12 C.F.R. §§ 715.4 and 715.6 Id. The annual audit's requirements depend on the credit union's total assets and whether its charter is state or federal:

(a) Annual audit requirement. A federally-insured credit union is required to obtain an annual supervisory committee audit which occurs at least once every calendar year (period of performance) and must cover the period elapsed since the last audit period (period effectively covered).

12 C.F.R. § 715.4.

…

DOCUMENT 603

DOCUMENT 603

(a) Total assets of $500 million or greater. To fulfill its Supervisory Committee audit responsibility, a federally-insured State-chartered credit union having total assets of $500 million or greater must obtain an annual audit of its financial statements performed in accordance with GAAS by an independent person who is licensed to do so by the State or jurisdiction in which the credit union is principally located.

12 C.F.R. § 715.6. (See Exhibit "2", showing that Alabama One has over $500,000,000 in assets). Otherwise stated, in addition and as a supplement to any NCUA sanctioned inspection and audit of a credit union, a "third set" of eyes (via an independent auditor) reviews the books and records of credit unions. [2]

## VI.    Independent Auditor Rules and Obligations.

The auditor performing the supervisory audit must remain independent from the credit union and exercise unbiased judgment. 12 C.F.R. § 715.9. As Alabama One itself acknowledges, an audit gives recommendations, not mandates. (See Requests for Admission Nos. 51, 52, and 54 and Alabama One's Responses to same, attached hereto as Exhibit "3"). The auditor has no power to compel the credit union to act or abstain, only to flag issues. Id.

The audit may take a **sampling** of the credit union's data to check the efficacy of the credit union's reporting and recording mechanisms. 12 C.F.R. § 715.8. This is the method used by Hutto & Carver, as acknowledged by Alabama One. (See Hutto & Carver executed Engagement Letters, attached as Exhibit 4-A, "An audit includes examining, on a test basis, . . ."). In other words, the sampling audit method does not definitively say whether or not a credit union's books are 100% accurate, but whether or not the credit union's books pass a random sample examination. See 12 C.F.R. § 715.8. Again, the responsibility to maintain accurate books and records remains with the credit union. See 12 C.F.R. § 715.3(b).

---

[2] The "first set" of eyes is the credit union itself. The "second set" of eyes are the regulators who also inspect the credit union's operation.

In performing its work, the auditor has access to virtually all of the credit union's sensitive business information. (See Exhibits "4-A" and "4-B"). Just as the NCUA is required to keep this information confidential and private, so does the independent auditor. (See Ex. "4-A", "The information we obtain in auditing is confidential. . .").

When the independent audit is completed it is sent to the Supervisory Committee. (Ex. "4-D"). The Supervisory Committee's certification pursuant to 12 C.F.R. § 715.10(a) indicates that the Supervisory committee is aware of the scope of the audit performed and the audit findings.

## VII.   The Allowance for Loan Losses ("the "ALLL").

One significant aspect of examining the books and records is how a lending institution is evaluating its outstanding loans. Most outstanding loans will pay in full. However (and unfortunately), a few loans will not pay in full, and a financial institution must evaluate and estimate the likelihood of non-payment. (See Requests for Admissions Nos. 9, 10, and 12 and Alabama One's Responses to same, attached as Exhibit "3"). A credit union's estimation of future loan losses is known as the "allowance for loan losses" (the "ALLL"), and is an inexact science:

> The allowance for loan losses is evaluated on a regular basis by management and is based upon management's periodic review of the collectability of the loans in light of historical experience, the nature and volume of the loan portfolio, adverse situations that may affect the borrower's ability to repay, estimated value of any underlying collateral, and prevailing economic conditions. **This evaluation is inherently subjective as it requires estimates that are susceptible to significant revisions as more information becomes available.**

PD.24801882.1

(Exhibit "4-C", *emphasis added*).  The extent of expected losses (and subsequent write downs) of any loan is highly confidential, as no financial institution would want its debtors (or their counsel) to track that very sensitive information.  (Exhibit "4").

## VIII.   Coordination Between Outside Audits and NCUA Audits.

The Supervisory Committee is responsible to coordinating with the NCUA to ensure that all appropriate records are made available. 12 C.F.R. § 715.10. For example, the results of the annual independent party audit (including all work papers from the outside auditor) are expected to be disclosed to the NCUA. See 12 C.F.R. § 715.10.

The outside auditor must verify in its engagement letter (and the credit union must acknowledge by receipt of same) that the NCUA will receive unconditional access to all work papers pursuant to 12 C.F.R. § 715.9:

(c) Contents of letter. The engagement letter shall:

(7) Certify that NCUA staff and/or the State credit union supervisor, or designated representatives of each, will be provided unconditional access to the complete set of original working papers, either at the offices of the credit union or at a mutually agreed upon location, for purposes of inspection....

Thus, the outside auditor provides a resource, not only for the credit union's own compliance, but for the NCUA's review. Upon information and belief, the NCUA receives and reviews the outside auditor's work product as part of its periodic review of a credit union. (Exhibit "4").

## IX.   Power to control the Credit Union.

A credit union itself is responsible for and controls its own conduct. See 12 C.F.R. § 701.4. In the event of any misfeasance, the regulators are authorized to sanction and alter the conduct of a credit union.   In the case of a state chartered institution that is federally insured, both the ACUA and NCUA have authority over the credit union.  Either or both the ACUA and

NCUA are authorized to issue Reports of Examination (ROEs), Documents of Resolution ("DORs"), Letters of Understanding and Agreement ("LUAs"), and other documents and/or sanctions affecting the conduct of a credit union. An independent auditor has no authority to control the conduct of a credit union. (Exhibit "3", at request for admission No. 51).

## NARRATIVE STATEMENT OF UNDISPUTED FACTS PARTICULAR TO THE ALABAMA ONE CREDIT UNION AND THIS CASE

### X.    Alabama One.

Alabama One Credit Union "is a member-owned, state –chartered credit union organized under Alabama law. (Doc. 1, Complaint at paragraph 3). According to the Complaint, Alabama One itself was negligent in its operations, in that "Alabama One's officer and employees (were) exploiting their positions and jeopardizing the assets and interests of Alabama One's members." (Doc. 1, Complaint at paragraph 18).    Plaintiff claims its own "mismanagement." (Doc. 1, Complaint at paragraph 19).

### XI.    Hutto & Carver's Role.

For many years, Hutto & Carver was engaged as an independent auditor to perform the aforementioned annual audit for Alabama One, and its predecessors. (See Exhibit "4-A"). In its engagement letters, Hutto & Carver communicated to Alabama One that the audit was "designed to provide reasonable, but not absolute assurance" and warned of the risk that "material misstatements may exist and not be detected by us." Id. When Hutto & Carver performed its audit, the relevant information was already recorded, the subject fiscal management had already occurred, and all loans were already made. Hutto & Carver was not participating in Alabama One's management or advising it on any decisions. As independent auditor, Hutto & Carver's

job was to ensure that, based on its sampling, Alabama One's financial accounting appeared appropriately kept. See 12 C.F.R. § 715.8; Ex. "4-A".

As part of each annual audit, material representations were made by Alabama One which Hutto & Carver relied upon in performing the annual audit work. (See Representation Letters, attached as Exhibit "4-B").   Plaintiff Alabama One acknowledged that it was responsible for "adopting sound accounting policies, establishing and maintaining internal control, and preventing and detecting fraud." Id. Hutto & Carver relied upon those Alabama One certifications and representations. (Ex. "4"). Hutto & Carver created its work papers and audit opinions for use by Alabama One's supervisory committee, its management, employees, and members, and with the understanding that regulators such as the NCUA and ACUA might view or rely on these documents as well. (Ex. "4"). Hutto & Carver did not create its work product for public disclosure, and noted so in its engagement. (Exhibit "4-A").

### XII.   The "Danny Butler Loans".

According to Plaintiff,  "[t]he most egregious example of Alabama One's mismanagement revolves around loans it made to Danny Ray Butler ("Butler"), a Tuscaloosa County business man. (Doc. 1, Complaint at paragraph 19). The Danny Butler loans that are in question had appraisals performed. (Doc. 1, Complaint at paragraph 72). According to the Complaint, the Alabama One was supplied *fraudulent* appraisals on these properties. (Doc. 1, Complaint at paragraph 72). Alabama One "reasonably relied on these (allegedly fraudulent) appraisals by extending loans collateralized by the property fraudulently appraised." (Doc. 1, Complaint at paragraph 74). Alabama One necessarily placed those loans on its books and records, and thus Hutto & Carver necessarily relied on those some appraisals when auditing the books and records of Alabama One. (Ex. "4-A", "4-B" and "4-D").

In performing its work, Hutto & Carver did have some concerns about the Danny Butler loans. As early as its letter dated November 7, 2008, Hutto & Carver noted a problematic loan concentration to Alabama One with respect to member Danny Butler. (See Letter, redacted to only include Danny Butler information, attached as Exhibit "4-A"). In response, the Alabama One Supervisory Committee acknowledged issues with the concentration and committed to closely monitor the situation. (See February 17, 2009 Supervisory Committee Memorandum, attached as Exhibit "6").

### XIII.   The regulators act on the Danny Butler loans.

Sometime after Hutto & Carver's November 7, 2008 letter, the regulators had another inspection/audit of the Alabama One. As noted above, the regulators would have access to Hutto and Carvers' work papers, including specifically the November 7, 2008 letter outlining the problem concentration to Danny Butler. At this next late 2008/early 2009 inspection by the regulators, the regulators also took issue with the Danny Butler loan concentration (presumably they learned of this concentration because Hutto & Carver pointed it out, thus the system worked!). By March 2009, the ACUA/NCUA auditors regulated Alabama One's loan concentration with Danny Butler. (Ex. "4"). **It is believed by Hutto & Carver that between March 2009 and August 2014 (i.e. before the lawsuit was filed), the NCUA regulators participated in at least 14 separate regulatory actions/sanctions relating to the Danny Butler loans.** It is that regulatory action that is directly relevant to the Plaintiff's allegations against Hutto & Carver. However, as noted above, Hutto & Carver cannot utilize this information without the NCUA's consent.

### XIV.   The Tuohy request.

PD 24801882.1

Hutto & Carver made a *Tuohy* request of the NCUA in order to obtain permission to use the regulatory information critical to its defense. (Letter attached as Ex. "7.").  Specifically, Hutto & Carver needs to use the numerous regulatory sanctions applicable to the Danny Butler loans are directly relevant to the issues at hand.  Despite a year passing since its *Tuohy* request, the NCUA has not "greenlighted" Hutto & Carver's use of this critical information.  Thus, the NCUA is needed to be joined as a party so that Hutto & Carver's discovery and evidentiary issues can be addressed forthwith.

### XV.   The Additional Discovery to Hutto & Carver.

Hutto and Carver is not the only Defendant who seeks to know what the regulators did in conjunction with the Danny Butler loans.  Specifically, other Defendants have sought this information from Hutto & Carver. (Discovery to Hutto and Carver attached as Exhibit "8").  Clearly regulatory sanctions starting in 2009 relating to the Danny Butler loans would be material to all Defendants statute of limitations defense.

### LEGAL ARGUMENT

### I.   The NCUA is an Indispensable Party Needed for Just Adjudication.

The NCUA needed in this case.  See Ala. R. Civ. P. 19(a).  Necessary party practice is governed by Rule 19 of the *Alabama Rules of Civil Procedure*, which provides as follows:

**(a) Persons to Be Joined If Feasible.**

PD.24801882.1

(a) *Persons to be joined if feasible.* A person who is subject to jurisdiction of the court shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

Ala. R. Civ. P. 19.

There is no prescribed formula to be mechanically applied in every case to determine whether a party is an indispensable party or merely a proper or necessary one. Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 119 (1968). This is a question to be decided in the context of the particular case. Id. The interest to be protected must be a legally protected interest, not just a financial interest. United States v. Nye Cty., Nev., 951 F. Supp. 1502, 1513 (D. Nev. 1996), aff'd in part, 178 F.3d 1080 (9th Cir. 1999) (quoting 3A Moore's Federal Practice ¶ 19.07–1[2] ). In this case, the language of the statute and the facts herein strongly indicate that the NCUA is a necessary party to this case. [3]

**A. The NCUA must be in this case to speak for itself/its purpose.**

The NCUA has eloquently indicated why it is a material party to this case. (Ex. 1). For the reasons set forth therein, the NCUA should be added as a necessary party for just administration.

---

[3] For the reasons set forth herein, at the very least, the NCUA is a permissible party under Alabama Rule of Civil Procedure 20.

**B. The NCUA must be in this case to speak discovery issues needed by Hutto & Carver.**

As noted above, from March 2019 to August 2014, it is believed that the Alabama One received 14 sets of regulatory "sanctions" relating to the Danny Butler loans. It is further believed that these sanctions started after, and as a result of, Hutto & Carver doing its job and flagging these loans to Danny Butler.

It is these sanctions/regulations which are particularly material to the facts and defenses of Hutto & Carver, and which the NCUA proposes be altogether excluded from this case unless it is consulted. (Ex. 1, Motion to Quash). Alabama One has substantial information relating to these sanctions, but thus far has refused to produce them in response to the written discovery propounded to it citing the need for approval from the regulators before they will produce the same.

Based on pleadings filed in other cases, Hutto & Carver, in good faith, believes that there will be substantial records relating to these sanctions which exculpate it from Plaintiff's allegations; such as:

**1.) The oversight from 2009 to 2011.**

Upon information and belief, the regulators heavily monitored and regulated the Danny Butler loan concentration between 2009 and 2011. That oversight/regulation establishes:

1.) who can control/change the behavior of the Alabama One officials (it's not Hutto & Carver);

2.) that stringent regulatory oversight did not reveal any particular anomalies with the backup material to these loans (which proves Hutto & Carver met the standard of care); and

3.) the timeframe for any statute of limitations defense.

2.) **The 2012 Pearce Beavill Report**. It is believed that one sanction involved the requirement of a different outside accounting firm (Pearce Beavill) addressing the Danny Butler loans.  This Pearce Beavill report is directly relevant to exculpating Hutto & Carver, as if another independent outside firm found no wrongdoing from an accounting standpoint in 2012, there can be no good faith basis for a claim against Hutto & Carver. This is particularly true since Pearce Beavill is now the approved outside accounting firm put in place by the ACUA conservator for the Plaintiff Alabama One.  Alternatively, if the Pearce Beavill report found accounting discrepancies in Alabama One's books, it proves contributory fault on behalf of Alabama One .  It also means that such discrepancies were "fixed" long ago, and thus would mean there is no resulting damage.  Furthermore, the July 2012 Pearce Beavill report further establishes Hutto & Carver's statute of limitations defense.   The Pearce Beavill report is paramount to Hutto & Carver's defense, and the NCUA controls if and how it gets disseminated.  The NCUA is a necessary party to address issues surrounding the production and use of this report.

3.) **The 2012 Bradley Arant Report.** It is believed that another sanction involve the regulatory requirement of an outside law firm examining the conduct of the Alabama One.  Bradley, Arant, Coumins & Bolt, a prominent Alabama law firm, produced  an independent report on Alabama One in 2012.  That expert finding is highly relevant to any defenses herein, as it either tends to prove the books were proper, or tends to prove Alabama One's own negligence.  Furthermore, the Bradley Arant Report further establishes Hutto & Carver's statute of limitations defense.   The Bradley

PD.24801882.1

DOCUMENT 603

Arant report is paramount to Hutto & Carver's defense, and the NCUA controls if and how it gets disseminated. The NCUA is a necessary party to address the discovery and use of this report.

4.) **The 2014 Carr Riggs Fraud Audit.** It is believed that another sanction involved the hiring of an outside firm to come in and perform a fraud audit. Plaintiff's counsel continues to try to confuse the issues between a fraud audit (performed by Carr Riggs) and a yearly accounting audit (performed by Hutto & Carver). If Carr Riggs found fraud, then it is material to this case, including any fraud by the Alabama One institution itself (which would bar the claims here). If Carr Riggs found no fraud, those finding directly relate to Hutto & Carver's defense that it met the standard of care.

Furthermore, Hutto & Carver has a defense of contributory negligence that is irrefutably established with any NCUA regulatory actions on the Danny Butler loans. Alabama One would be negligent as a matter of law if already adjudicated by administrative findings,[4] and would be barred from recovery for its contributory negligence under the doctrine of *res judicata*. Specifically, the doctrine of res judicata bars re-litigation of "(1) the same issues (2) previously litigated between substantially identical parties and (3) finally adjudicated on the merits (4) by a court of competent jurisdiction." Neal v. Neal, 856 So.2d 766, 778–79 (Ala.2002). "If these elements are present, then the former judgment is an absolute bar to any subsequent suit on the same cause of action, including any issue which was or could have been litigated in the prior action." Wheeler v. First Alabama Bank of Birmingham, 364 So.2d 1190, 1199 (Ala.1978); see also Ex parte Capstone Dev. Corp., 779 So.2d 1216, 1218 (Ala.2000).

---

[4] These findings are the subject of the Motion to Quash (Ex. 1).

PD.24801882.1

Findings from an earlier court, **regulatory body,** or tribunal may be given preclusive effect where they address the litigated issue. See Select Specialty Hosps., Inc. v. Alabama State Health Planning & Dev. Agency, 112 So. 3d 475, 487 (Ala. Civ. App. 2012), *as modified on denial of reh'g* (Nov. 30, 2012); B & B Hardware, Inc. v. Hargis Indus., Inc., 135 S. Ct. 1293, 1304, 191 L. Ed. 2d 222 (2015).

In this case, the documents the NCUA controls production over are expected to show that multiple administrative findings held that Alabama One was itself negligent as it relates to the Danny Butler loans. (See, e.g. Doc. 1, Complaint at ¶ 18-19). It is believed that Alabama One did not appeal these findings of the NCUA and ACUA, and even signed off on many of them. Even taking Plaintiff's allegations against Defendants as true, Plaintiff's negligence claims fail as a matter of law where Plaintiff bears fault for its own damages, if conclusively found by any regulatory body. Thus, if Hutto and Carver remains a Defendant in this case, it necessarily is entitled to discover & introduce the same sanctions on the Danny Butler loans, (which stemmed from its 2008 findings of "problem concentration.").

Another defense dependent on the information subject to this Motion to Quash is Hutto & Carver's defense of unclean hands. It is believed that the ACUA and NCUA found that Alabama One's conduct on the Danny Butler loans was improper and required correction, and that Alabama One itself committed to correcting its practices. In spite of this fault, which again is believed to have been adjudicated, Alabama One now seeks to make an equitable claim against the Defendants. If Hutto & Carver remains in this case, the NCUA documents are in good faith

believed to be extremely relevant to Hutto & Carver's defenses[5]. In that respect, the NCUA needs to be present in this case to fully answer what is produceable information.

In summary, multiple instances of regulatory sanctions exist, which are directly relevant to the issues at hand. However, the NCUA controls how and when this relevant sanctions got produced in discovery, resulting in the need for it to be a necessary party.

C. **The NCUA must be in this case to address the Court on any sensitive Discovery issued to Hutto & Carver.**

Despite acknowledging that its very purpose is to protect Alabama One's assets and interests,[6] the Alabama One is seeking to compromise and expose Alabama One's very own trade secrets, business information, and private creditor information in this lawsuit. Specifically, the Alabama One seeks discovery from this defendant which would expose very sensitive trade secrets and client secrets in the Alabama One documents from this Defendant. (Plaintiff's Request for Production of Documents to Hutto & Carver attached hereto as Exhibit "5"). As seen in Requests for Production 1, 2, 3, 4, 5 and 9-20, this Defendant is being asked to expose the credit union's own information relating to loans, loan handling, sensitive aspect of its books, application of the ALLL, and how specific loans were treated on the credit unions' books. Id. Hutto and Carver's files, work papers, audits, and opinion letters necessarily contain

---

[5] Another central issue to Hutto & Carver is how the problem Butler loans were addressed on the Alabama One's books The regulators had multiple opportunities to change the loan designations (including adjusting the "ALLL") each year from 2009 going forward. The lack of ALLL adjustment validates Hutto & Carver's work. Furthermore, as set forth above, at least one other independent auditor and a law firm reviewed the books and practices of Alabama One as a result of regulatory oversight. Clearly a "4th and 5th set of eyes" would be relevant to the allegations against Hutto & Carver, and should be discoverable.

[6] The ACUA, as conservator of the Alabama One Credit Union, states that it had to "takeover" the Alabama One to protect "the assets and interests of Alabama One's members." (Doc. 1, Complaint at paragraph 18; see also Alabama Code 5-17-8(e)(1) (conservatorship allowed when the ACUA "determines that the action is necessary the conserve the assets of any state-chartered credit union or the interests of the members of the credit union.").

DOCUMENT 603

highly confidential information, which Hutto & Carver (like the NCUA, Doc. 1), seeks to protect. (Ex. "4").

Specifically, there will necessarily be Alabama One business information and protected trade secrets (along with corresponding regulatory action) that ordinarily should not be disclosed. See, generally, infra.   There likely will be instances when certain information can be publicly shared.  By contrast, there certainly will be circumstances where Alabama One has no business introducing its information into the litigation arena, but it has chosen to do so under the direction of the ACUA Conservatorship (and presumably now under the ACUA's handpicked management).  Id.  Thus, the NCUA has a material need to remain actively involved in this case to fulfill its mission of protecting this credit union or its members, and making decisions when certain sensitive information can or cannot enter the litigation arena

First, the NCUA claims a legally protected interest in the subject of the action in the disclosure or non-disclosure of confidential credit union information it is statutorily tasked with protecting. Second, as a practical matter, the NCUA's absence will impede the NCUA's ability to protect that interest. Finally, the NCUA's absence leaves all remaining parties subject to the substantial risk of incurring inconsistent obligations between their duty of confidentiality versus their duty of candor in pleadings and discovery. Specific examples from the information at issue show the need for the NCUA to make real-time determinations on the disclosure of confidential information.

By way of example only, the Danny Butler loan concentration is squarely within the allegations of this lawsuit. (Complaint at ¶¶ 46-48). As a result, as the Alabama One's allegations have  necessarily implicated regulation of those Danny Butler loans, and thus regulatory actions relating to those very loans must be discoverable.   Since Butler is now

through bankruptcy, and there are multiple ongoing public lawsuits about Danny Butler and his loans, the NCUA (and this Court) potentially has no "asset" or "interest" to protect to allow full exploration of the historical facts and circumstances surrounding these debts and loans, including any regulatory actions (which as noted above are extensive) taken relating to those loans. However, the credit union took certain of the Butler assets by foreclosure and/or deed in lieu of foreclosure. Presumably, the Alabama One's "write downs" of those loans is protected information that the NCUA would not want disclosed to the general public so as to prevent scrupulous buyers from using that information when bidding on any property in the future relating to Alabama One property sales. For this reason, the ACUA conservatorship presumably should not have referenced the updated credit union's deflated valuation of Butler's land in Fosters (Complaint at ¶ 48), nor the deflated valuation of Butler's water treatment plant (Complaint at ¶ 46) when Alabama One still held those assets on its books.[7] Hutto & Carver suggests that the NCUA's oversight of this type of pleading and allegation practice is needed here to protect Alabama One and its members. See Fed. R. Civ. P. 19(a)(1)(B)( i).

By way of second example, in performing its charter mission of protecting credit union's member's interests, the NCUA should take significant interest in the handling of the "Marina Loan" member's interest. Specifically, if one were to read the allegations of this Complaint, specifically paragraphs 44 and 48, one would assume that the "Marina Loan" was "upside down" and critically undercapitalized. That member trying to market and/or refinance that marina asset could be greatly compromised with that type of stigma attached. Instead, almost three months *before* this lawsuit, the member paid the "Marina Loan" in full on all debt. (Exhibit "5"). The NCUA is necessarily interested in protecting any member's private business information from

---

[7] Thus, the Alabama One presumably did not get full value when it sold those properties at auction.

PD.24801882.1

DOCUMENT 603

becoming public for absolutely no reason (as has already occurred in this case). Thus, the NCUA has material interest in the discovery issued to Hutto & Carver on those private loans.

The parties' (and the NCUA's) interest in the confidentiality of this information must be balanced against the vitality of this information in establishing the parties' defenses. This balancing function starts with the NCUA, thus making the NCUA a necessary party. (Doc. 1).

Additionally, co-defendants are now seeking discovery from Hutto & Carver relating to the regulatory oversight. (Ex. 8). Hutto & Carver agrees that this information is extremely relevant to all Defendants, but cannot produce the same without the consent of the NCUA. As Hutto & Carver's *Tuohy* request for this information is now a year old, it is simply time for the NCUA to be a party to address these issues directly.

The need to balance the sensitivity of the information at issue with its centrality to the disposition of this case is precisely why Alabama One needs the NCUA's oversight on the production of documents in this case. Hutto & Carver has financial information in its work papers on a significant number of members of the credit union, and it has information on the projected payout of those loans. (Exhibit "4"). Hutto & Carver believes the information is private, sensitive, and should not be circulated to all counsel and parties in this case, as that precise information could be used *against* Alabama One at a later time. (Exhibit "4"). For reasons that are baffling to Hutto & Carver, Alabama One (previously through its conservator, the ACUA, and now through the ACUA's hand-picked board) wants its most confidential of information exposed. The NCUA will necessarily need to be involved with each piece of Hutto & Carver's evidence and determining what is in the best interest of Alabama One. This is precisely the "balancing test" needed to be applied by the NCUA as to which issues should be

discoverable, and whether documents relevant to any such subject (including any NCUA/regulatory action) necessarily becomes introduced at that time. See Fed. R. Civ. P. 19(a)(1)(B)(ii).

The NCUA is a necessary party to this case as it will have to be at depositions monitoring (in real time) the issues as presented, so as to permit the parties to "steer clear" of objectionable material until such time as this Court, with the NCUA's input and guidance, can adjudicate the specific necessities of any discovery issue and balance the equities involved. Since the NCUA is a necessary party, this Court should grant this motion.

### CONCLUSION

The NCUA is a necessary party to this suit to protect the Alabama One and its members, and to make real time determinations as to what information is not to be produced and discussed in the litigation context. Therefore, the NCUA should be made a necessary party to this action.

Respectfully submitted,

/s/ WILLIAM J. GAMBLE, JR.
William J. Gamble, Jr. (GAM019)
Attorneys for Defendant, Hutto & Carver, PC

OF COUNSEL:

PHELPS DUNBAR LLP

101 Dauphin Street, Suite 1000
Mobile, Alabama 36602
Post Office Box 2727
Mobile, Alabama 36652-2727
251-432-4481
Will.gamble@phelps.com

- 25 -

**CERTIFICATE OF SERVICE**

I do hereby certify that I have on this 13th day of November, 2018, electronically filed the foregoing with the Clerk of Court using the CM-ECF system which will send notification of such filing to the following and/or I have served a true and correct copy of the foregoing on the following parties by first class mail, postage prepaid which are not participants in the CM-ECF system:

Andrew P. Campbell
A. Todd Campbell
John Guin
Campbell, Guin, Williams, Guy & Gidiere, L.L.C.
505 N. 20th St. North, Ste. 1600
Birmingham, AL 35203
andy.campbell@campbellguin.com
todd.campbell@campbellguin.com
john.guin@campbellguin.com
Attorneys for Plaintiff

John Parker Yates
Thomas E. Baddley, Jr.
Jeffrey P. Mauro
Baddley & Mauro, L.L.C.
850 Shades Creek Pkwy., Ste. 310
Birmingham, AL 35209-4510
jpy@baddleymauro.com
tbaddley@baddleymauro.com
jpmauro@baddleymauro.com
Attorneys for Plaintiff

James D. Turner
Turner & Turner
1426 22nd Ave.
Tuscaloosa, AL 35401
Attorney for Dick Holley & West Alabama
Appraisal

Joseph E. Stott
Scott, Sullivan, Streetman & Fox, PC
2450 Valleydale Rd.
Birmingham, AL 35244
(205) 967-9675

PD.24801882.1

DOCUMENT 603

jstott@sssandf.com
Attorney for Paul Toppins

Barry V. Frederick
Brandi B. Frederick
The Frederick Firm
5409 Trace Ridge Ln.
Birmingham, AL  35244
(205) 739-0043
Barry@frederickfirm.net
Brandi@frederickfirm.net

David R. Wells
K. Phillip Luke
Whitaker, Mudd, Luke & Wells, L.L.C.
2011 4th Ave. N.
Birmingham, AL  35203
(205) 639-5300
dwells@wmslawfirm.com
pluke@wmslawfirm.com
Attorneys for Watson and Greene and Company Appraisers

Michael A. Vercher
Jonathan M. Hooks
Christian & Small LLP
505 20th St. N., Ste. 1800
Birmingham, AL  35203
(205) 795-6588
mavercher@csattorneys.com
jmhooks@csattorneys.com
Attorney for Maloy Defendants

Gregory A. Brockwell
Leitman, Siegal & Payne, PC
420 20th Street N., Suite 2000
Birmingham, AL  35203
(205) 251-5900
gbrockwell@lsppc.com
Attorney for Jeven Sloan

/s/  *WILLIAM J. GAMBLE, JR.*
WILLIAM J. GAMBLE, JR.

- 27 -

ELECTRONICALLY FILED
11/13/2018 9:24 AM
63-CV-2015-901234.00
CIRCUIT COURT OF
TUSCALOOSA COUNTY, ALABAMA
MAGARIA HAMNER BOBO, CLERK

**FILED**
2016 Aug-23  PM 03:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

ALABAMA ONE CREDIT UNION,

    Plaintiff,

v.

    CIVIL ACTION NO.

PAUL TOPPINS, et al.,

    Defendants.

DOCUMENT 604

## UNITED STATES' MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO QUASH ORDER FOR *IN CAMERA* INSPECTION OF REGULATORY INFORMATION AND REMAND THE CASE TO CIRCUIT COURT

COMES NOW the United States of America, by and through Joyce White

Vance, United States Attorney for the Northern District of Alabama, and Jack

Hood, Assistant U.S. Attorney, and moves the Court for an Order quashing the

portion of the July 13, 2016 Order entered in the Circuit Court of Tuscaloosa

County regarding an in camera inspection of regulatory information contained in or

related to examination reports prepared by, on behalf of or for the use of the

National Credit Union Administration (NCUA), an independent agency of the

executive branch of the United States Government and remanding the remainder of

the case to the Circuit Court of Tuscaloosa County, Alabama, and shows the Court

as follows:

1



EXHIBIT
1

## I. FACTS

On or about August 11, 2016, the NCUA first received notice that an Order from the Circuit Court of Tuscaloosa County, Alabama had been entered directing the parties to submit regulatory information for *in camera* inspection by the court to determine if it is privileged and relevant to the claims in the underlying action. In a related Protective Order of the same date, the court defined regulatory information to include information and records that are protected from public disclosure by federal regulation. 12 C.F.R. Part 792. (Copies of said Orders of the Circuit Court of Tuscaloosa County are attached as Exhibits 1 and 2 to the Notice of Removal filed contemporaneously herewith). Federal laws and regulations require that a party seeking access to such information and records must submit a request to NCUA first, and prohibit a litigant in possession of such records or information from producing them except as permitted by NCUA Regulations. 12 C.F.R §792.40.

## II. ARGUMENT AND AUTHORITIES

### A. The Agency and Its Regulations

The NCUA is an independent agency within the executive branch of the United States Government whose primary mission is to regulate, insure, and charter credit unions pursuant to its authority under the Federal Credit Union Act, 12 U.S.C. §1751, et seq. The NCUA is managed by a three member Board ap-

pointed by the President of the United States and confirmed by the United States

Senate.   The Board has promulgated regulations under authority of the federal

housekeeping statute, 5 U.S.C. § 301,  and *U.S. ex rel. Touhy v. Ragen*, 340 U.S.

462 (1951) to centralize decisions on releasing information in response to

subpoenas.  The federal housekeeping statute provides:

> The head of an Executive department or military department may prescribe
> regulations for the government of his department, the conduct of its
> employees, the distribution and performance of its business, and the custody,
> use, and preservation of its records, papers, and property. This section does
> not authorize withholding information from the public or limiting the
> availability of records to the public.

5 U.S.C. § 301.

The Board's regulations are contained in 12 C.F.R. Part 792 and provide the

requirements to obtain information from the NCUA generally or to obtain NCUA

records or testimony of NCUA employees in legal proceedings where the NCUA is

not a party.

### B. Freedom of Information Act

The NCUA Regulations for the Freedom of Information Act, 5 U.S.C. § 552,

purposes, provide in 12 C.F.R. Part 792, Subpart A, as follows:

§792.11   What kind of records are exempt from public disclosure?

(a) All records of NCUA or any officer, employee, or agent thereof,
are confidential, privileged and exempt from disclosure, except as otherwise
provided in this subpart, if they are:
(1) Records specifically authorized under criteria established by an
Executive Order to be kept secret in the interest of national defense or

3

DOCUMENT 604

foreign policy and are in fact properly classified pursuant to an Executive Order.

(2) Records related solely to NCUA internal personnel rules and practices. This exemption applies to internal rules or instructions which must be kept confidential in order to assure effective performance of the functions and activities for which NCUA is responsible and which do not materially affect members of the public. This exemption also applies to manuals and instructions to the extent that release of the information would permit circumvention of laws or regulations.

(3) Specifically exempted from disclosure by statute, where the statute either makes nondisclosure mandatory or establishes particular criteria for withholding information.

(4) Records which contain trade secrets and commercial or financial information which relate to the business, personal or financial affairs of any person or organization, are furnished to NCUA, and are confidential or privileged. This exemption includes, but is not limited to, various types of confidential sales and cost statistics, trade secrets, and names of key customers and personnel. Assurances of confidentiality given by staff are not binding on NCUA.

(5) Inter-agency or intra-agency memoranda or letters which would not be available by law to a private party in litigation with NCUA. This exemption preserves the existing freedom of NCUA officials and employees to engage in full and frank written or taped communications with each other and with officials and employees of other agencies. It includes, but is not limited to, inter-agency and intra-agency reports, memoranda, letters, correspondence, work papers, and minutes of meetings, as well as staff papers prepared for use within NCUA or in concert with other governmental agencies.

(6) Personnel, medical, and similar files (including financial files) pertaining to another person, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy without the subject person's written consent or proof of death. Written consent consists of a written statement by the subject person, authorizing the release of the information to you, and including either the subject person's notarized signature or a declaration made under penalty of perjury that the statement is true and correct. Proof of death consists of evidence that the subject of your request is deceased—such as a death certificate, a newspaper obituary, or some comparable proof of death. Files exempt from disclosure include, but are not limited to:

(i) The personnel records of the NCUA;

4

(ii) The personnel records voluntarily submitted by private parties in response to NCUA's requests for proposals; and

(iii) Files containing reports, records or other material pertaining to individual cases in which disciplinary or other administrative action has been or may be taken.

(7) Records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information:

(i) Could reasonably be expected to interfere with enforcement proceedings;

(ii) Would deprive a person of a right to a fair trial or an impartial adjudication;

(iii) Could reasonably be expected to constitute an unwarranted invasion of personal privacy;

(iv) Could reasonably be expected to disclose the identity of a confidential source, including a state, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation on or by an agency conducting a lawful national security intelligence investigation, information furnished by the confidential source;

(v) Would disclose techniques and procedures for law enforcement investigation or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law; or

(vi) Could reasonably be expected to endanger the life or physical safety of any individual. This includes, but is not limited to, information relating to enforcement proceedings upon which NCUA has acted or will act in the future.

(8) Contained in or related to examination, operating or condition reports prepared by, or on behalf of, or for the use of NCUA or any agency responsible for the regulation or supervision of financial institutions. This includes all information, whether in formal or informal report form, the disclosure of which would harm the financial security of credit unions or would interfere with the relationship between NCUA and credit unions.

Release of Exempt Information

§792.30   Is there a prohibition against disclosure of exempt records?

Except those authorized officials listed in §792.14, or as provided in §§792.31-792.32, and subpart C of this part, no officer, employee, or agent of NCUA or of any federally-insured credit union shall disclose or permit the disclosure of any exempt records of NCUA to any person other than those NCUA or credit union officers, employees, or agents properly entitled to such information for the performance of their official duties.

§792.31   Can exempt records be disclosed to credit unions, financial institutions and state or federal agencies?

The NCUA Board, in its sole discretion, or any person designated by it in writing, may make available to certain governmental agencies and insured financial institutions copies of reports of examination and other documents, papers or information for their use, when necessary, in the performance of their official duties or functions. All reports, documents and papers made available pursuant to this paragraph shall remain the property of NCUA. No person, agency or employee shall disclose the reports or exempt records without NCUA's express written authorization.

§792.32   Can exempt records be disclosed to investigatory agencies?

The NCUA Board, or any person designated by it in writing, in its discretion and in appropriate circumstances, may disclose to proper federal or state authorities copies of exempt records pertaining to irregularities discovered in credit unions which may constitute either unsafe or unsound practices or violations of federal or state, civil or criminal law.

To date, the NCUA Board has not given anyone permission to examine exempt, nonpublic records as they may relate to the litigation in the Circuit Court of Tuscaloosa County, Alabama. The Circuit Court's Protective Order defines "Regulatory Information" to include, "reports of examination of Alabama One Credit Union ("Alabama One") by the Alabama Credit Union Association (sic) ("ACUA") and/or the National Credit Union Administration ("NCUA"); (2) documents reflecting actions taken by Alabama One in response to the

aforementioned reports of examination; (3) records and minutes of meetings of the Credit Union Board concerning Alabama One; (4) internal correspondence and documents among ACUA staff and agents relating to the regulation and examination of Alabama One; (5) correspondence and documents between ACUA staff and agents and the NCUA relating to the regulation and examination of Alabama One; and/or (6) correspondence and documents between ACUA and/or NCUA and Alabama One officers and employees obtained or created in the course of the agencies' regulation and examination of Alabama One." The majority of these records are subject to the protections of the Freedom of Information Act and are exempt from disclosure under multiple bases stated in NCUA's implementing regulations described above, including but not limited to 12 C.F.R. §792.11(a)(5), (6), and (8).   Further, NCUA Regulations vest solely in the NCUA the authority to determine the application of these exemptions and the discretion to disclose them to parties in litigation.  12 C.F.R. §792.30.  Nevertheless, the Circuit Court's Orders defy this authority preserved by NCUA in its regulations, and instead purports to exercise its own authority in the place of NCUA.

## C. The Disclosure or *Touhy* Regulations

In addition, the NCUA's disclosure regulations (called the *Touhy* Regulations after the Supreme Court's case of *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951)), provide in 12 C.F.R. Part 792, as follows:

Subpart C—Production of Nonpublic Records and Testimony of NCUA Employees in Legal Proceedings

Source: 62 FR 56054, Oct. 29, 1997, unless otherwise noted.

§792.40   What does this subpart prohibit?

This subpart prohibits the release of nonpublic records or the appearance of an NCUA employee to testify in legal proceedings except as provided in this subpart. Any person possessing nonpublic records may release them or permit their disclosure only as provided in this subpart.

(a) Duty of NCUA employees.

(1) If an NCUA employee is served with a subpoena requiring him or her to appear as a witness or produce records, the employee must promptly notify the Office of General Counsel. The General Counsel has the authority to instruct NCUA employees to refuse appearing as a witness or to withhold nonpublic records. The General Counsel may let an NCUA employee provide testimony, including expert or opinion testimony, if the General Counsel determines that the need for the testimony clearly outweighs contrary considerations.

(2) If a court or other appropriate authority orders or demands expert or opinion testimony or testimony beyond authorized subjects contrary to the General Counsel's instructions, an NCUA employee must immediately notify the General Counsel of the order and respectfully decline to comply. An NCUA employee must decline to answer questions on the grounds that this subpart forbids such disclosure and should produce a copy of this subpart, request an opportunity to consult with the Office of General Counsel, and explain that providing such testimony without approval may expose him or her to disciplinary or other adverse action.

(b) Duty of persons who are not NCUA employees.

(1) If you are not an NCUA employee but have custody of nonpublic records and are served with a subpoena requiring you to appear as a witness or produce records, you must promptly notify the NCUA about the subpoena. Also, you must notify the issuing court or authority and the person or entity for whom the subpoena was issued of the contents of this subpart. Notice to the NCUA is made by sending a copy of the subpoena to the General Counsel of the NCUA, Office of General Counsel, 1775 Duke Street, Alexandria, Virginia 22314-3428. After receiving notice, the NCUA may advise the issuing court or authority and the person or entity for whom the subpoena was issued that this subpart applies and, in addition, may

8

DOCUMENT 604

intervene, attempt to have the subpoena quashed or withdrawn, or register appropriate objections.

(2) After notifying the Office of General Counsel, you should respond to a subpoena by appearing at the time and place stated in the subpoena. Unless authorized by the General Counsel, you should decline to produce any records or give any testimony, basing your refusal on this subpart. If the issuing court or authority orders the disclosure of records or orders you to testify, you should continue to decline to produce records or testify and should advise the Office of General Counsel.

(c) Penalties. Anyone who discloses nonpublic records or gives testimony related to those records, except as expressly authorized by the NCUA or as ordered by a federal court after NCUA has had the opportunity to be heard, may face the penalties provided in 18 U.S.C. 641 and other applicable laws. Also, former NCUA employees, in addition to the prohibition contained in this subpart, are subject to the restrictions and penalties of 18 U.S.C. 207.

§792.41   When does this subpart apply?

This subpart applies if you want to obtain nonpublic records or testimony of an NCUA employee for legal proceedings. It doesn't apply to the release of records under the Freedom of Information Act (FOIA), 5 U.S.C. 552, or the Privacy Act, 5 U.S.C. 552a, or the release of records to federal or state investigatory agencies under §792.32.
[62 FR 56054, Oct. 29, 1997, as amended at 65 FR 63789, Oct. 25, 2000]

§792.42   How do I request nonpublic records or testimony?

(a) To request nonpublic records or the testimony of an NCUA employee, you must submit a written request to the General Counsel of the NCUA. If you serve a subpoena on the NCUA or an NCUA employee before submitting a written request and receiving a final determination, the NCUA will oppose the subpoena on the grounds that you failed to follow the requirements of this subpart. You may serve a subpoena as long as it is accompanied by a written request that complies with this subpart.

(b) To request nonpublic records that are part of the records of the Office of the Inspector General or the testimony of an NCUA employee on matters within the knowledge of the NCUA employee as a result of his or her employment with the Office of the Inspector General, you must submit a written request to the Office of the Inspector General. Your request will be

handled in accordance with the provisions of this subpart except that the Inspector General will be responsible for those determinations that would otherwise be made by the General Counsel.

§792.43   What must my written request contain?

Your written request for records or testimony must include:

(a) The caption of the legal proceeding, docket number, and name of the court or other authority involved.

(b) A copy of the complaint or equivalent document setting forth the assertions in the case and any other pleading or document necessary to show relevance.

(c) A list of categories of records sought, a detailed description of how the information sought is relevant to the issues in the legal proceeding, and a specific description of the substance of the testimony or records sought.

(d) A statement as to how the need for the information outweighs the need to maintain the confidentiality of the information and outweighs the burden on the NCUA to produce the records or provide testimony.

(e) A statement indicating that the information sought is not available from another source, such as a credit union's own books and records, other persons or entities, or the testimony of someone other than an NCUA employee, for example, retained experts.

(f) A description of all prior decisions, orders, or pending motions in the case that bear upon the relevance of the records or testimony you want.

(g) The name, address, and telephone number of counsel to each party in the case.

(h) An estimate of the amount of time you anticipate that you and other parties will need with each NCUA employee for interviews, depositions, or testifying.

§792.44   When should I make a request?

You should submit your request at least 45 days before the date that you need the records or testimony. If you want to have your request processed in less time, you must explain why you couldn't submit the request earlier and why you need expedited processing. If you are requesting the testimony of an NCUA employee, the NCUA expects you to anticipate your need for the testimony in sufficient time to obtain it by a deposition. The General Counsel may deny a request for testimony at a legal proceeding unless you explain why you could not use deposition testimony. The General

DOCUMENT 604

Counsel will determine the location of a deposition taking into consideration the NCUA's interest in minimizing the disruption for an NCUA employee's work schedule and the costs and convenience of other persons attending the deposition.

§792.45   Where do I send my request?

You must send your request or subpoena for records or testimony to the attention of the General Counsel for the NCUA, Office of General Counsel, 1775 Duke Street, Alexandria, Virginia 22314-3428. You must send your request or subpoena for records or testimony from the Office of the Inspector General to the attention of the NCUA Inspector General, 1775 Duke Street, Alexandria, Virginia 22314-3428.

§792.46   What will the NCUA do with my request?

(a) Factors the NCUA will consider. The NCUA may consider various factors in reviewing a request for nonpublic records or testimony of NCUA employees, including:

(1) Whether disclosure would assist or hinder the NCUA in performing its statutory duties or use NCUA resources unreasonably, including whether responding to the request will interfere with NCUA employees' ability to do their work.

(2) Whether disclosure is necessary to prevent the perpetration of a fraud or other injustice in the matter or if you can get the records or testimony you want from sources other than the NCUA.

(3) Whether the request is unduly burdensome.

(4) Whether disclosure would violate a statute, executive order, or regulation, for example, the Privacy Act, 5 U.S.C. 552a.

(5) Whether disclosure would reveal confidential, sensitive or privileged information, trade secrets or similar, confidential commercial or financial information, or would otherwise be inappropriate for release and, if so, whether a confidentiality agreement or protective order as provided in §792.48(a) can adequately limit the disclosure.

(6) Whether the disclosure would interfere with law enforcement proceedings, compromise constitutional rights, or hamper NCUA research or investigatory activities.

(7) Whether the disclosure could result in NCUA appearing to favor one litigant over another.

(8) Any other factors the NCUA determines to be relevant to the interests of the NCUA.

(b) Review of your request. The NCUA will process your request in the order it is received. The NCUA will try to respond to your request within 45 days, but this may vary depending on the scope of your request.

(c) Final determination. The General Counsel makes the final determination on requests for nonpublic records or NCUA employee testimony. All final determinations are in the sole discretion of the General Counsel. The General Counsel will notify you and the court or other authority of the final determination of your request. In considering your request, the General Counsel may contact you to inform you of the requirements of this subpart, ask that the request or subpoena be modified or withdrawn, or may try to resolve the request or subpoena informally without issuing a final determination. You may seek judicial review of the final determination under the Administrative Procedure Act. 5 U.S.C. 702.

§792.47   If my request is granted, what fees apply?

(a) Generally. You must pay any fees associated with complying with your request, including copying fees for records and witness fees for testimony. The General Counsel may condition the production of records or appearance for testimony upon advance payment of a reasonable estimate of the fees.

(b) Fees for records. You must pay all fees for searching, reviewing and duplicating records produced in response to your request. The fees will be the same as those charged by the NCUA under its Freedom of Information Act regulations, §792.19.

(c) Witness fees. You must pay the fees, expenses, and allowances prescribed by the court's rules for attendance by a witness. If no such fees are prescribed, the local federal district court rule concerning witness fees, for the federal district court closest to where the witness appears, will apply. For testimony by current NCUA employees, you must pay witness fees, allowances, and expenses to the General Counsel by check made payable to the "National Credit Union Administration" within 30 days from receipt of NCUA's billing statement. For the testimony of a former NCUA employee, you must pay witness fees, allowances, and expenses directly to the former employee, in accordance with 28 U.S.C. 1821 or other applicable statutes.

(d) Certification of records. The NCUA may authenticate or certify records to facilitate their use as evidence. If you require authenticated records, you must request certified copies at least 45 days before the date

DOCUMENT 604

they will be needed. The request should be sent to the General Counsel. You will be charged a certification fee of $5.00 per document.

(e) Waiver of fees. A waiver or reduction of any fees in connection with the testimony, production, or certification or authentication of records may be granted in the discretion of the General Counsel. Waivers will not be granted routinely. If you request a waiver, your request for records or testimony must state the reasons why a waiver should be granted. [62 FR 56054, Oct. 29, 1997, as amended at 65 FR 63789, Oct. 25, 2000]

§792.48   If my request is granted, what restrictions apply?

(a) Records. The General Counsel may impose conditions or restrictions on the release of nonpublic records, including a requirement that you obtain a protective order or execute a confidentiality agreement with the other parties in the legal proceeding that limits access to and any further disclosure of the nonpublic records. The terms of a confidentiality agreement or protective order must be acceptable to the General Counsel. In cases where protective orders or confidentiality agreements have already been executed, the NCUA may condition the release of nonpublic records on an amendment to the existing protective order or confidentiality agreement.

(b) Testimony. The General Counsel may impose conditions or restrictions on the testimony of NCUA employees, including, for example, limiting the areas of testimony or requiring you and the other parties to the legal proceeding to agree that the transcript of the testimony will be kept under seal or will only be used or made available in the particular legal proceeding for which you requested the testimony. The General Counsel may also require you to provide a copy of the transcript of the testimony to the NCUA at your expense.

§792.49   Definitions.

Legal proceedings means any matter before any federal, state or foreign administrative or judicial authority, including courts, agencies, commissions, boards or other tribunals, involving such proceedings as lawsuits, licensing matters, hearings, trials, discovery, investigations, mediation or arbitration. When the NCUA is a party to a legal proceeding, it will be subject to the applicable rules of civil procedure governing production of documents and witnesses, however, this subpart will still apply to the testimony of former NCUA employees.

NCUA employee means current and former officials, members of the Board, officers, directors, employees and agents of the National Credit Union Administration, including contract employees and consultants and their employees. This definition does not include persons who are no longer employed by the NCUA and are retained or hired as expert witnesses or agree to testify about general matters, matters available to the public, or matters with which they had no specific involvement or responsibility during their employment.

Nonpublic records means any NCUA records that are exempt from disclosure under §792.11, the NCUA regulations implementing the provisions of the Freedom of Information Act. For example, this means records created in connection with NCUA's examination and supervision of insured credit unions, including examination reports, internal memoranda, and correspondence, and, also, records created in connection with NCUA's enforcement and investigatory responsibilities.

Subpoena means any order, subpoena for records or other tangible things or for testimony, summons, notice or legal process issued in a legal proceeding.

Testimony means any written or oral statements made by an individual in connection with a legal proceeding including personal appearances in court or at depositions, interviews in person or by telephone, responses to written interrogatories or other written statements such as reports, declarations, affidavits, or certifications or any response involving more than the delivery of records.

[62 FR 56054, Oct. 29, 1997, as amended at 65 FR 63789, Oct. 25, 2000]

No party in the case in the Circuit Court of Tuscaloosa, Alabama, has made a proper request for information to the NCUA under the foregoing *Touhy* Regulation. The *Touhy* Regulation makes clear that it is solely within the discretion of NCUA to determine what nonpublic records or testimony may be disclosed in legal proceedings. 12 C.F.R. §792.40(b). *See Westchester Gen. Hosp., Inc. v. Dep't of Health & Human Servs.*, 443 Fed. Appx. 407, 410-11 (11th Cir. 2011) (per curiam).The Circuit Court should not be permitted to usurp the

authority of NCUA to determine whether nonpublic records should remain protected from disclosure or disclosed in the underlying litigation.

For these reasons, the Order for *in camera* inspection should be quashed.

### III. CONCLUSION

WHEREFORE, for the foregoing reasons, the Circuit Court order to the parties to produce regulatory information to the Court for it to conduct an *in camera* inspection and determine whether such information and records are relevant and privileged should be quashed, and the parties should be admonished to comply with NCUA's *Touhy* Regulation to obtain access to any nonpublic regulatory information protected from disclosure under federal regulations, and the remainder of the case should be remanded to the Circuit Court of Tuscaloosa, County, Alabama; and further, the Court should grant all equitable and just relief to which the United States and its independent agency, the NCUA, may be entitled.

Respectfully submitted,

JOYCE WHITE VANCE
UNITED STATES ATTORNEY

<u>**s/ Jack Hood**</u>
Jack Hood
Assistant United States Attorney
U.S. Attorney's Office
State Bar No. D41J
1801 Fourth Avenue North
Birmingham, Alabama 35203
(205) 244-2103
(205) 244-2181 (fax)

15

jack.hood@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2016, I filed the foregoing with the Clerk

of Circuit Court and served same by email and by Federal Express of such filing

to:

Andrew P. Campbell
A Todd Campbell
CAMPBELL, GUIN, LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
Andy.campbell@campbellguin.com
Todd.campbell@campbellguin.com
John.guin@campbellguin.com

Thomas E. Baddley, Jr.
Jeffery P. Mauro
John Parker Yates
BADDLEY & MURO, LLC
850 Shades Creek Parkway, Suite 310
Birmingham, AL 35209
jpy@baddleymauro.com
tbaddley@baddleymauro.com
jpmauro@baddleymauro.com

William J. Gamble, Jr.
A Grady Williams, IV
Joseph M. Aguirre
PHELPS, DUNBAR, LLP
101 Dauphin Street, Suite 1000
Mobile, AL 36602

Will.gamble@phelps.com
Bo.williams@phelps.com
Joseph.Aguirre@phelps.com

Barry V. Frederick
Brandi B. Frederick
THE FREDERICK LAW FIRM
5409 Trace Ridge Lane
Birmingham, AL 35244
barry@frederickfirm.net
brandi@frederickfirm.net

David R. Wells
WHITAKER, MUDD, LUKE & WELLS, LLC
2011-4th Avenue North
Birmingham, AL 35203
dwells@wmslawfirm.com

Michael A. Vercher
Jonathan M. Hooks
CHRISTIAN & SMALL, LLP
505-20th Street North, Suite 1800
Birmingham, AL 35203
mavercher@csattorneys.com
jmhooks@csattorneys.com

James D. Turner
TURNER & TURNER
1426-22nd Avenue
Tuscaloosa, AL 35401
Jturner003@aol.com

Jeven Sloan
LOEWINSOHN, FLEGLE, DEARY, LLP
420-20th Street North, Suite 2000

DOCUMENT 004

17

Birmingham, AL 35203
jevens@lfdlaw.com

Joseph E. Scott
SCOTT, SULLIVAN, STREETMAN & FOX, P.C.
2450 Valleydale Road
Birmingham, AL 35244
jstott@sssandf.com

**s/Jack Hood**
Jack Hood
Assistant United States Attorney

DOCUMENT 604

## Angela Ryals (8263)

| | |
|---|---|
| **From:** | Will Gamble (8205) |
| **Sent:** | Friday, August 26, 2016 2:10 PM |
| **To:** | Angela Ryals (8263) |
| **Subject:** | FW: Activity in Case 7:16-cv-01382-TMP Alabama One Credit Union v. Toppins et al Motion to Quash |

Doc. 2

---

**William ("Will") J. Gamble, Jr.**
Phelps Dunbar LLP
101 Dauphin Street, Suite 1000
P.O. Box 2727
Mobile, AL 36652
Direct: 251-441-8205
Fax: 251-433-1820
Email: will.gamble@phelps.com

PHELPS DUNBAR LLP
Louisiana | Mississippi | Florida
Texas | Alabama | North Carolina    London

CONFIDENTIALITY NOTICE – This e-mail message, including any attachments, is private communication sent by a law firm, Phelps Dunbar LLP, and may contain confidential, legally privileged information meant solely for the intended recipient. If you are not the intended recipient, any use, distribution, or copying of this communication is strictly prohibited. Please notify the sender immediately by replying to this message, then delete the e-mail and any attachments from your system. Thank you.

**From:** cmecf_ALND@alnd.uscourts.gov [mailto:cmecf_ALND@alnd.uscourts.gov]
**Sent:** Tuesday, August 23, 2016 3:31 PM
**To:** ecfAdmin@alnd.uscourts.gov
**Subject:** Activity in Case 7:16-cv-01382-TMP Alabama One Credit Union v. Toppins et al Motion to Quash

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

Northern District of Alabama

**Notice of Electronic Filing**

The following transaction was entered on 8/23/2016 at 3:31 PM CDT and filed on 8/23/2016
**Case Name:**      Alabama One Credit Union v. Toppins et al
**Case Number:**    7:16-cv-01382-TMP
**Filer:**          United States of America
**Document Number:** 2

**Docket Text:**
**MOTION to Quash Order for In Camera Inspection of Regulatory Information and Remand the case to Circuit Court by United States of America. (KAM, )**

**7:16-cv-01382-TMP Notice has been electronically mailed to:**

Joyce White Vance, US Attorney    usaaln.ecfusa@usdoj.gov

Andrew Phillip Campbell    andy.campbell@campbellguin.com

Anthony N Fox    afox@sssandf.com

Barry V Frederick    barry@frederickfirm.net

Gregory A Brockwell    gbrockwell@lsppc.com

Jack B Hood    jack.hood@usdoj.gov

James D Turner    jturner003@aol.com

Jonathan Michael Hooks    jmh@csattorneys.com

William J Gamble , Jr    will.gamble@phelps.com

**7:16-cv-01382-TMP Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1078951271 [Date=8/23/2016] [FileNumber=3826502-0
] [3c0ec210fcdfe09dd703a75f4507d428304c8421b17b19f170f96b5ca73da9659b7
6f67d818d24e6dd33899c51607427d909baf8a7c76269df6c2149540ecd75]]

DOCUMENT 604

ELECTRONICALLY FILED
11/13/2018 9:24 AM
63-CV-2015-901234.00
CIRCUIT COURT OF
TUSCALOOSA COUNTY, ALABAMA
MAGARIA HAMNER BOBO, CLERK

# redit Union Details

back to ncua.gov

back to mycreditunion.gov

:sults

| | |
|---|---|
| Credit Union Name: | ALABAMA ONE |
| Charter Number: | 68595 |
| Credit Union Type: | FISCU |
| Credit Union Status: | Active |
| Corporate Credit Union: | No |
| Credit Union Charter Year: | 1951 |
| Current Charter Issue Date: | 01/01/1951 |
| Date Insured: | 01/04/1971 |
| Charter State: | Alabama |
| Region: | 3 - Atlanta |
| Field of Membership Type: | Non-Federal Credit Union |
| Low Income Designation: | No |
| Member of FHLB: | No |
| Assets: | $586,574,367 |
| Peer Group: | 6 - $500,000,000 and greater |
| Number of Members: | 61,128 |

## Main Office

| | |
|---|---|
| Address: | 1215 Veterans Memorial Pkwy |
| City, State Zip code: | Tuscaloosa, AL 35404-5842 |
| Country: | United States |
| County: | Tuscaloosa |
| Phone: | 205-759-1595 |
| Website: | http://www.alabamaone.org |
| CEO/Manager: | William C Wells |

DOCUMENT 605


EXHIBIT
2

ELECTRONICALLY FILED
11/13/2018 9:24 AM
63-CV-2015-901234.00
CIRCUIT COURT OF
TUSCALOOSA COUNTY, ALABAMA
MAGARIA HAMNER BOBO, CLERK

DOCUMENT 606

## IN THE CIRCUIT COURT OF TUSCALOOSA COUNTY, ALABAMA

ALABAMA ONE CREDIT UNION,    )
                              )
      Plaintiff,          )     **CIVIL ACTION NUMBER**
                              )     **CV-2015-901234**
v.                          )
                              )
PAUL TOPPINS, et al,          )
                              )
      Defendants.      )

## PLAINTIFF ALABAMA ONE CREDIT UNION'S RESPONSES TO DEFENDANT HUTTO & CARVER'S REQUEST FOR ADMISSIONS AND FIRST SET OF INTERROGATORIES

COMES NOW Plaintiff Alabama One Credit Union ("Alabama One") and hereby objects and responds to Defendant Hutto & Carver, P.A.'s ("Hutto and Carver") Requests for Production as follows:

### GENERAL OBJECTIONS

1.     Plaintiff objects to each and every discovery request to the extent that the information called for, if any, was obtained and prepared in anticipation of litigation or for trial, and Defendant has made no showing that it has substantial need for the materials in the preparation of its case and that it is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means. Plaintiff further objects to each and every discovery requests to the extent that the information called for, if any, is privileged, constitutes work product and/or is not discoverable under the *Alabama Rules of Civil Procedure*.

2.     Plaintiff objects to each and every request to the extent that it is vague, overly broad and unduly burdensome and/or calls for a legal conclusion.

3.     Plaintiff objects to each and every request to the extent that it calls for information that is not material or relevant and information that is not reasonably calculated to lead to the discovery of admissible evidence.

4.     Plaintiff objects to the "Definitions" contained in the Request for Production to the extent that they are vague, ambiguous and unintelligible, and to the extent that they seek to impose burdens upon Plaintiff greater than the burdens imposed by the *Alabama Rules of Civil Procedure*.

5.     Plaintiff objects to each and every request to the extent that it calls for documents that are already in the possession of Defendant.

1


EXHIBIT
3

relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to, and without waiving the foregoing objections, Alabama One states that it is without knowledge regarding the guidelines for accountants' quarterly, semi, and/or year-end audits.

9.      Admit that the ALLL is simply an estimate of the future performance of problem

loans that are not expected to pay back the full amount of the loan balance.

RESPONSE: Alabama One admits that the ALLL is an estimate of the future performance of problem loans that are not expected to pay back the full amount of the loan balance.

10.    Admit that the actual performance of a loan may be greater or less than the write-

off estimate established in the ALLL.

RESPONSE: Admitted.

11.    Admit that an ALLL estimate does not affect the collectability of a problem loan.

RESPONSE: Alabama One objects to this Request on the grounds that is vague and ambiguous as to the meaning of "affect the collectability."

Subject to, and without waiving the foregoing objections, Alabama One denies this Request and refers to its response to Request No. 13.

12.    Admit than an ALLL estimate does not affect the value of loan collateral.

RESPONSE: Admitted.

13.    Admit than an ALLL estimate does not make a loan more or less profitable.

RESPONSE: Alabama One objects to this Request on the grounds that it is vague and ambiguous.

Subject to, and without waiving the foregoing objections, Alabama One states that the ALLL estimate for a particular problem loan may affect a lender's strategy for collecting that loan. In turn, a lender's strategy for collecting a problem loan may make that loan more or less profitable. Thus, an ALLL estimate may indirectly affect a loan's profitability. However, Alabama One admits that the mere recording of an ALLL estimate regarding an existing loan, by itself, does not make that particular loan more or less profitable.

DOCUMENT 606

51.   Admit that an accounting firm has no regulatory authority over Alabama One.

**RESPONSE:** **Admitted**

52.   Admit that the Alabama Credit Union Administration and/or the National Credit
      Union Administration are the only entity/entities that has/have regulatory
      authority over Alabama One.

**RESPONSE:** **Admitted.**

14

54.     Admit that an accounting firm has no authority to implement practices and

procedures at Alabama One.

**RESPONSE:** Alabama One admits that an accounting firm has no authority to
implement practices and procedures at Alabama One, with the caveat that
accounting firms have the authority to, among other things, identify significant
deficiencies with the practices and procedures at Alabama One.

15

DOCUMENT 606

Respectfully submitted,

/s/ John C. Guin
Attorneys for Plaintiffs

20

Andrew P. Campbell
A. Todd Campbell
John C. Guin
CAMPBELL, GUIN, LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
Telephone: (205) 224-0750
andy.campbell@campbellguin.com
todd.campbell@campbellguin.com
john.guin@campbellguin.com

Thomas E. Baddley, Jr.
Jeffrey P. Mauro
John Parker Yates
BADDLEY & MAURO, LLC
850 Shades Creek Pkwy, Ste. 310
Birmingham, AL 35209-4510
jpy@baddleymauro.com
tbaddley@baddleymauro.com
jpmauro@baddleymauro.com



ELECTRONICALLY FILED
11/13/2018 9:24 AM
63-CV-2015-901234.00
CIRCUIT COURT OF
TUSCALOOSA COUNTY, ALABAMA
MAGARIA HAMNER BOBO, CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| ALABAMA ONE CREDIT UNION, | * | |
| | * | |
| Plaintiff, | * | |
| | * | Case No.: 7:16-cv-01382-TMP |
| v. | * | |
| | * | |
| PAUL TOPPINS, et al, | * | |
| | * | |
| Defendants. | * | |

STATE OF _Florida_

COUNTY OF _Escambia_

### AFFIDAVIT OF HAROLD S. HUTTO, JR.

Before me the undersigned authority in said state and county, personally appeared
HAROLD S. HUTTO, JR., who being duly sworn deposes and says as follows:

1. I am over nineteen years of age and competent to make this Affidavit. I am the President
of Hutto & Carver, P.A. ("Hutto & Carver"). I have personal knowledge of the matters
set forth herein.

2. Hutto & Carver provided independent audit services for the "Alabama One Credit Union"
("Alabama One") from the time it became known as such until it was placed into
conservatorship by the Alabama Credit Union Association.

3. During this time, Alabama One engaged Hutto & Carver to conduct an annual
independent audit of Alabama One's financial statements. Attached hereto as Exhibit A
are true and accurate copies of Hutto & Carver's Engagement Letters for annual audits
for fiscal years ending September 30, 2006 through September 30, 2014.



EXHIBIT
4

DOCUMENT 607

4. As part of the annual audits, Hutto & Carver relied on representations from Alabama One in the form of Representation Letters. Attached hereto as Exhibit B are true and accurate copies of Representation Letters from the Alabama One to Hutto & Carver for fiscal years ending September 30, 2007 through September 30, 2014).

5. As part of its annual submissions, Hutto & Carver sent notes to Alabama One related to its review of Alabama One's financial statements. Attached hereto as Exhibit C is a true and accurate copy of a portion of Hutto and Carver's Notes to Financial Statements for the review of fiscal year September 30, 2008 and 2007.

6. On November 7, 2008, Hutto & Carver issued a letter to the Alabama One Supervisory Committee advising of Hutto & Carver's observations and concerns resulting from the audit for the fiscal year ending September 30, 2008. Alabama One specific information has been redacted except for that information related to the Danny Butler loans. A true and accurate copy of the redacted letter is attached hereto as Exhibit D.

7. As shown in attached Exhibit "D", in the annual audit of Alabama One's fiscal year ending September 30, 2008, Hutto & Carver recognized an unusually high loan concentration to Danny Butler and Danny Butler related entities. As a point of clarification, the loans financing the "truck stop," "cabin," and "water treatment plant" projects as referenced in ¶¶ 44-48 of Plaintiff's Complaint were part of the Butler-related loan concentration identified in the attached November 7, 2008 letter. The "marina" loan as referenced in Plaintiff's Complaint was unrelated to Danny Butler. During the next regulatory audit, which I believe occurred in early 2009. the regulators would have had access to our November 7, 2008 correspondence and all of our workpapers, as Alabama One asked for our workpapers (which includes our November 7, 2008 letter as the very

first item) to be on-site during any regulatory audit. It is customary for the regulatory auditors to focus on any areas of concern noted by Hutto & Carver, and I believe that the regulators began direct oversight of the Danny Butler loan concentration as early as March 2009 due in part to the issue being flagged by Hutto & Carver.

8. In performing its work, Hutto & Carver has access to sensitive customer information as well as sensitive credit union information. Hutto & Carver understands that information it receives is confidential, and it undertakes to ensure that the information remains confidential. If loan information is disseminated to people outside of the credit union, that information could be used to harm the credit union and negatively affect its performance. Likewise, if private information of a credit union member is improperly publicly disseminated, that could affect the credit union's relationship with that member, and could affect the credit union's reputation in the community at large.

9. In my opinion, one of the most sensitive areas of a credit union is how it treats non-performing loans, as those loans are at risk of default, and the credit union needs to mitigate and diminish the amount of loss it expects to take. However, the credit union is obligated to realistically account for the likely amount of losses that are expected, which is known in the industry as the "allowance for loan loss" or the "ALLL". If any debtor were to know that the credit union had already planned to not recover the full balance of the loan, the credit union's ability to recapture the indebtedness would, in my opinion, be significantly compromised. Hutto and Carver's workpapers for the Alabama One Credit Union contains this information, and for it to be disclosed publicly (or even to the lawyers and parties in this case) could damage the Alabama One Credit Union. Likewise, Hutto & Carvers' workpapers contain information relating to member loans and the rates

- 3 -

of interest and other terms established on those loans.  Should that information be disseminated outside of the credit union, that information could damage member relations for exposing what is generally considered private information (not to mention problems with trust for those that did not obtain as favorable an interest rate as other, similar, members).  That the Alabama One Credit Union's lawyers want this information produced in discovery to the parties and attorneys in this case violates my understanding of management's duties to maintain and protect the assets of the Alabama One Credit Union.

10. As it relates to the loan concentration with Danny Butler, where real estate/development loans were involved, Hutto & Carver reviewed the corresponding appraisals for those properties to determine if the collateral value exceeded the loan obligation (if the collateral value was ever below the loan value, the ALLL would need to be adjusted accordingly).  At no time was Hutto & Carver aware of any fraud concerning the appraisals for the Danny Butler real property/development loans.

Further, the affiant sayeth not.

_____
HAROLD S. HUTTO, JR.

STATE OF _Florida_

COUNTY OF _Escambia_

- 4 -

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that HAROLD S. HUTTO, JR., whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the foregoing instrument, he executed the same voluntarily.

Given under my hand and seal this the 22nd day of September , 2016.



NOTARY PUBLIC

My Commission Expires: 7/1/18

JAMIE PEADEN
MY COMMISSION # FF112134
EXPIRES: July 01, 2018

DOCUMENT 607

- 5 -

PD.20115712.1



# HUTTO CARVER, P.A.
*CERTIFIED PUBLIC ACCOUNTANTS*
400 East Government Street, Suite 110
Pensacola, Florida 32502



EXHIBIT
4-A

<u>ENGAGEMENT LETTER</u>

August 24, 2006

To the Supervisory Committee of
The Credit Union of Alabama FCU

This letter will confirm our understanding of the services we will provide to The Credit Union of Alabama FCU (Credit Union) for the three audit years ending September 30, 2006, 2007, and 2008.

Our firm shall audit the statements of financial condition of the Credit Union as of September 30, 2006 (2007 and 2008), and the related statements of income, changes in members' equity, and cash flows for the years then ended. The objective of our audits is the expression of an opinion as to whether the Credit Union's financial statements are fairly presented, in all material respects, in conformity with accounting principles generally accepted in the United States of America. Our audits will be conducted in accordance with United States generally accepted auditing standards and will include tests of accounting records and other procedures we consider necessary to enable us to express such an opinion. If our opinion is other than unqualified, we will discuss the reasons with the Supervisory Committee in advance. If, for any reason, we are unable to complete the audits or unable to express an opinion, we may decline to express an opinion or may not issue a report as a result of this engagement.

Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, consideration of the allowance for loan losses and other estimates made by management, and direct confirmation of loans, deposits, investments, and certain other assets and liabilities by correspondence with selected members, creditors, safekeeping agents, and correspondent institutions. Certain audit procedures, such as direct verification of loans and deposits, may be on an unannounced basis. We will also request written representations from the Credit Union's attorneys as part of the engagement, and they may bill the Credit Union for responding to this inquiry. At the conclusion of our audits, we will require certain written representations from management about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audits will involve judgement about the number of transactions to be examined and the areas to be tested. Also, we will plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the Credit Union or to acts by management or employees acting on behalf of the Credit Union.

Because an audit is designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform you of any material errors that come to our attention, and we will inform you of any fraudulent financial reporting or misappropriation of assets that comes to our attention. We will also inform you of any other violations of laws or governmental regulations that comes to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audits and does not extend to any later periods for which we are not engaged as auditors.

phone: 850.438.5299 · fax: 850.469.8071 · toll free: 800.316.8057 · e-mail: Huttoandcarver@bellsol

Supervisory Committee
Page 2

Our audits will include obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed. An audit is not designed to provide assurance on internal control or to identify internal control exceptions or reportable conditions, that is, significant deficiencies in the design or operation of internal control. However, if during the audits, we become aware of such reportable conditions or ways that we believe management practices can be improved, we will communicate these to the Supervisory Committee in a separate letter.

You are responsible for establishing and maintaining internal controls, including monitoring ongoing activities; for the selection and application of accounting principles; and for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U. S. generally accepted accounting principles. As part of our engagement we may propose standard, adjusting, or correcting journal entries to you financial statements. You are responsible for reviewing the entries and understanding the nature of any proposed entries and the impact they have on the financial statements. Further, you are responsible for designating a qualified management level individual to be responsible and accountable for overseeing these services.

You are responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. Your responsibilities include adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

You are responsible for the design and implementation of programs and controls to prevent and detect fraud and for informing us about all known or suspected fraud affecting the institution involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements. Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the institution received in communications from employees, former employees, regulators, or others. In addition, you are also responsible for identifying and ensuring that the financial institution complies with applicable laws and regulations.

We understand that your employees will prepare all cash, loans receivable, deposit, and other confirmation we request and will locate any loan documents and support for other transactions selected by us for testing.

In accordance with regulatory requirements, we, as your auditors, are required to make the following commitments:

1.  We will deliver final audit reports no later than the last day of December of the audit year. Those reports shall include the auditor's report and accompanying financial statements, internal control exceptions or reportable conditions noted during the engagement, and any fraud or illegal acts noted during the engagement.

2.  The audit workpapers are the property of Hutto & Carver, P.A. and constitute confidential information, as required by Section ET301 of the AICPA Code of Professional Conduct. However, we will provide the National Credit Union Administration examiners with access to all of our original workpapers that are the basis of our opinion on the financial statements. The NCUA may intend, or decide, to distribute the copies or information contained therein to others, including other governmental agencies.

3.  Additionally, this engagement is an opinion audit that fulfills the requirements of a complete supervisory committee audit.

4.  The engagement workpapers will be retained for at least three years from the date of the report.

Supervisory Committee
Page 3

The information that we obtain in auditing is confidential, as required by Section ET301 of the AICPA Code of Professional Conduct. Therefore, your acceptance of this engagement letter will serve as your advance consent to our compliance with above commitments.

If the Credit Union plans any reproduction or publication of our reports, or any portion of them, copies of master or printer's proofs of the entire document should be submitted to us in sufficient time for the firm's review and approval.

We will be pleased, at your request, to attend any Supervisory Committee and Board of Director's meetings. We would also like to meet with you and other executives of the Credit Union at various times throughout each year to discuss current accounting and auditing matters affecting your Credit Union. Whenever you feel such a meeting would be desirable, please let us know.

The fee for the audit year ending September 30, 2006, will not exceed $17,200, excluding costs associated with the confirmation process. The fees for the audit years ending September 30, 2007 and 2008, will not exceed $18,500 per year excluding costs associated with the confirmation process.. The costs associated with the confirmation process will be capped at $1,000. The Credit Union agrees to pay all postage, printing, and other costs associated with the circularization and confirmation of member accounts and other Credit Union accounts requiring verification as determined necessary by the firm and/or required by auditing standards generally accepted in the United States of America. In the event circumstances arise which will materially affect these amounts, we will notify you immediately in order that all parties can arrive at a mutually agreed upon adjustment. In no event will this approximation be adjusted without mutual agreement. The firm will render invoices as work progresses. The Supervisory Committee may terminate this contract at any time if it chooses to do so.

We believe the foregoing correctly sets forth our understanding, but if you have any questions, please let us know. If you find the arrangements acceptable, please acknowledge your agreement by signing and returning to the firm one of the copies enclosed.

It is a pleasure for us to be of service to you and your Credit Union.

Very truly yours,

*Hutto & Carver, P.a.*

Hutto & Carver, P.A.

Acknowledge:

*Malloa N Lancosto*                          8-29-06
Chairman, Supervisory Committee          Date



# HUTTO
# CARVER, P.A.

*CERTIFIED PUBLIC ACCOUNTANTS*

200 East Government Street, Suite 110
Pensacola, Florida 32502

ENGAGEMENT LETTER

June 29, 2009

To the Supervisory Committee of
Alabama One Credit Union

This letter will confirm our understanding of the services we will provide to Alabama One Credit Union (the Credit Union) for the three audit years ending September 30, 2009, 2010, and 2011.

Our firm shall audit the statements of financial condition of the Credit Union as of September 30, 2009 (2010 and 2011), and the related statements of income, changes in members' equity, and cash flows for the years then ended. The objective of our audits is the expression of an opinion as to whether the Credit Union's financial statements are fairly presented, in all material respects, in conformity with accounting principles generally accepted in the United States of America. Our audits will be conducted in accordance with United States generally accepted auditing standards and will include tests of accounting records and other procedures we consider necessary to enable us to express such an opinion. If our opinion is other than unqualified, we will discuss the reasons with the Supervisory Committee in advance. If, for any reason, we are unable to complete the audits or unable to express an opinion we may decline to express an opinion or may not issue a report as a result of this engagement.

Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, consideration of the allowance for loan losses and other estimates made by management, and direct confirmation of loans, deposits, investments, and certain other assets and liabilities by correspondence with selected members, creditors, safekeeping agents, and correspondent institutions. Certain audit procedures, such as direct verification of loans and deposits, may be on an unannounced basis. We will also request written representations from the Credit Union's attorneys as part of the engagement, and they may bill the Credit Union for responding to this inquiry. At the conclusion of our audits, we will require certain written representations from management about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audits will involve judgement about the number of transactions to be examined and the areas to be tested. Also, we will plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the Credit Union or to acts by management or employees acting on behalf of the Credit Union.

Because an audit is designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform you of any material errors that come to our attention, and we will inform you of any other any fraudulent financial reporting or misappropriation of assets that comes to our attention. We will also inform you of any other violations of laws or governmental regulations that comes to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audits and does not extend to any later periods for which we are not engaged as auditors.

Our audits will include obtaining an understanding of the entity and its environment, including internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures. An audit is not designed to provide assurance on internal control or to identify deficiencies in internal control. However, during the audit, we will communicate to you internal control related matters that are required to be communicated under professional standards.

phone: 850.469.5299     fax: 850.469.8071     toll free: 800.316.3057     e-mail: huttoandcarver@bellsouth.net