Case 7:18-cv-02102-LSC-GMB   Document 12-1   Filed 05/13/19   Page 1 of 188

FILED
2019 May-13  PM 09:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

Case 7:16-cv-01382-TMP   Document 6-1   Filed 09/22/16   Page 171 of 179
Case 7:15-cv-01089-JHE   Document 1   Filed 06/29/15   Page 72 of 80

(*i.e.*, the ultimate goal of Defendants' conspiracy) during the time we was interim CEO of Alabama One.

230.   This conduct on the part of Key was done in furtherance of and as a part of the conspiracy between all of the Defendants described previously herein. Accordingly, all of the Defendants are liable for the damages and injury caused by the breaches of fiduciary duty described herein.

231.   As a result of the breaches of fiduciary duty set forth herein, Alabama One suffered injury in that it paid significant attorneys' fees and other costs to overturn the improper employee suspensions and to put a stop to the illegal and improper search of Alabama One's premises, documents, and employees that Key was actively participating in.  Moreover, as a matter of law, Key must disgorge any profits or compensation he received while acting as interim CEO of Alabama One.

232.   As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT XIII – ABUSE OF PROCESS

### *By All Plaintiffs Against the Smyth Defendants.*

233.   Plaintiffs incorporate each and every allegation in paragraphs 1 through 144 above as if fully stated herein.

234. In filing the Smyth Lawsuits, the Smyth Defendants acted with an ulterior purpose beyond legitimately prosecuting good faith claims against the Plaintiffs and their actions amount to a wrongful use of process.

235. The Smyth Defendants acted with malice and unlawfully interfered with the Plaintiffs' property under color or process.

236. The Smyth Defendants issued process and commenced the Smyth Lawsuits for the ulterior motive of taking advantage of what the Smyth Defendants perceived as regulatory pressure and public image concerns on the part of Alabama One and to extort payment from Plaintiffs. In filing the Smyth Lawsuits, the Smyth Defendants had no intent to actually prosecute the claims asserted in the Smyth Lawsuits, but rather the Smyth Lawsuits were nothing more than the mechanism through which the Smyth Defendants have attempted to extort payment from Plaintiffs.

237. The Smyth Defendants' conduct amounts to a malicious perversion of a regularly issued process to accomplish a purpose whereby a result not lawfully or properly obtainable under it is secured.

238. As a proximate result of this abuse of process, Plaintiffs suffered and continue to suffer damages, including attorneys' fees and costs resulting from defending themselves in the Smyth Lawsuits.

239. As a proximate cause of the foregoing, Plaintiffs have been injured in

an amount to be proven at trial, and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT XIV – INVASION OF PRIVACY

### *By All Plaintiffs Against All Defendants*

240.  Plaintiffs incorporate each and every allegation in paragraphs 1 through 144 above as if fully stated herein.

241.  During his tenure as the interim CEO, Defendant Key intentionally and unlawfully intruded upon the solitude and seclusion of Plaintiffs' and their private affairs or concerns.

242.  During his tenure as the interim CEO, Defendant Key accessed Plaintiffs' highly sensitive, confidential, and private information contained at Alabama One's office and Mr. Carruth's office.  Plaintiffs had a reasonable expectation of privacy in these offices and Key's access was unlawful, improper, and unauthorized.

243.  The circumstances of this intrusion, as alleged in this Complaint, would be highly offensive to a reasonable person.

244.  This conduct on the part of Key was done in furtherance of and as a part of the conspiracy between all of the Defendants described previously herein. Accordingly, all of the Defendants are liable for the damages and injury caused by

the invasion of privacy described herein.

245.   As a result of the invasion of privacy set forth herein, Plaintiffs suffered injury.

246.   As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT XV – CIVIL ACTION WITHOUT CRIMINAL PROSECUTION

## (ALA. CODE § 6-5-370)

### *By All Plaintiffs Against All Defendants*

247.   Plaintiffs incorporate each and every allegation in paragraphs 1 through 144 above as if fully stated herein.

248.   Plaintiffs suffered injury to both person and property amounting to a felony committed by Defendants.

249.   Defendants made threats to take action as officials against Plaintiffs, or withhold official action, or caused such action or withholding by, among other things, threatening Plaintiffs with unlawful, adverse regulatory actions if they did not settle the Smyth Lawsuits, threatening Plaintiffs with unlawful, adverse regulatory actions if Plaintiffs did not terminate certain employees, threatening Plaintiffs with conservatorship unless Plaintiffs complied with unlawful, adverse

Case 7:18-cv-02102-LSC-GMB   Document 12-1   Filed 05/13/19   Page 5 of 188

Case 7:16-cv-01382-TMP   Document 6-1   Filed 09/22/16   Page 175 of 179
Case 7:15-cv-01089-JHE   Document 1   Filed 06/29/15   Page 76 of 80

regulatory actions, raiding Plaintiffs' offices under the purported authority of the ACUA without any lawful basis to do so, and suspending Plaintiffs from conducting their business or continuing in their employment. Under Alabama Code Sections 13A-8-15 and 13A-8-1(13)i, Defendants' actions constitute extortion, which is a class c felony.

250. Defendants did acts that would not themselves substantially benefit Defendants but which were calculated to harm substantially Plaintiffs with respect to their health, safety, business, calling, career, financial condition, reputation or personal relationships by, among other things, threatening Plaintiffs with unlawful, adverse regulatory actions if they did not settle the Smyth Lawsuits, threatening Plaintiffs with unlawful, adverse regulatory actions if Plaintiffs did not terminate certain employees, threatening Plaintiffs with conservatorship unless Plaintiffs complied with unlawful, adverse regulatory actions, raiding Plaintiffs' offices under the purported authority of the ACUA without any lawful basis to do so, and suspending Plaintiffs from conducting their business or continuing in their employment. Under Alabama Code Sections 13A-8-15 and 13A-8-1(13)k, Defendants' actions constitute extortion, which is a class c felony.

251. Defendants acted with the intent to commit the foregoing actions that amount to a class c felony under Alabama Code Sections 13A-8-15 and 13A-8-1(13).

Case 7:18-cv-02102-LSC-GMB   Document 12-1   Filed 05/13/19   Page 6 of 188

Case 7:16-cv-01382-TMP   Document 6-1   Filed 09/22/16   Page 176 of 179
Case 7:15-cv-01089-JHE   Document 1   Filed 06/29/15   Page 77 of 80

252.   As a proximate result of the foregoing, Plaintiffs have been injured in an amount to be proven at trial, and should be awarded actual and punitive damages in accordance with the evidence.

## COUNT XVI – CIVIL CONSPIRACY

### *By All Plaintiffs Against All Defendants*

253.   Plaintiffs incorporate each and every allegation in paragraphs 1 through 144 above as if fully stated herein.

254.   Each of the Defendants agreed to participate and did, in fact, participate in a conspiracy to commit the torts and violations set out herein and to injure the Plaintiffs, as further described at Paragraphs 136-140 herein.

255.   The conduct of the Defendants was extreme, outrageous, and intolerable in a civilized society and was undertaken by the Defendants herein in such a manner as to be malicious, oppressive, contumacious, willful conduct in the prosecution of a civil conspiracy undertaken for the purpose of causing injury or damage to the Plaintiffs herein.

256.   The actions of the Defendants were not privileged or lawfully sanctioned or undertaken but were intentional and reckless conduct of such an extreme and outrageous degree and nature that the same have resulted in or cause the Plaintiffs to suffer severe emotional distress and mental anguish, as well as

Case 7:18-cv-02102-LSC-GMB   Document 12-1   Filed 05/13/19   Page 7 of 188

Case 7:16-cv-01382-TMP   Document 6-1   Filed 09/22/16   Page 177 of 179
Case 7:15-cv-01089-JHE   Document 1   Filed 06/29/15   Page 78 of 80

economic damages as herein set forth.

257.   The injuries and damages suffered by the Plaintiffs as a result of the conduct of the Defendants are so severe that no reasonable person could be expected to endure the same.   The extreme nature of the conduct of the Defendants is so outrageous in character and so extreme in degree as to go beyond all reasonable bounds of decency and is atrocious and utterly intolerable in a civilized society.

258.   The Defendants did conspire to undertake the actions and activities set forth herein and did federate and combine to cause the injuries and damages suffered by Plaintiffs.   The conduct of the Defendants was a part of a pattern and practice of intentional conduct, willful, wanton, malicious and contumacious in nature designed and orchestrated by the Defendants to achieve an unlawful and tortious result.

259.   Plaintiffs have suffered injuries and damages as set out in each of the preceding Counts herein and each of the Defendants is liable for all such injuries and damages.

## V.

## JURY DEMAND

260.   Plaintiffs hereby demand a trial by jury in this action.

Case 7:18-cv-02102-LSC-GMB   Document 12-1   Filed 05/13/19   Page 8 of 188

Case 7:16-cv-01382-TMP   Document 6-1   Filed 09/22/16   Page 178 of 179
Case 7:15-cv-01089-JHE   Document 1   Filed 06/29/15   Page 79 of 80

# VI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for:

a. the acts alleged herein to be adjudged and decreed to be unlawful in violation of the federal and state claims asserted herein;

b. compensatory damages in an amount to be ascertained at trial;

c. punitive or exemplary damages in an amount to be ascertained at trial;

d. pre- and post-judgment interest and attorneys' fees and costs as provided by law; and

e. all other relief, in law or in equity, to which Plaintiffs may be entitled.

Respectfully submitted this 29th day of June, 2015.

Case 7:18-cv-02102-LSC-GMB   Document 12-1   Filed 05/13/19   Page 9 of 188

Case 7:16-cv-01382-TMP   Document 6-1   Filed 09/22/16   Page 179 of 179
Case 7:15-cv-01089-JHE   Document 1   Filed 06/29/15   Page 80 of 80

LOEWINSOHN FLEGLE DEARY, LLP

JEXEN R. SLOAN
ASB: 3412V51S
The Kress Building
301 Nineteenth Street North, Suite 520
Birmingham, Alabama 35203
(205) 314-0627 - Telephone

DAVID R. DEARY (*seeking admission Pro Hac Vice*)
Texas Bar No.: 05624900
12377 Merit Drive, Suite 900
Dallas, Texas  75251
(214) 572-1700 - Telephone
(214) 572-1717 – Facsimile

ATTORNEYS FOR PLAINTIFFS

FILED
2016 Sep-22  PM 02:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Credit Union Details

Go back to ncua.gov

Go back to mycreditunion.gov

## Results

| | |
|---|---|
| Credit Union Name: | ALABAMA ONE |
| Charter Number: | 68595 |
| Credit Union Type: | FISCU |
| Credit Union Status: | Active |
| Corporate Credit Union: | No |
| Credit Union Charter Year: | 1951 |
| Current Charter Issue Date: | 01/01/1951 |
| Date Insured: | 01/04/1971 |
| Charter State: | Alabama |
| Region: | 3 - Atlanta |
| Field of Membership Type: | Non-Federal Credit Union |
| Low Income Designation: | No |
| Member of FHLB: | No |
| Assets: | $586,574,367 |
| Peer Group: | 6 - $500,000,000 and greater |
| Number of Members: | 61,128 |

### Main Office

| | |
|---|---|
| Address: | 1215 Veterans Memorial Pkwy |
| City, State Zip code: | Tuscaloosa, AL 35404-5842 |
| Country: | United States |
| County: | Tuscaloosa |
| Phone: | 205-759-1595 |
| Website: | http://www.alabamaone.org |
| CEO/Manager: | William C Wells |

EXHIBIT
2

FILED
2016 Sep-22  PM 02:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE CIRCUIT COURT OF TUSCALOOSA COUNTY, ALABAMA

ALABAMA ONE CREDIT UNION,   )
                              )
       Plaintiff,         )     **CIVIL ACTION NUMBER**
v.                       )     **CV-2015-901234**
                              )
PAUL TOPPINS, et al,       )
                              )
       Defendants.       )

### PLAINTIFF ALABAMA ONE CREDIT UNION'S RESPONSES TO DEFENDANT HUTTO & CARVER'S REQUEST FOR ADMISSIONS AND FIRST SET OF INTERROGATORIES

     COMES NOW Plaintiff Alabama One Credit Union ("Alabama One") and hereby objects and responds to Defendant Hutto & Carver, P.A.'s ("Hutto and Carver") Requests for Production as follows:

### GENERAL OBJECTIONS

     1.    Plaintiff objects to each and every discovery request to the extent that the information called for, if any, was obtained and prepared in anticipation of litigation or for trial, and Defendant has made no showing that it has substantial need for the materials in the preparation of its case and that it is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means. Plaintiff further objects to each and every discovery requests to the extent that the information called for, if any, is privileged, constitutes work product and/or is not discoverable under the *Alabama Rules of Civil Procedure*.

     2.    Plaintiff objects to each and every request to the extent that it is vague, overly broad and unduly burdensome and/or calls for a legal conclusion.

     3.    Plaintiff objects to each and every request to the extent that it calls for information that is not material or relevant and information that is not reasonably calculated to lead to the discovery of admissible evidence.

     4.    Plaintiff objects to the "Definitions" contained in the Request for Production to the extent that they are vague, ambiguous and unintelligible, and to the extent that they seek to impose burdens upon Plaintiff greater than the burdens imposed by the *Alabama Rules of Civil Procedure*.

     5.    Plaintiff objects to each and every request to the extent that it calls for documents that are already in the possession of Defendant.

1



relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to, and without waiving the foregoing objections, Alabama One states that it is without knowledge regarding the guidelines for accountants' quarterly, semi, and/or year-end audits.

9.      Admit that the ALLL is simply an estimate of the future performance of problem

loans that are not expected to pay back the full amount of the loan balance.

RESPONSE: Alabama One admits that the ALLL is an estimate of the future performance of problem loans that are not expected to pay back the full amount of the loan balance.

10.      Admit that the actual performance of a loan may be greater or less than the write-

off estimate established in the ALLL.

RESPONSE: Admitted.

11.      Admit that an ALLL estimate does not affect the collectability of a problem loan.

RESPONSE: Alabama One objects to this Request on the grounds that is vague and ambiguous as to the meaning of "affect the collectability."

Subject to, and without waiving the foregoing objections, Alabama One denies this Request and refers to its response to Request No. 13.

12.      Admit than an ALLL estimate does not affect the value of loan collateral.

RESPONSE: Admitted.

13.      Admit than an ALLL estimate does not make a loan more or less profitable.

RESPONSE: Alabama One objects to this Request on the grounds that it is vague and ambiguous.

Subject to, and without waiving the foregoing objections, Alabama One states that the ALLL estimate for a particular problem loan may affect a lender's strategy for collecting that loan. In turn, a lender's strategy for collecting a problem loan may make that loan more or less profitable. Thus, an ALLL estimate may indirectly affect a loan's profitability. However, Alabama One admits that the mere recording of an ALLL estimate regarding an existing loan, by itself, does not make that particular loan more or less profitable.

5

51.    Admit that an accounting firm has no regulatory authority over Alabama One.

**RESPONSE**: **Admitted**

52.    Admit that the Alabama Credit Union Administration and/or the National Credit Union Administration are the only entity/entities that has/have regulatory authority over Alabama One.

**RESPONSE**: **Admitted.**

54.    Admit that an accounting firm has no authority to implement practices and

procedures at Alabama One.

**RESPONSE**: Alabama One admits that an accounting firm has no authority to implement practices and procedures at Alabama One, with the caveat that accounting firms have the authority to, among other things, identify significant deficiencies with the practices and procedures at Alabama One.

Respectfully submitted,


/s/ John C. Guin
Attorneys for Plaintiffs

Andrew P. Campbell
A. Todd Campbell
John C. Guin
CAMPBELL, GUIN, LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
Telephone: (205) 224-0750
andy.campbell@campbellguin.com
todd.campbell@campbellguin.com
john.guin@campbellguin.com

Thomas E. Baddley, Jr.
Jeffrey P. Mauro
John Parker Yates
BADDLEY & MAURO, LLC
850 Shades Creek Pkwy, Ste. 310
Birmingham, AL 35209-4510
jpy@baddleymauro.com
tbaddley@baddleymauro.com
jpmauro@baddleymauro.com

**FILED**

2016 Sep-22  PM 02:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

ALABAMA ONE CREDIT UNION,　　　\*
　　　　　　　　　　　　　　　　\*
　　　　Plaintiff,　　　　　　　\*
　　　　　　　　　　　　　　　　\*　　Case No.: 7:16-cv-01382-TMP
v.　　　　　　　　　　　　　　　\*
　　　　　　　　　　　　　　　　\*
PAUL TOPPINS, et al,　　　　　　\*
　　　　　　　　　　　　　　　　\*
　　　　Defendants.　　　　　　　\*

STATE OF ___F L o R i D 4___

COUNTY OF ___E s c A m b . c___

### AFFIDAVIT OF HAROLD S. HUTTO, JR.

Before me the undersigned authority in said state and county, personally appeared

HAROLD S. HUTTO, JR., who being duly sworn deposes and says as follows:

1.  I am over nineteen years of age and competent to make this Affidavit. I am the President
    of Hutto & Carver, P.A. ("Hutto & Carver"). I have personal knowledge of the matters
    set forth herein.

2.  Hutto & Carver provided independent audit services for the "Alabama One Credit Union"
    ("Alabama One") from the time it became known as such until it was placed into
    conservatorship by the Alabama Credit Union Association.

3.  During this time, Alabama One engaged Hutto & Carver to conduct an annual
    independent audit of Alabama One's financial statements. Attached hereto as Exhibit A
    are true and accurate copies of Hutto & Carver's Engagement Letters for annual audits
    for fiscal years ending September 30, 2006 through September 30, 2014.



EXHIBIT
4

PD.20115712.1

4.  As part of the annual audits, Hutto & Carver relied on representations from Alabama One in the form of Representation Letters. Attached hereto as Exhibit B are true and accurate copies of Representation Letters from the Alabama One to Hutto & Carver for fiscal years ending September 30, 2007 through September 30, 2014).

5.  As part of its annual submissions, Hutto & Carver sent notes to Alabama One related to its review of Alabama One's financial statements. Attached hereto as Exhibit C is a true and accurate copy of a portion of Hutto and Carver's Notes to Financial Statements for the review of fiscal year September 30, 2008 and 2007.

6.  On November 7, 2008, Hutto & Carver issued a letter to the Alabama One Supervisory Committee advising of Hutto & Carver's observations and concerns resulting from the audit for the fiscal year ending September 30, 2008. Alabama One specific information has been redacted except for that information related to the Danny Butler loans. A true and accurate copy of the redacted letter is attached hereto as Exhibit D.

7.  As shown in attached Exhibit "D", in the annual audit of Alabama One's fiscal year ending September 30, 2008, Hutto & Carver recognized an unusually high loan concentration to Danny Butler and Danny Butler related entities. As a point of clarification, the loans financing the "truck stop," "cabin," and "water treatment plant" projects as referenced in ¶¶ 44-48 of Plaintiff's Complaint were part of the Butler-related loan concentration identified in the attached November 7, 2008 letter. The "marina" loan as referenced in Plaintiff's Complaint was unrelated to Danny Butler. During the next regulatory audit, which I believe occurred in early 2009, the regulators would have had access to our November 7, 2008 correspondence and all of our workpapers, as Alabama One asked for our workpapers (which includes our November 7, 2008 letter as the very

first item) to be on-site during any regulatory audit. It is customary for the regulatory auditors to focus on any areas of concern noted by Hutto & Carver, and I believe that the regulators began direct oversight of the Danny Butler loan concentration as early as March 2009 due in part to the issue being flagged by Hutto & Carver.

8. In performing its work, Hutto & Carver has access to sensitive customer information as well as sensitive credit union information. Hutto & Carver understands that information it receives is confidential, and it undertakes to ensure that the information remains confidential. If loan information is disseminated to people outside of the credit union, that information could be used to harm the credit union and negatively affect its performance. Likewise, if private information of a credit union member is improperly publicly disseminated, that could affect the credit union's relationship with that member, and could affect the credit union's reputation in the community at large.

9. In my opinion, one of the most sensitive areas of a credit union is how it treats non-performing loans, as those loans are at risk of default, and the credit union needs to mitigate and diminish the amount of loss it expects to take. However, the credit union is obligated to realistically account for the likely amount of losses that are expected, which is known in the industry as the "allowance for loan loss" or the "ALLL". If any debtor were to know that the credit union had already planned to not recover the full balance of the loan, the credit union's ability to recapture the indebtedness would, in my opinion, be significantly compromised. Hutto and Carver's workpapers for the Alabama One Credit Union contains this information, and for it to be disclosed publicly (or even to the lawyers and parties in this case) could damage the Alabama One Credit Union. Likewise, Hutto & Carvers' workpapers contain information relating to member loans and the rates

PD.20115712.1

of interest and other terms established on those loans. Should that information be disseminated outside of the credit union, that information could damage member relations for exposing what is generally considered private information (not to mention problems with trust for those that did not obtain as favorable an interest rate as other, similar, members). That the Alabama One Credit Union's lawyers want this information produced in discovery to the parties and attorneys in this case violates my understanding of management's duties to maintain and protect the assets of the Alabama One Credit Union.

10. As it relates to the loan concentration with Danny Butler, where real estate/development loans were involved, Hutto & Carver reviewed the corresponding appraisals for those properties to determine if the collateral value exceeded the loan obligation (if the collateral value was ever below the loan value, the ALLL would need to be adjusted accordingly). At no time was Hutto & Carver aware of any fraud concerning the appraisals for the Danny Butler real property/development loans.

Further, the affiant sayeth not.

_Harold S. Hutto, Jr._
HAROLD S. HUTTO, JR.

STATE OF _Florida_

COUNTY OF _Escambia_

- 4 -

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that HAROLD S. HUTTO, JR., whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the foregoing instrument, he executed the same voluntarily.

Given under my hand and seal this the 22nd day of September , 2016.

JAMIE PEADEN
MY COMMISSION # FF112234
EXPIRES: July 01, 2018

NOTARY PUBLIC
My Commission Expires: 7/1/18

- 5 -



# HUTTO CARVER, P.A.

*CERTIFIED PUBLIC ACCOUNTANTS*

400 East Government Street, Suite 110
Pensacola, Florida 32502



ENGAGEMENT LETTER

August 24, 2006

To the Supervisory Committee of
The Credit Union of Alabama FCU

This letter will confirm our understanding of the services we will provide to The Credit Union of Alabama FCU (Credit Union) for the three audit years ending September 30, 2006, 2007, and 2008.

Our firm shall audit the statements of financial condition of the Credit Union as of September 30, 2006 (2007 and 2008), and the related statements of income, changes in members' equity, and cash flows for the years then ended. The objective of our audits is the expression of an opinion as to whether the Credit Union's financial statements are fairly presented, in all material respects, in conformity with accounting principles generally accepted in the United States of America. Our audits will be conducted in accordance with United States generally accepted auditing standards and will include tests of accounting records and other procedures we consider necessary to enable us to express such an opinion. If our opinion is other than unqualified, we will discuss the reasons with the Supervisory Committee in advance. If, for any reason, we are unable to complete the audits or unable to express an opinion; we may decline to express an opinion or may not issue a report as a result of this engagement.

Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, consideration of the allowance for loan losses and other estimates made by management, and direct confirmation of loans, deposits, investments, and certain other assets and liabilities by correspondence with selected members, creditors, safekeeping agents, and correspondent institutions. Certain audit procedures, such as direct verification of loans and deposits, may be on an unannounced basis. We will also request written representations from the Credit Union's attorneys as part of the engagement, and they may bill the Credit Union for responding to this inquiry. At the conclusion of our audits, we will require certain written representations from management about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audits will involve judgement about the number of transactions to be examined and the areas to be tested. Also, we will plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the Credit Union or to acts by management or employees acting on behalf of the Credit Union.

Because an audit is designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform you of any material errors that come to our attention, and we will inform you of any fraudulent financial reporting or misappropriation of assets that comes to our attention. We will also inform you of any other violations of laws or governmental regulations that comes to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audits and does not extend to any later periods for which we are not engaged as auditors.

Supervisory Committee
Page 2

Our audits will include obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed. An audit is not designed to provide assurance on internal control or to identify internal control exceptions or reportable conditions, that is, significant deficiencies in the design or operation of internal control. However, if during the audits, we become aware of such reportable conditions or ways that we believe management practices can be improved, we will communicate these to the Supervisory Committee in a separate letter.

You are responsible for establishing and maintaining internal controls, including monitoring ongoing activities; for the selection and application of accounting principles; and for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U. S. generally accepted accounting principles. As part of our engagement we may propose standard, adjusting, or correcting journal entries to you financial statements. You are responsible for reviewing the entries and understanding the nature of any proposed entries and the impact they have on the financial statements. Further, you are responsible for designating a qualified management level individual to be responsible and accountable for overseeing these services.

You are responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. Your responsibilities include adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

You are responsible for the design and implementation of programs and controls to prevent and detect fraud and for informing us about all known or suspected fraud affecting the institution involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements. Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the institution received in communications from employees, former employees, regulators, or others. In addition, you are also responsible for identifying and ensuring that the financial institution complies with applicable laws and regulations.

We understand that your employees will prepare all cash, loans receivable, deposit, and other confirmation we request and will locate any loan documents and support for other transactions selected by us for testing.

In accordance with regulatory requirements, we, as your auditors, are required to make the following commitments:

1.   We will deliver final audit reports no later than the last day of December of the audit year. Those reports shall include the auditor's report and accompanying financial statements, internal control exceptions or reportable conditions noted during the engagement, and any fraud or illegal acts noted during the engagement.

2.   The audit workpapers are the property of Hutto & Carver, P.A. and constitute confidential information, as required by Section ET301 of the AICPA Code of Professional Conduct. However, we will provide the National Credit Union Administration examiners with access to all of our original workpapers that are the basis of our opinion on the financial statements. The NCUA may intend, or decide, to distribute the copies or information contained therein to others, including other governmental agencies.

3.   Additionally, this engagement is an opinion audit that fulfills the requirements of a complete supervisory committee audit.

4.   The engagement workpapers will be retained for at least three years from the date of the report.

Supervisory Committee
Page 3

The information that we obtain in auditing is confidential, as required by Section ET301 of the AICPA Code of Professional Conduct. Therefore, your acceptance of this engagement letter will serve as your advance consent to our compliance with above commitments.

If the Credit Union plans any reproduction or publication of our reports, or any portion of them, copies of master or printer's proofs of the entire document should be submitted to us in sufficient time for the firm's review and approval.

We will be pleased, at your request, to attend any Supervisory Committee and Board of Director's meetings. We would also like to meet with you and other executives of the Credit Union at various times throughout each year to discuss current accounting and auditing matters affecting your Credit Union. Whenever you feel such a meeting would be desirable, please let us know.

The fee for the audit year ending September 30, 2006, will not exceed $17,200, excluding costs associated with the confirmation process. The fees for the audit years ending September 30, 2007 and 2008, will not exceed $18,500 per year excluding costs associated with the confirmation process. The costs associated with the confirmation process will be capped at $1,000. The Credit Union agrees to pay all postage, printing, and other costs associated with the circularization and confirmation of member accounts and other Credit Union accounts requiring verification as determined necessary by the firm and/or required by auditing standards generally accepted in the United States of America. In the event circumstances arise which will materially affect these amounts, we will notify you immediately in order that all parties can arrive at a mutually agreed upon adjustment. In no event will this approximation be adjusted without mutual agreement. The firm will render invoices as work progresses. **The Supervisory Committee may terminate this contract at any time if it chooses to do so.**

We believe the foregoing correctly sets forth our understanding, but if you have any questions, please let us know. If you find the arrangements acceptable, please acknowledge your agreement by signing and returning to the firm one of the copies enclosed.

It is a pleasure for us to be of service to you and your Credit Union.

Very truly yours,

*Hutto & Carver, P.a.*

Hutto & Carver, P.A.

Acknowledge:

_Walloa H Luncoste_                    _8-29-06_
Chairman, Supervisory Committee        Date



# HUTTO CARVER, P.A.

*CERTIFIED PUBLIC ACCOUNTANTS*

200 East Government Street, Suite 110
Pensacola, Florida 32502

ENGAGEMENT LETTER

June 29, 2009

To the Supervisory Committee of
Alabama One Credit Union

This letter will confirm our understanding of the services we will provide to Alabama One Credit Union (the Credit Union) for the three audit years ending September 30, 2009, 2010, and 2011.

Our firm shall audit the statements of financial condition of the Credit Union as of September 30, 2009 (2010 and 2011), and the related statements of income, changes in members' equity, and cash flows for the years then ended. The objective of our audits is the expression of an opinion as to whether the Credit Union's financial statements are fairly presented, in all material respects, in conformity with accounting principles generally accepted in the United States of America. Our audits will be conducted in accordance with United States generally accepted auditing standards and will include tests of accounting records and other procedures we consider necessary to enable us to express such an opinion. If our opinion is other than unqualified, we will discuss the reasons with the Supervisory Committee in advance. If, for any reason, we are unable to complete the audits or unable to express an opinion, we may decline to express an opinion or may not issue a report as a result of this engagement.

Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, consideration of the allowance for loan losses and other estimates made by management, and direct confirmation of loans, deposits, investments, and certain other assets and liabilities by correspondence with selected members, creditors, safekeeping agents, and correspondent institutions. Certain audit procedures, such as direct verification of loans and deposits, may be on an unannounced basis. We will also request written representations from the Credit Union's attorneys as part of the engagement, and they may bill the Credit Union for responding to this inquiry. At the conclusion of our audits, we will require certain written representations from management about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audits will involve judgement about the number of transactions to be examined and the areas to be tested. Also, we will plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the Credit Union or to acts by management or employees acting on behalf of the Credit Union.

Because an audit is designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform you of any material errors that come to our attention, and we will inform you of any fraudulent financial reporting or misappropriation of assets that comes to our attention. We will also inform you of any other violations of laws or governmental regulations that comes to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audits and does not extend to any later periods for which we are not engaged as auditors.

Our audits will include obtaining an understanding of the entity and its environment, including internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures. An audit is not designed to provide assurance on internal control or to identify deficiencies in internal control. However, during the audit, we will communicate to you internal control-related matters that are required to be communicated under professional standards.

phone: 850.438.6299   fax: 850.469.8071   toll free: 800.316.3057   e-mail: huttoandcarver@bellsouth.net

Hutto & Carver-000001

Supervisory Committee
Page 2

You are responsible for establishing and maintaining internal controls, including monitoring ongoing activities, for the selection and application of accounting principles, and for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U. S. generally accepted accounting principles. You are also responsible for management decisions and functions, for designating an individual with suitable skill, knowledge, or experience to oversee the tax services and any other non attest services we provide, and for evaluating the adequacy and results of those services and accepting responsibility for them.

You are responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. Your responsibilities include adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

You are responsible for the design and implementation of programs and controls to prevent and detect fraud and for informing us about all known or suspected fraud affecting the institution involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements. Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the institution received in communications from employees, former employees, regulators, or others. In addition, you are also responsible for identifying and ensuring that the financial institution complies with applicable laws and regulations.

We understand that your employees will prepare all cash, loans receivable, deposit and other confirmation we request and will locate any loan documents and support for other transactions selected by us for testing.

In accordance with regulatory requirements, we, as your auditors, are required to make the following commitments:

1.  We will deliver final audit reports no later than the last day of December of the audit year. Those reports shall include the auditor's report and accompanying financial statements, internal control exceptions or reportable conditions noted during the engagement, and any fraud or illegal acts noted during the engagement.

2.  The audit workpapers are the property of Hutto & Carver, P.A. and constitute confidential information, as required by Section ET301 of the AICPA Code of Professional Conduct. However, we will provide the National Credit Union Administration examiners with access to all of our original workpapers that are the basis of our opinion on the financial statements. If requested, access to such audit documentation will be provided under the supervision of Hutto & Carver, P.A. personnel. Furthermore, upon request, we may provide copies of audit documentation to the NCUA. The NCUA may intend, or decide, to distribute the copies or information contained therein to others, including other governmental agencies.

3.  Additionally, this engagement is an opinion audit that fulfills the requirements of a complete supervisory committee audit.

4.  The engagement workpapers will be retained for at least five years from the date of the report.

The information that we obtain in auditing is confidential, as required by Section ET301 of the AICPA Code of Professional Conduct. Therefore, your acceptance of this engagement letter will serve as your advance consent to our compliance with above commitments.

If the Credit Union plans any reproduction or publication of our reports, or any portion of them, copies of master or printer's proofs of the entire document should be submitted to us in sufficient time for the firm's review and approval.

We will be pleased, at your request, to attend any Supervisory Committee and Board of Director's meetings. We would also like to meet with you and other executives of the Credit Union at various times throughout each year to discuss current accounting and

Supervisory Committee
Page 3

auditing matters affecting your Credit Union. Whenever you feel such a meeting would be desirable, please let us know.

The fee for the audit year ending September 30, 2009, will not exceed $25,500 per year, excluding costs associated with the confirmation process. The fees for the audit years ending September 30, 2010 and 2011, will not exceed $23,000 per year excluding costs associated with the confirmation process. The costs associated with the confirmation process will be capped at $1,500. The Credit Union agrees to pay all postage, printing, and other costs associated with the circularization and confirmation of member accounts and other Credit Union accounts requiring verification as determined necessary by the firm and/or required by auditing standards generally accepted in the United States of America. The fee estimate is based on anticipated cooperation from your personnel and the assumption that unexpected circumstances will not be encountered during the audit. In the event circumstances arise which will materially affect these amounts, we will notify you immediately in order that all parties can arrive at a mutually agreed upon adjustment. In no event will this approximation be adjusted without mutual agreement. The firm will render invoices as work progresses. **The Supervisory Committee may terminate this contract at any time if it chooses to do so.**

We believe the foregoing correctly sets forth our understanding, but if you have any questions, please let us know. If you find the arrangements acceptable, please acknowledge your agreement by signing and returning to the firm one of the copies enclosed.

It is a pleasure for us to be of service to you and your Credit Union.

Very truly yours,

*Hutto & Carver, P.A.*

Hutto & Carver, P.A.

This letter correctly sets forth the understanding of Alabama One Credit Union.

_____          6/30/09
Chairman, Supervisory Committee           Date

Hutto & Carver-000003

12.01



## HUTTO CARVER, P.A.

*CERTIFIED PUBLIC ACCOUNTANTS*

200 East Government Street, Suite 110
Pensacola, Florida 32502

<u>SEPTEMBER 30, 2012, 2013, AND 2014
AUDIT ENGAGEMENT LETTER</u>

July 12, 2012

To the Supervisory Committee of
Alabama One Credit Union

This letter will confirm our understanding of the services we will provide to Alabama One Credit Union (the Credit Union) for the three audit years ending September 30, 2012, 2013, and 2014. Our firm will audit the statements of financial condition of the Credit Union as of September 30, 2012 (2013 and 2014), and the related statements of income, changes in members' equity, and cash flows for the years then ended.

**AUDIT OBJECTIVES**
The objective of our audits is the expression of an opinion as to whether the Credit Union's financial statements are fairly presented, in all material respects, in conformity with accounting principles generally accepted in the United States of America. Our audits will be conducted in accordance with audit standards generally accepted in the United States of America and will include tests of accounting records and other procedures we consider necessary to enable us to express such an opinion. If our opinion is other than unqualified, we will discuss the reasons with the Supervisory Committee in advance. If, for any reason, we are unable to complete the audits or unable to express an opinion, we may decline to express an opinion or may not issue a report as a result of this engagement.

**AUDIT PROCEDURES**
Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, consideration of the allowance for loan losses and other estimates made by management, and direct confirmation of loans, deposits, investments, and certain other assets and liabilities by correspondence with selected members, creditors, safekeeping agents, and correspondent institutions. Certain audit procedures, such as direct verification of loans and deposits, may be on an unannounced basis. We will also request written representations from the Credit Union's attorneys as part of the engagement, and they may bill the Credit Union for responding to this inquiry. At the conclusion of our audits, we will require certain written representations from management about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audits will involve judgement about the number of transactions to be examined and the areas to be tested. We will plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the Credit Union or to acts by management or employees acting on behalf of the Credit Union.

Because an audit is designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform you of any material errors that come to our attention, and we will inform you of any fraudulent financial statements.

phone: 850.438.5299  •  fax: 850.469.8071  •  toll free: 800.316.3057  •  e-mail: officemanager@huttocarvercpa.com

12

Hutto & Carver-000004

Supervisory Committee
Page 2

financial reporting or misappropriation of assets that comes to our attention. We will also inform you of any other violations of laws or governmental regulations that come to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audits and does not extend to any later periods for which we are not engaged as auditors.

Our audits will include obtaining an understanding of the entity and its environment, including internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures. An audit is not designed to provide assurance on internal control or to identify deficiencies in internal control. However, during the audit, we will communicate to you and those charged with governance internal control related matters that are required to be communicated under professional standards.

We may from time to time, and depending on the circumstances, use third-party service providers. We understand the need for confidentiality of your records and information and the privacy of the information within your data system. We remain committed to maintaining the confidentiality and security of your information, and agree to take all steps reasonably necessary to prevent the unauthorized disclosure or use of this information. Accordingly, we maintain internal policies, procedures, and safeguards to protect confidentiality. Furthermore, we will remain responsible for the work provided by any such third-party service providers.

## MANAGEMENT RESPONSIBILITIES

You are responsible for making all management decisions and performing all management functions; for designating an individual with suitable skill, knowledge, or experience to oversee all tax services and any other nonattest services we provide; and for evaluating the adequacy and results of those services and accepting responsibility for them.

 are responsible for establishing and maintaining internal controls, including monitoring ongoing activities; for the selection and application of accounting principles; and for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U.S. generally accepted accounting principles. You are also responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. Your responsibilities include adjusting the financial statements to correct any material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

You are responsible for the design and implementation of programs and controls to prevent and detect fraud and for informing us about all known or suspected fraud affecting the institution involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements. Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the institution received in communications from employees, former employees, regulators, or others. In addition, you are also responsible for identifying and ensuring that the financial institution complies with applicable laws and regulations.

## ENGAGEMENT ADMINISTRATION, FEES, AND OTHER

We understand that your employees will prepare all cash, loans receivable, deposit, and other confirmation we request and will locate any loan documents and support for other transactions selected by us for testing.

In accordance with regulatory requirements, we, as your auditors, are required to make the following commitments:

1.   We will deliver final audit reports no later than the last day of January of the audit year. Those reports shall include the auditor's report and accompanying financial statements, internal control exceptions or reportable

Hutto & Carver-000005

Supervisory Committee
Page 3

conditions noted during the engagement, and any fraud or illegal acts noted during the engagement.

2.  The audit documentation for this engagement is the property of Hutto & Carver, P.A. and constitute confidential information, as required by Section ET301 of the AICPA Code of Professional Conduct. However, we will provide your regulators with access to all of our original workpapers that are the basis of our opinion on the financial statements. If requested, access to such audit documentation will be provided under the supervision of Hutto & Carver, P.A. personnel. Furthermore, upon request, we may provide copies of audit documentation to your regulators. Your regulators may intend, or decide, to distribute the copies or information contained therein to others, including other governmental agencies.

3.  Additionally, this engagement is an opinion audit that fulfills the requirements of a complete supervisory committee audit.

4.  The engagement workpapers will be retained for at least five years from the date of the report.

The information that we obtain in auditing is confidential, as required by Section ET301 of the AICPA Code of Professional Conduct. Therefore, your acceptance of this engagement letter will serve as your advance consent to our compliance with above commitments.

If the Credit Union plans any reproduction or publication of our reports, or any portion of them, copies of master or printer's proofs of the entire document should be submitted to us in sufficient time for the firm's review and approval.

We will be pleased, at your request, to attend any Supervisory Committee and Board of Director's meetings. We would also like to meet with and other executives of the Credit Union at various times throughout each year to discuss current accounting and auditing matters affecting your Credit Union. Whenever you feel such a meeting would be desirable, please let us know.

The fees for the fiscal audit years ending September 30, 2012, 2013, and 2014 will not exceed $26,500 per year excluding costs associated with the confirmation process. The costs associated with the confirmation process will be capped at $1,500. The Credit Union agrees to pay all postage, printing, and other costs associated with the circularization and confirmation of member accounts and other Credit Union accounts requiring verification as determined necessary by the firm and/or required by auditing standards generally accepted in the United States of America. The fee estimate is based on anticipated cooperation from your personnel and the assumption that unexpected circumstances will not be encountered during the audit. In the event circumstances arise which will materially affect these amounts, we will notify you immediately in order that all parties can arrive at a mutually agreed upon adjustment. In no event will this approximation be adjusted without mutual agreement. The firm will render invoices as work progresses. The Supervisory Committee may terminate this contract at any time if it chooses to do so.

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us. This letter will continue in effect until cancelled by either party.

It is a pleasure for us to be of service to you and your Credit Union.

Very truly yours,

*Hutto & Carver, P.a.*

Hutto & Carver, P.A.

Hutto & Carver-000006

Supervisory Committee
Page 4

This letter correctly sets forth the understanding of Alabama One Credit Union.

_(signature)_                7/13/12

Chairman, Supervisory Committee        Date

Hutto & Carver-000007

**(   HE CREDIT UNION OF ALABAM.**
**1215 VETERANS MEMORIAL PARKWAY**
**TUSCALOOSA, ALABAMA 35404**

REPRESENTATION LETTER

November 7, 2008

Hutto & Carver, P.A.
200 East Government Street, Suite 110
Pensacola, FL  32502

Dear Sir/Madam:

In connection with your audit of the statements of financial condition of The Credit Union of Alabama as of September 30, 2008 and 2007, and the related statements of income, retained earnings, and cash flows for the years then ended for the purpose of expressing an opinion as to whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of The Credit Union of Alabama in conformity with generally accepted accounting principles, we confirm that we are responsible for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U.S. generally accepted accounting principles.  We are also responsible for adopting sound accounting policies, establishing and maintaining internal control, and preventing and detecting fraud.

Certain representations in this letter are described as being limited to matters that are material.  Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgement of a reasonable person relying on the information would be changed or influenced by the omission or misstatement.

We confirm, to the best of our knowledge and belief the following representations made to you during your audit:

1.  The financial statements referred to above are fairly presented in conformity with U.S. generally accepted accounting principles.

2.  We have made available to you all:

    a.  Financial records and related data.

    b.  Minutes of the meetings of directors and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.

    c.  All regulatory or examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies, including communications about supervisory actions or noncompliance with, or deficiencies in rules and regulations or supervisory actions.

3.  There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices.



EXHIBIT
4-B

Hutto & Carver-000011

Hutto & Carver, P.A.
Page 2

4.  There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.

5.  We believe the effects of the uncorrected financial statement misstatements summarized in the attached schedule are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

6.  We acknowledge our responsibility for the design and implementation of programs and controls to prevent and detect fraud.

7.  We have no knowledge of any fraud or suspected fraud affecting the institution involving:

    a.  Management.

    b.  Employees who have significant roles in internal control.

    c.  Others where the fraud could have material effect on the financial statements.

8.  We have no knowledge of any allegations of fraud or suspected fraud affecting the institution received in communications from employees, former employees, regulators, or others.

9.  The institution has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

10. All of the following have been properly recorded or disclosed in the financial statements as applicable:

    a.  Related party transactions and related amounts receivable or payable, including loans, deposits, sales, purchases, transfers, leasing arrangements, and guarantees.

    b.  Contingent assets and liabilities, including loans charged off and outstanding letters of credit.

    c.  Commitments to originate, purchase, or sell loans and participations.

    d.  Commitments to purchase or sell securities, including commitments to purchase or sell securities under forward-placement, financial-futures contracts, and standby commitments.

    e.  Positions in financial futures contracts or other derivative securities.

    f.  The status of the institution's capital plan filed with regulators.

    g.  Sales of loans or other transfers of financial assets.

    h.  The methods and significant assumptions used result in a measure of fair value appropriate for financial statement measurement and disclosure purposes.

    i.  The following information about financial instruments with concentrations of credit risk has been properly disclosed in the financial statements:

        (1)  The common activity, region, or characteristic that identifies the concentration.

Hutto & Carver-000012

Hutto & Carver, P.A.
Page 3

> (2)   The maximum loss that could result if the counterparties completely failed to perform their obligations and any collateral for the amounts due were worthless to the institution.
>
> (3)   The institution's policy of requiring collateral to minimize the risk, the nature of this collateral, and information about the institution's access to the collateral.

j.   Lease obligations under long-term leases.

k.   Guarantees, whether written or oral, under which the institution is contingently liable.

11.   There are no estimates that may be subject to a material change in the near term that have not been properly disclosed in the financial statements. We understand that near term means the period within one year of the date of the financial statements. In addition, we have no knowledge of concentrations existing at the date of the financial statements that make the institution vulnerable to the risk of severe impact that have not been properly disclosed in the financial statements.

12.   There are no:

a.   Violations or possible violations of laws, regulations, or supervisory actions, whose effect should be considered for disclosure in the financial statements or as a basis for recording a loss contingency.

b.   Unasserted claims or assessments that our lawyer has advised us are probable of assertion and must be disclosed in accordance with Statement of Financial Accounting Standards No. 5.

c.   Other liabilities or gain or loss contingencies that are required to be accrued or disclosed by Statement of Financial Accounting Standards No. 5, including any liabilities resulting from acting in a fiduciary capacity.

13.   The institution has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged or deposited in escrow as security except as made known to you and disclosed in the notes to the financial statements.

14.   We have disclosed to you all of our:

a.   Nonperforming assets.

b.   Intentions to foreclose or repossess property.

15.   If applicable, provision has been made for:

a.   Losses, costs, or expenses that may be incurred in the collection of securities, loans, leases, and real estate.

b.   Losses, costs, or expenses that may be incurred in the disposition of other real estate owned.

c.   Liabilities for interest on deposits and other indebtedness, including subordinated capital notes and participation loans.

d.   Other than temporary declines in the value of investment securities and other investment assets.

Hutto & Carver-000013

Hutto & Carver, P.A.
Page 4

16.   The classification of securities and other investment assets as held-to-maturity, available-for-sale, or trading correctly reflects management's ability and intent.

17.   There are no regulatory examinations currently in progress for which we have not received examination reports.

18.   Related party transactions (including insider loans) have been entered into in compliance with existing regulations.

19.   We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

20.   The methodology for determining fair value disclosures is based on reasonable assumptions.

No events have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment to, or disclosure in, the financial statements.

Signature: _____   Title: Manager/CEO _____

**ALABAMA ONE CREDIT UNION**
**1215 VETERANS MEMORIAL PARKWAY**
**TUSCALOOSA, ALABAMA 35401**

REPRESENTATION LETTER

December 11, 2009

Hutto & Carver, P.A.
200 East Government Street, Suite 110
Pensacola, FL 32502

Dear Sir/Madam:

In connection with your audit of the statements of financial condition of Alabama One Credit Union as of September 30, 2009 and 2008, and the related statements of income, retained earnings, and cash flows for the years then ended for the purpose of expressing an opinion as to whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the Credit Union in conformity with generally accepted accounting principles, we confirm that we are responsible for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U.S. generally accepted accounting principles. We are also responsible for adopting sound accounting policies, establishing and maintaining internal control, and preventing and detecting fraud.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgement of a reasonable person relying on the information would be changed or influenced by the omission or misstatement.

We confirm, to the best of our knowledge and belief the following representations made to you during your audit:

1.  The financial statements referred to above are fairly presented in conformity with U.S. generally accepted accounting principles.

2.  We have made available to you all:

    a.  Financial records and related data.

    b.  Minutes of the meetings of directors and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.

    c.  All regulatory or examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies, including communications about supervisory actions or noncompliance with, or deficiencies in rules and regulations or supervisory actions.

3.  There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices.

Hutto & Carver-000015

Hutto & Carver, P.A.
Page 3

     (2)    The maximum loss that could result if the counterparties completely failed to perform their obligations and any collateral for the amounts due were worthless to the institution.

     (3)    The institution's policy of requiring collateral to minimize the risk, the nature of this collateral, and information about the institution's access to the collateral.

    j.    Lease obligations under long-term leases.

    k.    Guarantees, whether written or oral, under which the institution is contingently liable.

11.    There are no estimates that may be subject to a material change in the near term that have not been properly disclosed in the financial statements. We understand that near term means the period within one year of the date of the financial statements. In addition, we have no knowledge of concentrations existing at the date of the financial statements that make the institution vulnerable to the risk of severe impact that have not been properly disclosed in the financial statements.

12.    There are no:

    a.    Violations or possible violations of laws, regulations, or supervisory actions, whose effect should be considered for disclosure in the financial statements or as a basis for recording a loss contingency.

    b.    Unasserted claims or assessments that our lawyer has advised us are probable of assertion and must be disclosed in accordance with Statement of Financial Accounting Standards No. 5.

    c.    Other liabilities or gain or loss contingencies that are required to be accrued or disclosed by Statement of Financial Accounting Standards No. 5, including any liabilities resulting from acting in a fiduciary capacity.

13.    The institution has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged or deposited in escrow as security except as made known to you and disclosed in the notes to the financial statements.

14.    We have disclosed to you all of our:

    a.    Nonperforming assets.

    b.    Intentions to foreclose or repossess property.

15.    If applicable, provision has been made for:

    a.    Losses, costs, or expenses that may be incurred in the collection of securities, loans, leases, and real estate.

    b.    Losses, costs, or expenses that may be incurred in the disposition of other real estate owned.

    c.    Liabilities for interest on deposits and other indebtedness, including subordinated capital notes and participation loans.

    d.    Other than temporary declines in the value of investment securities and other investment assets.

Hutto & Carver-000016

Hutto & Carver, P.A.
Page 4

16.     The classification of securities and other investment assets as held-to-maturity, available-for-sale, or trading correctly reflects management's ability and intent.

17.     There are no regulatory examinations currently in progress for which we have not received examination reports.

18.     Related party transactions (including insider loans) have been entered into in compliance with existing regulations.

19.     We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

20.     The methodology for determining fair value disclosures is based on reasonable assumptions.

No events have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment to, or disclosure in, the financial statements.

Signature: _____          Title: Manager + CEO _____

ALABAMA ONE CREDIT UNION

1216 VETERANS MEMORIAL PARKWAY

TUSCALOOSA, ALABAMA  35401

March 11, 2010

Hutto & Carver, P.A.

200 East Government Street, Suite 110

Pensacola, FL  32502

In connection with your audit of the balance sheet of Alabama One Credit Union as of September 30, 2009, and the related statements of income, retained earnings and cash flows for the period then ended for the purpose of expressing an opinion as to whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of Alabama One Credit Union in conformity with U.S. generally accepted accounting principles, you were previously provided with a representation letter dated December 11, 2009. No information has come to my attention that would cause me to believe that any of those previous representations should be modified.

No events have occurred subsequent to September 30, 2009, and through the date of this letter that would require adjustment to or disclosure in the financial statements.

Signature: _____

Title: Manager and CEO

AFI-CL-3.3

**ALABAMA ONE CREDIT UNION**
**1215 VETERANS MEMORIAL PARKWAY**
**TUSCALOOSA, ALABAMA  35404**


REPRESENTATION LETTER


December 17, 2010


Hutto & Carver, P.A.
200 East Government Street, Suite 110
Pensacola, FL  32502

Dear Sir/Madam:

In connection with your audit of the statements of financial condition of Alabama One Credit Union as of September 30, 2010 and 2009, and the related statements of income, retained earnings, and cash flows for the years then ended for the purpose of expressing an opinion as to whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of Alabama One Credit Union in conformity with generally accepted accounting principles, we confirm that we are responsible for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U.S. generally accepted accounting principles. We are also responsible for adopting sound accounting policies, establishing and maintaining internal control, and preventing and detecting fraud.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgement of a reasonable person relying on the information would be changed or influenced by the omission or misstatement.

We confirm, to the best of our knowledge and belief the following representations made to you during your audit:

1.   The financial statements referred to above are fairly presented in conformity with U.S. generally accepted accounting principles.

2.   We have made available to you all:

   a.   Financial records and related data.

   b.   Minutes of the meetings of directors and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.

   c.   All regulatory or examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies, including communications about supervisory actions or noncompliance with, or deficiencies in rules and regulations or supervisory actions.

3.   There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices.

Hutto & Carver-000019

Hutto & Carver, P.A.
Page 2

4.   There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.

5.   We believe the effects of the uncorrected financial statement misstatements summarized in the attached schedule are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

6.   We acknowledge our responsibility for the design and implementation of programs and controls to prevent and detect fraud.

7.   We have no knowledge of any fraud or suspected fraud affecting the institution involving:

   a.   Management.

   b.   Employees who have significant roles in internal control.

   c.   Others where the fraud could have material effect on the financial statements.

8.   We have no knowledge of any allegations of fraud or suspected fraud affecting the institution received in communications from employees, former employees, regulators, or others.

9.   The institution has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

10.  All of the following have been properly recorded or disclosed in the financial statements as applicable:

   a.   Related party transactions and related amounts receivable or payable, including loans, deposits, sales, purchases, transfers, leasing arrangements, and guarantees.

   b.   Contingent assets and liabilities, including loans charged off and outstanding letters of credit.

   c.   Commitments to originate, purchase, or sell loans and participations.

   d.   Commitments to purchase or sell securities, including commitments to purchase or sell securities under forward-placement, financial-futures contracts, and standby commitments.

   e.   Positions in financial futures contracts or other derivative securities.

   f.   The status of the institution's capital plan filed with regulators.

   g.   Sales of loans or other transfers of financial assets.

   h.   The methods and significant assumptions used result in a measure of fair value appropriate for financial statement measurement and disclosure purposes.

   i.   The following information about financial instruments with concentrations of credit risk has been properly disclosed in the financial statements:

      (1)   The common activity, region, or characteristic that identifies the concentration.

Hutto & Carver-000020

Hutto & Carver, P.A.
Page 3

     (2)    The maximum loss that could result if the counterparties completely failed to perform their obligations and any collateral for the amounts due were worthless to the institution.

     (3)    The institution's policy of requiring collateral to minimize the risk, the nature of this collateral, and information about the institution's access to the collateral.

    j.    Lease obligations under long-term leases.

    k.    Guarantees, whether written or oral, under which the institution is contingently liable.

11.    There are no estimates that may be subject to a material change in the near term that have not been properly disclosed in the financial statements. We understand that near term means the period within one year of the date of the financial statements. In addition, we have no knowledge of concentrations existing at the date of the financial statements that make the institution vulnerable to the risk of severe impact that have not been properly disclosed in the financial statements.

12.    There are no:

    a.    Violations or possible violations of laws, regulations, or supervisory actions, whose effect should be considered for disclosure in the financial statements or as a basis for recording a loss contingency.

    b.    Unasserted claims or assessments that our lawyer has advised us are probable of assertion and must be disclosed in accordance with Statement of Financial Accounting Standards No. 5.

    c.    Other liabilities or gain or loss contingencies that are required to be accrued or disclosed by Statement of Financial Accounting Standards No. 5, including any liabilities resulting from acting in a fiduciary capacity.

13.    The institution has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged or deposited in escrow as security except as made known to you and disclosed in the notes to the financial statements.

14.    We have disclosed to you all of our:

    a.    Nonperforming assets.

    b.    Intentions to foreclose or repossess property.

15.    If applicable, provision has been made for:

    a.    Losses, costs, or expenses that may be incurred in the collection of securities, loans, leases, and real estate.

    b.    Losses, costs, or expenses that may be incurred in the disposition of other real estate owned.

    c.    Liabilities for interest on deposits and other indebtedness, including subordinated capital notes and participation loans.

    d.    Other than temporary declines in the value of investment securities and other investment assets.

Hutto & Carver-000021

Hutto & Carver, P.A.
Page 4

16. The classification of securities and other investment assets as held-to-maturity, available-for-sale, or trading correctly reflects management's ability and intent.

17. There are no regulatory examinations currently in progress for which we have not received examination reports.

18. Related party transactions (including insider loans) have been entered into in compliance with existing regulations.

19. We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

20. The methodology for determining fair value disclosures is based on reasonable assumptions.

21. In regards to the preparation of the Federal Forms 990 and 990-T and Alabama Excise Tax Return, performed by you, we have:

    a. Made all management decisions and performed all management functions.

    b. Designated an individual with suitable skill, knowledge, or experience to oversee the services.

    c. Evaluated the adequacy and results of the services performed.

    d. Accepted responsibility for the results of the services.

    e. Established and maintained internal controls, including monitoring ongoing activities.

No events have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment to, or disclosure in, the financial statements.

Signature: _John Dee Carruth_   Title: _Manager and CEO_

**ALABAMA ONE CREDIT UNION
1215 VETERANS MEMORIAL PARKWAY
TUSCALOOSA, ALABAMA 35404**

REPRESENTATION LETTER

December 16, 2011

Hutto & Carver, P.A.
200 East Government Street, Suite 110
Pensacola, FL 32502

Dear Sir/Madam:

In connection with your audit of the statements of financial condition of Alabama One Credit Union as of September 30, 2011 and 2010, and the related statements of income, retained earnings, and cash flows for the years then ended for the purpose of expressing an opinion as to whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of Alabama One Credit Union in conformity with generally accepted accounting principles, we confirm that we are responsible for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U.S. generally accepted accounting principles. We are also responsible for adopting sound accounting policies, establishing and maintaining internal control, and preventing and detecting fraud.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgement of a reasonable person relying on the information would be changed or influenced by the omission or misstatement.

We confirm, to the best of our knowledge and belief the following representations made to you during your audit:

1.   The financial statements referred to above are fairly presented in conformity with U.S. generally accepted accounting principles.

2.   We have made available to you all:

   a.   Financial records and related data.

   b.   Minutes of the meetings of directors and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.

   c.   All regulatory or examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies, including communications about supervisory actions or noncompliance with, or deficiencies in rules and regulations or supervisory actions.

3.   There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices.

Hutto & Carver, P.A.
Page 2

4.   There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.

5.   We believe the effects of the uncorrected financial statement misstatements summarized in the attached schedule are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

6.   We acknowledge our responsibility for the design and implementation of programs and controls to prevent and detect fraud.

7.   We have no knowledge of any fraud or suspected fraud affecting the institution involving:

   a.   Management.

   b.   Employees who have significant roles in internal control.

   c.   Others where the fraud could have material effect on the financial statements.

8.   We have no knowledge of any allegations of fraud or suspected fraud affecting the institution received in communications from

Hutto & Carver-000023

employees, former employees, regulators, or others.

9. The institution has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

10. All of the following have been properly recorded or disclosed in the financial statements as applicable:

    a. Related party transactions and related amounts receivable or payable, including loans, deposits, sales, purchases, transfers, leasing arrangements, and guarantees.

    b. Contingent assets and liabilities, including loans charged off and outstanding letters of credit.

    c. Commitments to originate, purchase, or sell loans and participations.

    d. Commitments to purchase or sell securities, including commitments to purchase or sell securities under forward-placement, financial-futures contracts, and standby commitments.

    e. Positions in financial futures contracts or other derivative securities.

    f. The status of the institution's capital plan filed with regulators.

    g. Sales of loans or other transfers of financial assets.

    h. The methods and significant assumptions used result in a measure of fair value appropriate for financial statement measurement and disclosure purposes.

    i. The following information about financial instruments with concentrations of credit risk has been properly disclosed in the financial statements:

        (1) The common activity, region, or characteristic that identifies the concentration.

Hutto & Carver, P.A.
Page 3

        (2) The maximum loss that could result if the counterparties completely failed to perform their obligations and any collateral for the amounts due were worthless to the institution.

        (3) The institution's policy of requiring collateral to minimize the risk, the nature of this collateral, and information about the institution's access to the collateral.

    j. Lease obligations under long-term leases.

    k. Guarantees, whether written or oral, under which the institution is contingently liable.

    l. Significant estimates and material concentrations known to management that are required to be disclosed in accordance with *FASB Accounting Standards Codification 275, Risk and Uncertainties.*

11. There are no estimates that may be subject to a material change in the near term that have not been properly disclosed in the financial statements. We understand that near term means the period within one year of the date of the financial statements. In addition, we have no knowledge of concentrations existing at the date of the financial statements that make the institution vulnerable to the risk of severe impact that have not been properly disclosed in the financial statements.

12. There are no:

    a. Violations or possible violations of laws, regulations, or supervisory actions, whose effect should be considered for disclosure in the financial statements or as a basis for recording a loss contingency.

    b. Unasserted claims or assessments that our lawyer has advised us are probable of assertion and must be disclosed in accordance with FASB ASC 450, *Contingencies,* (formerly Statement of Financial Accounting Standards No. 5).

    c. Other liabilities or gain or loss contingencies that are required to be accrued or disclosed by FASB ASC 450, *Contingencies,* (formerly Statement of Financial Accounting Standards No. 5), including any liabilities resulting from acting in a fiduciary capacity.

13. The institution has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged or deposited in escrow as security except as made known to you and disclosed in the notes to the financial statements.

14. We have disclosed to you all of our:

    a. Nonperforming assets.

Hutto & Carver-000024

      b.      Intentions to foreclose or repossess property.

15.    If applicable, provision has been made for:

      a.      Losses, costs, or expenses that may be incurred in the collection of securities, loans, leases, and real estate.

      b.      Losses, costs, or expenses that may be incurred in the disposition of other real estate owned.

Hutto & Carver, P.A.
Page 4

      c.      Liabilities for interest on deposits and other indebtedness, including subordinated capital notes and participation loans.

      d.      Other than temporary declines in the value of investment securities and other investment assets.

16.    We agree with the findings of appraisers used and have adequately considered the qualifications of the appraisers in determining the amounts and disclosures in the financial statements and underlying accounting records. We did not give or cause any instructions to be given to appraisers regarding the values or amounts derived in an attempt to bias their work, and we are not otherwise aware of any matters that have had an impact on the independence or objectivity of the appraisers.

17.    The classification of securities and other investment assets as held-to-maturity, available-for-sale, or trading correctly reflects management's ability and intent.

18.    There are no regulatory examinations currently in progress for which we have not received examination reports.

19.    Related party transactions (including insider loans) have been entered into in compliance with existing regulations.

20.    We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

21.    The methodology for determining fair value disclosures is based on reasonable assumptions.

22.    In regards to the preparation of the Federal Forms 990 and 990T, as well as the Alabama Excise (ET-1) tax returns, performed by you, we have:

      a.      Made all management decisions and performed all management functions.

      b.      Designated an individual with suitable skill, knowledge, or experience to oversee the services.

      c.      Evaluated the adequacy and results of the services performed.

      d.      Accepted responsibility for the results of the services.

      e.      Internal controls, including monitoring ongoing activities.

No events have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment to, or disclosure in, the financial statements.

Signature: _____    Title: Manager / CEO

**ALABAMA ONE CREDIT UNION**
**1215 VETERANS MEMORIAL PARKWAY**
**TUSCALOOSA, ALABAMA 35404**

Management Representation Letter

March 1, 2013

Hutto & Carver, P.A.
200 E. Government Street, Suite 110
Pensacola, FL 32502

This representation letter is provided in connection with your audit of the financial statements of Alabama One Credit Union and its subsidiaries, which comprise the statements of financial condition as of September 30, 2012, and 2011, and the related statements of income, changes in members' equity, and cash flows for the fiscal years then ended, and the related notes to the financial statements, for the purpose of expressing an opinion as to whether the financial statements are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States (U.S. GAAP).

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement. An omission or misstatement that is monetarily small in amount could be considered material as a result of qualitative factors.

We confirm, to the best of our knowledge and belief, as of March 1, 2013, the following representations made to you during your audit.

**Financial Statements**

- We have fulfilled our responsibilities, as set out in the terms of the audit engagement letter dated July 12, 2012.
- The financial statements referred to above are fairly presented in conformity with U.S. generally accepted accounting principles.
- We acknowledge our responsibility for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.
- We acknowledge our responsibility for the design, implementation, and maintenance of internal control to prevent and detect fraud.
- Significant assumptions we used in making accounting estimates, including those measured at fair value, are reasonable.
- Related party relationships and transactions have been appropriately accounted for and disclosed in accordance with the requirements of U.S. GAAP.
- All of the following have been properly recorded or disclosed in the financial statements as applicable:
    - Related party relationships and transactions and related amounts receivable or payable, including loans, deposits, sales, purchases, transfers, leasing arrangements, and guarantees.
    - Contingent assets and liabilities, including those loans charged off and outstanding letters of credit.
    - Commitments to originate, purchase, or sell loans and participations.

Hutto & Carver-000026

Hutto & Carver, P.A.
Page 2

    o  Commitments to purchase or sell securities, including commitments to purchase or sell securities under forward-placement, financial-futures contracts, and standby commitments.

    o  Positions in financial futures contracts or other derivative securities.

    o  The status of the institution's capital plan filed with regulators.

    o  Sales of loans or other transfers of financial assets.

    o  The following information about financial instruments with concentrations of credit risk:

        ▪  The common activity, region, or characteristic that identifies the concentration.

        ▪  The maximum loss that could result if the counterparties completely failed to perform their obligations and any collateral for the amounts due were worthless to the institution.

        ▪  The institution's policy of requiring collateral to minimize the risk, the nature of this collateral, and information about the institution's access to the collateral.

    o  Lease obligations under long-term leases.

- All events subsequent to the date of the financial statements and for which U.S. GAAP requires adjustment or disclosure have been adjusted or disclosed.

- We have disclosed to you all of our—

    o  Nonperforming assets.

    o  Intentions to foreclose or repossess property.

- If applicable, provision has been made for:

    o  Losses, costs, or expenses that may be incurred in the collection of securities, loans, leases, and real estate.

    o  Losses, costs, or expenses that may be incurred in the disposition of other real estate owned.

    o  Liabilities for interest on deposits and other indebtedness, including subordinated capital notes and participation loans.

    o  Other than temporary declines in the value of investment securities and other investment assets.

- We agree with the findings of appraisers used and have adequately considered the qualifications of the appraisers in determining the amounts and disclosures in the financial statements and underlying accounting records. We did not give or cause any instructions to be given to appraisers regarding the values or amounts derived in an attempt to bias their work, and we are not otherwise aware of any matters that have had an impact on the independence or objectivity of the appraisers.

- The classification of securities and other investment assets as held-to-maturity, available-for-sale, or trading correctly reflects management's ability and intent.

- The effects of uncorrected misstatements are immaterial, both individually and in the aggregate, to the financial statements as a whole. A list of the uncorrected misstatements is attached to the representation letter.

- The effects of all known actual or possible litigation, claims, and assessments have been accounted for and disclosed in accordance with U.S. GAAP.

- Material concentrations have been properly disclosed in accordance with U.S. GAAP.

- Guarantees, whether written or oral, under which the institution is contingently liable, have been properly recorded or disclosed in accordance with U.S. GAAP.

- The institution has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

Institution—Specific

Hutto & Carver-000027

Hutto & Carver, P.A.
Page 3

- There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices.
- Loans receivable and other receivables recorded in the financial statements represent valid claims against debtors for lending transactions, sales, or other charges arising on or before the balance sheet date, and the carrying amounts of those receivables are determined in accordance with generally accepted accounting principles.
- Arrangements with financial institutions involving compensating balances or other arrangements involving restrictions on cash balances, lines of credit, or similar arrangements have been properly disclosed.
- Loans to executive officers have been properly accounted for and disclosed.
- Agreements to repurchase assets previously sold have been properly disclosed. The following have been evaluated and properly accounted for, if applicable.

*Investments and Derivatives*

- Securities classification under FASB ASC 320 reflecting management's ability and intent to hold investments.
- Management considers the decline in value of debt or equity securities to be temporary.

*Accounts Payable and Other Liabilities*

- Contributions to employee benefit plans or bonuses not documented in the minutes.
- Pension payments made after the client's year end.
- Actuarial assumptions used to measure pension liabilities and costs are appropriate.
- Expected employer contributions to defined benefit pension and postretirement benefit plans for the next fiscal year, if material to the financial statements.

**Information Provided**

We have provided you with:

- Access to all information, of which we are aware, that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters.
- Additional information that you have requested from us for the purpose of the audit.
- Unrestricted access to persons within the institution from whom you determined it necessary to obtain audit evidence.
- Minutes of the meetings of stockholders, directors, and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.
- All regulatory or examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies, including communications about supervisory actions or noncompliance with, or deficiencies in, rules and regulations or supervisory actions.

- All material transactions have been recorded in the accounting records and are reflected in the financial statements.
- We have disclosed to you the results of our assessment of the risk that the financial statements may be materially misstated as a result of fraud.
- We have no knowledge of any fraud or suspected fraud that affects the institution and involves:

- Management,
- Employees who have significant roles in internal control, or
- Others where the fraud could have a material effect on the financial statements.

Hutto & Carver, P.A.
Page 4

- We have no knowledge of any allegations of fraud or suspected fraud affecting the institution's financial statements communicated by employees, former employees, analysts, regulators, or others.
- We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.
- We have disclosed to you all known instances of noncompliance or suspected noncompliance with laws and regulations, or supervisory actions, whose effects should be considered when preparing financial statements.
- We have disclosed to you all known actual or possible litigation, claims, and assessments, including any liabilities resulting from acting in a fiduciary capacity, whose effects should be considered when preparing the financial statements.
- We have disclosed to you the identity of the institution's related parties and all the related party relationships and transactions of which we are aware.
- Related party transactions (including insider loans) have been entered into in compliance with existing regulations.
- The institution has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral or deposited in escrow as security.
- There are no regulatory examinations currently in progress for which we have not received examination reports.

Signature: _____

Title: Manager and CEO _____

Hutto & Carver-000029

**ALABAMA ONE CREDIT UNION**

**1215 VETERANS MEMORIAL PARKWAY**

**TUSCALOOSA, ALABAMA 35404**

**Management Representation Letter**

December 13, 2013

Hutto & Carver, P.A.
200 East Government Street, Suite 110
Pensacola, Florida 32502

This representation letter is provided in connection with your audit of the financial statements of Alabama One Credit Union, which comprise the statements of financial condition as of September 30, 2013 and 2012, and the related statements of income, comprehensive income, changes in members' equity, and cash flows for the years then ended, and the related notes to the financial statements, for the purpose of expressing an opinion as to whether the financial statements are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States (U.S. GAAP).

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement. An omission or misstatement that is monetarily small in amount could be considered material as a result of qualitative factors.

We confirm, to the best of our knowledge and belief, as of December 13, 2013, the following representations made to you during your audit.

**Financial Statements**

- We have fulfilled our responsibilities, as set out in the terms of the audit engagement letter dated July 12, 2012, including our responsibility for the preparation and fair presentation of the financial statements.
- The financial statements referred to above are fairly presented in conformity with U.S. GAAP.
- We acknowledge our responsibility for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.
- We acknowledge our responsibility for the design, implementation, and maintenance of internal control to prevent and detect fraud.
- Significant assumptions we used in making accounting estimates, including those measured at fair value, are reasonable.
- Related party relationships and transactions have been appropriately accounted for and disclosed in accordance with the requirements of U.S. GAAP.
- All of the following have been properly recorded or disclosed in the financial statements as applicable:
    - Related party relationships and transactions and related amounts receivable or payable, including loans, deposits, sales, purchases, transfers, leasing arrangements, and guarantees.
    - Contingent assets and liabilities, including loans charged off and outstanding letters of credit.
    - Commitments to originate, purchase, or sell loans and participations.

Hutto & Carver-000030

Hutto & Carver, P.A.
Page 2

- o   Commitments to purchase or sell securities, including commitments to purchase or sell securities under forward-placement, financial-futures contracts, and standby commitments.
- o   Positions in financial futures contracts or other derivative securities.
- o   The status of the institution's capital plan filed with regulators.
- o   Sales of loans or other transfers of financial assets.
- o   The following information about financial instruments with concentrations of credit risk:
  - ▪   The common activity, region, or characteristic that identifies the concentration.
  - ▪   The maximum loss that could result if the counterparties completely failed to perform their obligations and any collateral for the amounts due were worthless to the institution.
  - ▪   The institution's policy of requiring collateral to minimize the risk, the nature of this collateral, and information about the institution's access to the collateral.
- o   Lease obligations under long-term leases.
- • All events subsequent to the date of the financial statements and for which U.S. GAAP requires adjustment or disclosure have been adjusted or disclosed.
- • We have disclosed to you all of our—
  - o   Nonperforming assets.
  - o   Intentions to foreclose or repossess property.
- • If applicable, provision has been made for:
  - o   Losses, costs, or expenses that may be incurred in the collection of securities, loans, leases, and real estate.
  - o   Losses, costs, or expenses that may be incurred in the disposition of other real estate owned.
  - o   Liabilities for interest on deposits and other indebtedness, including subordinated capital notes and participation loans.
  - o   Other than temporary declines in the value of investment securities and other investment assets.
- • We agree with the findings of appraisers used and have adequately considered the qualifications of the appraisers in determining the amounts and disclosures in the financial statements and underlying accounting records. We did not give or cause any instructions to be given to appraisers regarding the values or amounts derived in an attempt to bias their work, and we are not otherwise aware of any matters that have had an impact on the independence or objectivity of the appraisers.
- • The classification of securities and other investment assets as held-to-maturity, available-for-sale, or trading correctly reflects management's ability and intent.
- • No transactions or activities are planned that would result in any recapture of the base-year, tax-basis bad debt reserve.
- • The effects of uncorrected misstatements are immaterial, both individually and in the aggregate, to the financial statements as a whole. A list of the uncorrected misstatements is attached to the representation letter.
- • The effects of all known actual or possible litigation, claims, and assessments have been accounted for and disclosed in accordance with U.S. GAAP.
- • Material concentrations have been properly disclosed in accordance with U.S. GAAP.
- • Guarantees, whether written or oral, under which the institution is contingently liable, have been properly recorded or disclosed in accordance with U.S. GAAP.
- • The institution has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

Hutto & Carver-000031

Hutto & Carver, P.A.
Page 3

**Institution—Specific**

- There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices.
- Loans receivable and other receivables recorded in the financial statements represent valid claims against debtors for lending transactions, sales, or other charges arising on or before the balance sheet date, and the carrying amounts of those receivables are determined in accordance with generally accepted accounting principles.
- Loans to executive officers have been properly accounted for and disclosed.

The following have been evaluated and properly accounted for, if applicable:

**Prepaids, Deferred Charges, Intangibles, and Other Assets**

- Material deferred charges.

**Investments and Derivatives**

- Securities classification under FASB ASC 320 reflecting management's ability and intent to hold investments.
- Management considers the decline in value of debt or equity securities to be temporary.
- The appropriateness and consistency of the measurement processes used by management in determining accounting estimates.
- That the disclosures related to accounting estimates are complete and appropriate.
- That no subsequent event has occurred that would require adjustment to the accounting estimates or disclosures included in the financial statements.

**Accounts Payable and Other Liabilities**

- Contributions to employee benefit plans or bonuses not documented in the minutes.
- Pension payments made after the client's year end.
- Actuarial assumptions used to measure pension liabilities and costs are appropriate.
- Expected employer contributions to defined benefit pension and postretirement benefit plans for the next fiscal year, if material to the financial statements.

**Information Provided**

- We have provided you with:
  - Access to all information, of which we are aware, that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters.
  - Additional information that you have requested from us for the purpose of the audit.
  - Unrestricted access to persons within the institution from whom you determined it necessary to obtain audit evidence.
  - Minutes of the meetings of stockholders, directors, committees of directors, credit/loan committee, asset/liability management committee, other relevant committees or summaries of actions of recent meetings for which minutes have not yet been prepared.
  - All regulatory or examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies, including communications about supervisory actions or noncompliance with, or deficiencies in, rules and regulations or supervisory actions.
- All material transactions have been recorded in the accounting records and are reflected in the financial statements.

Hutto & Carver-000032

Hutto & Carver, P.A.
Page 4

- We have disclosed to you the results of our assessment of the risk that the financial statements may be materially misstated as a result of fraud.

- We have no knowledge of any fraud or suspected fraud that affects the institution and involves:

  o Management,

  o Employees who have significant roles in internal control, or

  o Others where the fraud could have a material effect on the financial statements.

- We have no knowledge of any allegations of fraud or suspected fraud affecting the institution's financial statements communicated by employees, former employees, analysts, regulators, or others.

- We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

- We have no knowledge of any instances of noncompliance or suspected noncompliance with laws and regulations, or supervisory actions, whose effects should be considered when preparing financial statements.

- We have disclosed to you all known actual or possible litigation, claims, and assessments, including any liabilities resulting from acting in a fiduciary capacity, whose effects should be considered when preparing the financial statements.

- We have disclosed to you the identity of the institution's related parties and all the related party relationships and transactions of which we are aware.

- Related party transactions (including insider loans) have been entered into in compliance with existing regulations.

- The institution has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral or deposited in escrow as security.

- There are no regulatory examinations currently in progress for which we have not received examination reports.

Signature: _____

Title: Manager and CEO

Hutto & Carver-000033

21.00
PBC

## ALABAMA ONE CREDIT UNION
## 1215 VETERANS MEMORIAL PARKWAY
## TUSCALOOSA, ALABAMA 35404

Management Representation Letter

March 3, 2015

Hutto & Carver, P.A.
200 E. Government St. Suite 110
Pensacola, FL 32502

Ladies and Gentlemen:

This representation letter is provided in connection with your audit of the financial statements of Alabama One Credit Union, which comprise the statements of financial condition as of September 30, 2014 and 2013, and the related statements of income, changes in members' equity, comprehensive income, and cash flows for the periods then ended, and the related notes to the financial statements, for the purpose of expressing an opinion as to whether the financial statements are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States (U.S. GAAP).

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement. An omission or misstatement that is monetarily small in amount could be considered material as a result of qualitative factors.

We confirm, to the best of our knowledge and belief, as of March 3, 2015, the following representations made to you during your audit.

**Financial Statements**

1) We have fulfilled our responsibilities, as set out in the terms of the audit engagement letter dated July 13, 2012, including our responsibility for the preparation and fair presentation of the financial statements.

2) The financial statements referred to above are fairly presented in conformity with U.S. GAAP.

3) We acknowledge our responsibility for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

4) We acknowledge our responsibility for the design, implementation, and maintenance of internal control to prevent and detect fraud.

5) Significant assumptions we used in making accounting estimates, including those measured at fair value, are reasonable.

6) Related party relationships and transactions have been appropriately accounted for and disclosed in accordance with U.S. GAAP.

7) All of the following have been properly recorded or disclosed in the financial statements as applicable:
   a) Related party relationships and transactions and related amounts receivable or payable, including loans, deposits, sales, purchases, transfers, leasing arrangements, and guarantees.
   b) Contingent assets and liabilities, including loans charged off and outstanding letters of credit.
   c) Commitments to originate, purchase, or sell loans and participations.

Hutto & Carver-000034

Hutto & Carver, P.A.
Page 2

   d)  Commitments to purchase or sell securities, including commitments to purchase or sell securities under forward-placement, financial-futures contracts, and standby commitments.

   e)  Positions in financial futures contracts or other derivative securities.

   f)  The status of the institution's capital plan filed with regulators.

   g)  Sales of loans or other transfers of financial assets.

   h)  The following information about financial instruments with concentrations of credit risk:

      i)  The common activity, region, or characteristic that identifies the concentration.

      ii)  The maximum loss that could result if the counterparties completely failed to perform their obligations and any collateral for the amounts due were worthless to the institution.

      iii)  The institution's policy of requiring collateral to minimize the risk, the nature of this collateral, and information about the institution's access to the collateral.

   i)  Lease obligations under long-term leases.

8) Significant events subsequent to the date of the financial statements and for which U.S. GAAP requires adjustment or disclosure have been adjusted or disclosed.

9) We have disclosed to you all of our-

   a)  Nonperforming assets.

   b)  Intentions to foreclose or repossess property.

10) If applicable, provision has been made for:

   a)  Losses, costs, or expenses that may be incurred in the collection of securities, loans, leases, and real estate.

   b)  Losses, costs, or expenses that may be incurred in the disposition of other real estate owned.

   c)  Liabilities for interest on deposits and other indebtedness, including subordinated capital notes and participation loans.

   d)  Other than temporary declines in the value of investment securities and other investment assets.

11) We accept the findings of appraisers used and have adequately considered the qualifications of the appraisers in determining the amounts and disclosures in the financial statements and underlying accounting records. We did not give or cause any instructions to be given to appraisers regarding the values or amounts derived in an attempt to bias their work, and we are not otherwise aware of any matters that have had an impact on the independence or objectivity of the appraisers.

12) The classification of securities and other investment assets as held-to-maturity, available-for-sale, or trading correctly reflects management's ability and intent.

13) No transactions or activities are planned that would result in any recapture of the base-year, tax-basis bad debt reserve.

14) The effects of uncorrected misstatements are immaterial, both individually and in the aggregate, to the financial statements as a whole. A list of the uncorrected misstatements is attached to the representation letter.

15) The effects of all known actual or possible litigation, claims, and assessments have been accounted for and disclosed in accordance with U.S. GAAP.

16) Material concentrations have been properly disclosed in accordance with U.S. GAAP.

17) Guarantees, whether written or oral, under which the institution is contingently liable, have been properly recorded or disclosed in accordance with U.S. GAAP.

18) The institution has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

Hutto & Carver, P.A.
Page 3

### Institution-Specific

19) There have been communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices, which have been disclosed to you and corrective action has been taken.

20) Loans receivable and other receivables recorded in the financial statements represent valid claims against debtors for lending transactions, sales, or other charges arising on or before the balance sheet date, and the carrying amounts of those receivables are determined in accordance with generally accepted accounting principles.

21) Arrangements with financial institutions involving compensating balances or other arrangements involving restrictions on cash balances, lines of credit, or similar arrangements have been properly disclosed.

22) Loans to executive officers have been properly accounted for and disclosed.

23) Agreements to repurchase assets previously sold have been properly disclosed.

24) Capital stock repurchase options or agreements or capital stock reserved for options, warrants, conversions, or other requirements have been properly disclosed.

25) We have reviewed long-lived assets and certain identifiable intangibles to be held and used for impairment whenever events or changes in circumstances have indicated that the carrying amount of assets might not be recoverable and have appropriately recorded the adjustment.

26) The following have been evaluated and properly accounted for, if applicable:

### Prepaids, Deferred Charges, Intangibles, and Other Assets

- Impairment of goodwill and other intangible assets not subject to amortization.
- Material deferred charges.

### Investments and Derivatives

- Securities classification under FASB ASC 320 reflecting management's ability and intent to hold investments.
- Management considers the decline in value of debt or equity securities to be temporary.
- Existence and completeness of derivatives and appropriate characteristics of hedges.
- Unusual considerations involved in determining the application of the equity method of accounting.
- Special purpose or variable interest entities.

### Accounts Payable and Other Liabilities

- Contributions to employee benefit plans or bonuses not documented in the minutes.
- Pension payments made after the client's year end;
- Actuarial assumptions used to measure pension liabilities and costs are appropriate.
- Expected employer contributions to defined benefit pension and postretirement benefit plans for the next fiscal year, if material to the financial statements.

### General

- Acknowledgment of oral communications made by the auditor.
- Transactions for which there is no written supporting documentation.
- Actions allowed by regulatory agencies that are not documented in writing or by legal references.
- GAAP changes/adoption.
- Future plans or commitments.
- Lawsuits, regulatory actions, etc.

Hutto & Carver, P.A.
Page 4

## Information Provided

27) We have provided you with:

   a) Access to all information, of which we are aware, that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters.

   b) Additional information that you have requested from us for the purpose of the audit.

   c) Unrestricted access to persons within the institution from whom you determined it necessary to obtain audit evidence.

   d) Minutes of the meetings of stockholders, directors, committees of directors, credit/loan committee, asset/liability management committee, other relevant committees or summaries of actions of recent meetings for which minutes have not yet been prepared.

   e) All regulatory or examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies, including communications about supervisory actions or noncompliance with, or deficiencies in, rules and regulations or supervisory actions.

28) All material transactions have been recorded in the accounting records and are reflected in the financial statements.

29) We have disclosed to you the results of our assessment of the risk that the financial statements may be materially misstated as a result of fraud.

30) We have no knowledge of any fraud or suspected fraud that affects the institution and involves:

   a) Management,

   b) Employees who have significant roles in internal control, or

   c) Others where the fraud could have a material effect on the financial statements.

31) We have no knowledge of any allegations of fraud or suspected fraud affecting the institution's financial statements communicated by employees, former employees, analysts, regulators, or others, which we have not disclosed to you.

32) We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

33) We have no knowledge of any instances of noncompliance or suspected noncompliance with laws and regulations, or supervisory actions, whose effects should be considered when preparing financial statements.

34) We have disclosed to you all known actual or possible litigation, claims, and assessments, including any liabilities resulting from acting in a fiduciary capacity, whose effects should be considered when preparing the financial statements.

35) We have disclosed to you the identity of the institution's related parties and all the related party relationships and transactions of which we are aware.

36) Related party transactions (including insider loans) have been entered into in compliance with existing regulations.

37) The institution has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral or deposited in escrow as security other than as disclosed.

38) There is an on-going regulatory examination currently in progress for which we have not received examination report.

## Other Services

39) In regard to the Federal Form 990 and 990T services performed by you, we have-

   1) Assumed all management responsibilities.

   2) Designated an individual (within senior management) with suitable skill, knowledge, or experience to oversee the services,

   3) Evaluated the adequacy and results of the services performed.

Hutto & Carver-000037

Hutto & Carver, P.A.
Page 5

   4)  Accepted responsibility for the results of the services.


Signature: _____

Title: _Manager and CEO_____

# THE CREDIT UNION OF ALABAMA FEDERAL CREDIT UNION
## NOTES TO FINANCIAL STATEMENTS
### SEPTEMBER 30, 2008 AND 2007

## NOTE 1 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

The allowance for loan losses is established as losses are estimated to have occurred through a provision for loans losses charged to earnings. Loan losses are charged against the allowance when management believes the uncollectibility of a loan balance is confirmed. Subsequent recoveries, if any, are credited to the allowance.

The allowance for loan losses is evaluated on a regular basis by management and is based upon management's periodic review of the collectibility of the loans in light of historical experience, the nature and volume of the loan portfolio, adverse situations that may affect the borrower's ability to repay, estimated value of any underlying collateral, and prevailing economic conditions. This evaluation is inherently subjective as it requires estimates that are susceptible to significant revisions as more information becomes available.

The Credit Union's allowance for loan and lease losses is that amount considered adequate to absorb probable losses in the portfolio based on management's evaluations of the size and current risk characteristics of the loan portfolio. Such evaluation considers prior loss experience, the risk rating distribution of the portfolios, the impact of current internal and external influences on credit loss and the levels of nonperforming loans. Specific allowances for loan losses are established for large impaired loans on a individual basis as required per SFAS No. 114. The specific allowance established for these loans and leases is based on a thorough analysis of the most probable source of repayment, including the present value of the loan's expected future cash flow, the loan's estimated market value, or the estimated fair value of the underlying collateral. General allowances are established for loans that can be grouped into pools based on similar characteristics as described in SFAS No. 5. In this process, general allowance factors are based on an analysis of historical charge-off experience and expected losses given default derived from the Credit Union's internal risk rating process. These factors are developed and applied to the portfolio in terms of loan type. The qualitative factors associated with the allowance are subjective and require a high degree of management judgment. These factors include the credit quality statistics, recent economic uncertainty, losses incurred from recent events, and lagging data.



## OTHER REAL ESTATE OWNED

Real estate properties acquired through or in lieu of loan foreclosure are initially recorded at the lower of the Credit Union's carrying amount or fair value less estimated selling cost at the date of foreclosure. Any write-downs based on the asset's fair value at the date of acquisition are charged to the allowance for loan losses. After foreclosure, property held for sale is carried at the lower of the new cost basis or fair value less cost to sell. Impairment losses on property to be held and used are measured as the amount by which the carrying amount of property exceeds its value. Costs of significant property improvement are capitalized, whereas costs relating to holding property are expensed. Valuations are periodically performed by management, and any subsequent write-downs are recorded as a charge to operations, if necessary, to reduce the carrying value of a property to the lower of its costs or fair value less cost to sell.

EXHIBIT
4-C



# HUTTO
# CARVER, P.A.

*CERTIFIED PUBLIC ACCOUNTANTS*

200 East Government Street, Suite 110
Pensacola, Florida 32502

November 7, 2008



EXHIBIT
4-D

Supervisory Committee
The Credit Union of Alabama Federal Credit Union
1215 Veteran's Memorial Parkway
Tuscaloosa, AL 35404

Dear Committee Members:

In planning and performing our audit of the financial statements of The Credit Union of Alabama Federal Credit Union for the year ended September 30, 2008, in accordance with auditing standards generally accepted in the United States of America, we considered the Credit Union's internal control over financial reporting (internal control) as a basis for designing our auditing procedures for the purpose of expressing our opinion on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of the Credit Union's internal control. Our consideration of internal control included procedures to evaluate the design of controls relevant to an audit of financial statements and to determine whether they have been implemented, but it did not include procedures to test the operating effectiveness of controls. Accordingly, we do not express an opinion on the effectiveness of the Credit Union's internal controls.

Our consideration of internal control was for the limited purpose described in the preceding paragraph and would not necessarily identify all deficiencies in internal control that might be significant deficiencies or material weaknesses. In addition, because of inherent limitations in internal control, including the possibility of management override of controls, misstatements due to error or fraud may occur and not be detected by such controls.

Professional standards require that we provide you with the following information.

- *Our Responsibility*   Our responsibility as auditors is limited to the period covered by our audit and does not extend to any later periods for which we are not engaged as auditors. Our audit does ensure that based on the audit, the financial statements are free of material misstatement and are in conformity with accounting principles generally accepted in the United States of America. Our audit does not relieve you or management of your responsibilities.

- *Accounting Policies*   Management is responsible for the selection and use of appropriate accounting policies. There were no new or significant changes in accounting policies that would affect the financial statements.

- *Accounting Estimates*   Accounting estimates are an integral part of the financial statements prepared by management and are based on management's knowledge and experience about past and current events and assumptions about future events. Certain accounting estimates are particularly sensitive because of their significance to the financial statements and because of the possibility that future events affecting them may differ significantly from those expected. The most sensitive estimate affecting the financial statements is the allowance for loan loss account. Management's estimate of the allowance account is based on historical loss levels and an analysis of the collectibility of individual accounts. We evaluated the key factors and assumptions used to develop the allowance in determining that it is reasonable in relation to the financial statements taken as a whole.

- *Disagreements with Management*   There were no disagreements or difficulties with management in completing this engagement, and there was no undue pressure placed on our firm to present financial data in a manner inconsistent with acceptable accounting principles.

- *Misstatements*   Standards require us to accumulate all known and likely misstatements identified during the audit, other than those that are trivial, and communicate them to the appropriate level of management. There were no

phone: 850.438.5299  ·  fax: 850.469.8071  ·  toll free: 800.316.3057  ·  e-mail: huttoandcarver@bellsouth.net

Supervisory Committee
Page 2

- significant accounting adjustments that we are aware of, either recorded or unrecorded, that have not been disclosed to you.

  ○   **_Management Representations_**   We have requested certain representations from management that are included in a management representation letter.

  ○   **_Management Consultations with Other Accountants_**   In some cases, management may decide to consult with other accountants about auditing and accounting matters, similar to obtaining a "second opinion" on certain situations. If a consultation involves application of an accounting principle to the Credit Union's financial statements or a determination of the type of auditor's opinion that may be expressed on those statements, our professional standards require the consulting accountant to check with us to determine that the consultant has all the relevant facts. To our knowledge, there were no such consultations with other accountants.

Auditing standards further require our firm to report to you significant deficiencies or material weaknesses in internal control. A control deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis. A significant deficiency is a control deficiency, or combination of control deficiencies, that adversely affects the entity's ability to initiate, authorize, record, process, or report financial data reliably in accordance with generally accepted accounting principles such that there is more than a remote likelihood that a misstatement of the entity's financial statements that is more than inconsequential will not be prevented or detected by the entity's internal control. A material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the financial statements will not be prevented or detected by the entity's internal control.

Our consideration of internal control was for the limited purpose described in the first paragraph and would not necessarily identify all deficiencies in internal control that might be significant deficiencies or material weaknesses. We did not identify any significant deficiencies or material weaknesses in internal control as defined above. The following items do not represent significant deficiencies or material weaknesses; therefore, we are not required to communicate them to you. However, these observations resulted from the application of auditing procedures and are provided for your information.



Supervisory Committee
Page 3

<u>Comment Two</u>
As an informational item, while reviewing credit concentration relationships, we noted the following credit concentration which in total was significant to both outstanding credits and commitments to extend credit.

| Member Name | Loan Amount |
| --- | --- |
| Danny Butler | |
| DB Enterprises | |
| Dunn & Butler | |
| Foster Water Treatment, LLC | |
| Frances Butler | |
| Michael Dunn | |
| Dunn Auto Sales | |
| Total loans as of September 30, 2008, excluding unfunded LOCs | |
| Loan disbursed to Butler Enterprises in October 2008 | |
| Unfunded Commitments as of September 30, 2008 | |
| Total outstanding exposure | |



We did review collateral values supporting the loans and found they were supported by property appraisals. However, two of the Danny Butler loans which were secured by real property reflected a loan-to-value in the high 90% range. While the loans appear to be within policy, and there were adequate support indicating the members have the ability to repay the loans, the Board may wish to consider requesting that management provide a monthly report identifying significant loan relationships and/or commitments.



Supervisory Committee
Page 4



In conclusion, the Credit Union strong earning and net worth places it in the financial position to provide new and improved financial services to its members.

This report is intended solely for the information and use of the Supervisory Committee, Management, the Board of Directors, and your regulatory agency.

Sincerely,

*Hutto & Carver, P.A.*

Hutto & Carver, P.A.

FILED

2016 Sep-22  PM 02:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

ALABAMA ONE CREDIT UNION,                *
                                         *
          Plaintiff,                     *
                                         *      Case No.: 7:16-cv-01382-TMP
v.                                       *
                                         *
PAUL TOPPINS, et al,                     *
                                         *
          Defendants.                    *

STATE OF _Florida_

COUNTY OF _Escambia_

### AFFIDAVIT OF HAROLD S. HUTTO, JR.

Before me the undersigned authority in said state and county, personally appeared

HAROLD S. HUTTO, JR., who being duly sworn deposes and says as follows:

1. I am over nineteen years of age and competent to make this Affidavit. I am the President
   of Hutto & Carver, P.A. ("Hutto & Carver"). I have personal knowledge of the matters
   set forth herein.

2. Hutto & Carver provided independent audit services for the "Alabama One Credit Union"
   ("Alabama One") from the time it became known as such until it was placed into
   conservatorship by the Alabama Credit Union Association.

3. During this time, Alabama One engaged Hutto & Carver to conduct an annual
   independent audit of Alabama One's financial statements. Attached hereto as Exhibit A
   are true and accurate copies of Hutto & Carver's Engagement Letters for annual audits
   for fiscal years ending September 30, 2006 through September 30, 2014.



EXHIBIT
4

PD.20115712.1

4. As part of the annual audits, Hutto & Carver relied on representations from Alabama One in the form of Representation Letters. Attached hereto as Exhibit B are true and accurate copies of Representation Letters from the Alabama One to Hutto & Carver for fiscal years ending September 30, 2007 through September 30, 2014).

5. As part of its annual submissions, Hutto & Carver sent notes to Alabama One related to its review of Alabama One's financial statements. Attached hereto as Exhibit C is a true and accurate copy of a portion of Hutto and Carver's Notes to Financial Statements for the review of fiscal year September 30, 2008 and 2007.

6. On November 7, 2008, Hutto & Carver issued a letter to the Alabama One Supervisory Committee advising of Hutto & Carver's observations and concerns resulting from the audit for the fiscal year ending September 30, 2008. Alabama One specific information has been redacted except for that information related to the Danny Butler loans. A true and accurate copy of the redacted letter is attached hereto as Exhibit D.

7. As shown in attached Exhibit "D", in the annual audit of Alabama One's fiscal year ending September 30, 2008, Hutto & Carver recognized an unusually high loan concentration to Danny Butler and Danny Butler related entities. As a point of clarification, the loans financing the "truck stop," "cabin," and "water treatment plant" projects as referenced in ¶¶ 44-48 of Plaintiff's Complaint were part of the Butler-related loan concentration identified in the attached November 7, 2008 letter. The "marina" loan as referenced in Plaintiff's Complaint was unrelated to Danny Butler. During the next regulatory audit, which I believe occurred in early 2009, the regulators would have had access to our November 7, 2008 correspondence and all of our workpapers, as Alabama One asked for our workpapers (which includes our November 7, 2008 letter as the very

- 2 -

first item) to be on-site during any regulatory audit. It is customary for the regulatory auditors to focus on any areas of concern noted by Hutto & Carver, and I believe that the regulators began direct oversight of the Danny Butler loan concentration as early as March 2009 due in part to the issue being flagged by Hutto & Carver.

8. In performing its work, Hutto & Carver has access to sensitive customer information as well as sensitive credit union information. Hutto & Carver understands that information it receives is confidential, and it undertakes to ensure that the information remains confidential. If loan information is disseminated to people outside of the credit union, that information could be used to harm the credit union and negatively affect its performance. Likewise, if private information of a credit union member is improperly publicly disseminated, that could affect the credit union's relationship with that member, and could affect the credit union's reputation in the community at large.

9. In my opinion, one of the most sensitive areas of a credit union is how it treats non-performing loans, as those loans are at risk of default, and the credit union needs to mitigate and diminish the amount of loss it expects to take. However, the credit union is obligated to realistically account for the likely amount of losses that are expected, which is known in the industry as the "allowance for loan loss" or the "ALLL". If any debtor were to know that the credit union had already planned to not recover the full balance of the loan, the credit union's ability to recapture the indebtedness would, in my opinion, be significantly compromised. Hutto and Carver's workpapers for the Alabama One Credit Union contains this information, and for it to be disclosed publicly (or even to the lawyers and parties in this case) could damage the Alabama One Credit Union. Likewise, Hutto & Carvers' workpapers contain information relating to member loans and the rates

- 3 -

of interest and other terms established on those loans. Should that information be disseminated outside of the credit union, that information could damage member relations for exposing what is generally considered private information (not to mention problems with trust for those that did not obtain as favorable an interest rate as other, similar, members). That the Alabama One Credit Union's lawyers want this information produced in discovery to the parties and attorneys in this case violates my understanding of management's duties to maintain and protect the assets of the Alabama One Credit Union.

10. As it relates to the loan concentration with Danny Butler, where real estate/development loans were involved, Hutto & Carver reviewed the corresponding appraisals for those properties to determine if the collateral value exceeded the loan obligation (if the collateral value was ever below the loan value, the ALLL would need to be adjusted accordingly). At no time was Hutto & Carver aware of any fraud concerning the appraisals for the Danny Butler real property/development loans.

Further, the affiant sayeth not.

HAROLD S. HUTTO, JR.

STATE OF _Florida_

COUNTY OF _Escambia_

- 4 -

PD.20115712.1

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that HAROLD S. HUTTO, JR., whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the foregoing instrument, he executed the same voluntarily.

Given under my hand and seal this the 22nd day of September , 2016.

JAMIE PEADEN
MY COMMISSION # FF112234
EXPIRES: July 01, 2018

NOTARY PUBLIC
My Commission Expires: 7/1/18

- 5 -



# HUTTO CARVER, P.A.
### CERTIFIED PUBLIC ACCOUNTANTS
400 East Government Street, Suite 110
Pensacola, Florida 32502



ENGAGEMENT LETTER

August 24, 2006

To the Supervisory Committee of
The Credit Union of Alabama FCU

This letter will confirm our understanding of the services we will provide to The Credit Union of Alabama FCU (Credit Union) for the three audit years ending September 30, 2006, 2007, and 2008.

Our firm shall audit the statements of financial condition of the Credit Union as of September 30, 2006 (2007 and 2008), and the related statements of income, changes in members' equity, and cash flows for the years then ended. The objective of our audits is the expression of an opinion as to whether the Credit Union's financial statements are fairly presented, in all material respects, in conformity with accounting principles generally accepted in the United States of America. Our audits will be conducted in accordance with United States generally accepted auditing standards and will include tests of accounting records and other procedures we consider necessary to enable us to express such an opinion. If our opinion is other than unqualified, we will discuss the reasons with the Supervisory Committee in advance. If, for any reason, we are unable to complete the audits or unable to express an opinion; we may decline to express an opinion or may not issue a report as a result of this engagement.

Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, consideration of the allowance for loan losses and other estimates made by management, and direct confirmation of loans, deposits, investments, and certain other assets and liabilities by correspondence with selected members, creditors, safekeeping agents, and correspondent institutions. Certain audit procedures, such as direct verification of loans and deposits, may be on an unannounced basis. We will also request written representations from the Credit Union's attorneys as part of the engagement, and they may bill the Credit Union for responding to this inquiry. At the conclusion of our audits, we will require certain written representations from management about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audits will involve judgement about the number of transactions to be examined and the areas to be tested. Also, we will plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the Credit Union or to acts by management or employees acting on behalf of the Credit Union.

Because an audit is designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform you of any material errors that come to our attention, and we will inform you of any fraudulent financial reporting or misappropriation of assets that comes to our attention. We will also inform you of any other violations of laws or governmental regulations that comes to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audits and does not extend to any later periods for which we are not engaged as auditors.

phone: 850.438.5299  ·  fax: 850.469.8071  ·  toll free: 800.316.3057  ·  e-mail: huttoandcarver@bellsoi

Supervisory Committee
Page 2

Our audits will include obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed. An audit is not designed to provide assurance on internal control or to identify internal control exceptions or reportable conditions, that is, significant deficiencies in the design or operation of internal control. However, if during the audits, we become aware of such reportable conditions or ways that we believe management practices can be improved, we will communicate these to the Supervisory Committee in a separate letter.

You are responsible for establishing and maintaining internal controls, including monitoring ongoing activities; for the selection and application of accounting principles; and for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U. S. generally accepted accounting principles. As part of our engagement we may propose standard, adjusting, or correcting journal entries to you financial statements. You are responsible for reviewing the entries and understanding the nature of any proposed entries and the impact they have on the financial statements. Further, you are responsible for designating a qualified management level individual to be responsible and accountable for overseeing these services.

You are responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. Your responsibilities include adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

You are responsible for the design and implementation of programs and controls to prevent and detect fraud and for informing us about all known or suspected fraud affecting the institution involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements. Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the institution received in communications from employees, former employees, regulators, or others. In addition, you are also responsible for identifying and ensuring that the financial institution complies with applicable laws and regulations.

We understand that your employees will prepare all cash, loans receivable, deposit, and other confirmation we request and will locate any loan documents and support for other transactions selected by us for testing.

In accordance with regulatory requirements, we, as your auditors, are required to make the following commitments:

1. We will deliver final audit reports no later than the last day of December of the audit year. Those reports shall include the auditor's report and accompanying financial statements, internal control exceptions or reportable conditions noted during the engagement, and any fraud or illegal acts noted during the engagement.

2. The audit workpapers are the property of Hutto & Carver, P.A. and constitute confidential information, as required by Section ET301 of the AICPA Code of Professional Conduct. However, we will provide the National Credit Union Administration examiners with access to all of our original workpapers that are the basis of our opinion on the financial statements. The NCUA may intend, or decide, to distribute the copies or information contained therein to others, including other governmental agencies.

3. Additionally, this engagement is an opinion audit that fulfills the requirements of a complete supervisory committee audit.

4. The engagement workpapers will be retained for at least three years from the date of the report.

Supervisory Committee
Page 3

The information that we obtain in auditing is confidential, as required by Section ET301 of the AICPA Code of Professional Conduct. Therefore, your acceptance of this engagement letter will serve as your advance consent to our compliance with above commitments.

If the Credit Union plans any reproduction or publication of our reports, or any portion of them, copies of master or printer's proofs of the entire document should be submitted to us in sufficient time for the firm's review and approval.

We will be pleased, at your request, to attend any Supervisory Committee and Board of Director's meetings. We would also like to meet with you and other executives of the Credit Union at various times throughout each year to discuss current accounting and auditing matters affecting your Credit Union. Whenever you feel such a meeting would be desirable, please let us know.

The fee for the audit year ending September 30, 2006, will not exceed $17,200, excluding costs associated with the confirmation process. The fees for the audit years ending September 30, 2007 and 2008, will not exceed $18,500 per year excluding costs associated with the confirmation process. The costs associated with the confirmation process will be capped at $1,000. The Credit Union agrees to pay all postage, printing, and other costs associated with the circularization and confirmation of member accounts and other Credit Union accounts requiring verification as determined necessary by the firm and/or required by auditing standards generally accepted in the United States of America. In the event circumstances arise which will materially affect these amounts, we will notify you immediately in order that all parties can arrive at a mutually agreed upon adjustment. In no event will this approximation be adjusted without mutual agreement. The firm will render invoices as work progresses. The Supervisory Committee may terminate this contract at any time if it chooses to do so.

We believe the foregoing correctly sets forth our understanding, but if you have any questions, please let us know. If you find the arrangements acceptable, please acknowledge your agreement by signing and returning to the firm one of the copies enclosed.

It is a pleasure for us to be of service to you and your Credit Union.

Very truly yours,

*Hutto & Carver, P.A.*

Hutto & Carver, P.A.


Acknowledge:

_Wallou H. Luncorts_                    _8-29-06_
Chairman, Supervisory Committee         Date

Hutto & Carver-000010

12



# HUTTO CARVER, P.A.

*CERTIFIED PUBLIC ACCOUNTANTS*

200 East Government Street, Suite 110
Pensacola, Florida 32502

<u>ENGAGEMENT LETTER</u>

June 29, 2009

To the Supervisory Committee of
Alabama One Credit Union

This letter will confirm our understanding of the services we will provide to Alabama One Credit Union (the Credit Union) for the three audit years ending September 30, 2009, 2010, and 2011.

Our firm shall audit the statements of financial condition of the Credit Union as of September 30, 2009 (2010 and 2011), and the related statements of income, changes in members' equity, and cash flows for the years then ended. The objective of our audits is the expression of an opinion as to whether the Credit Union's financial statements are fairly presented, in all material respects, in conformity with accounting principles generally accepted in the United States of America. Our audits will be conducted in accordance with United States generally accepted auditing standards and will include tests of accounting records and other procedures we consider necessary to enable us to express such an opinion. If our opinion is other than unqualified, we will discuss the reasons with the Supervisory Committee in advance. If, for any reason, we are unable to complete the audits or unable to express an opinion, we may decline to express an opinion or may not issue a report as a result of this engagement.

Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, consideration of the allowance for loan losses and other estimates made by management, and direct confirmation of loans, deposits, investments, and certain other assets and liabilities by correspondence with selected members, creditors, safekeeping agents, and correspondent institutions. Certain audit procedures, such as direct verification of loans and deposits, may be on an unannounced basis. We will also request written representations from the Credit Union's attorneys as part of the engagement, and they may bill the Credit Union for responding to this inquiry. At the conclusion of our audits, we will require certain written representations from management about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audits will involve judgement about the number of transactions to be examined and the areas to be tested. Also, we will plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the Credit Union or to acts by management or employees acting on behalf of the Credit Union.

Because an audit is designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform you of any material errors that come to our attention, and we will inform you of any fraudulent financial reporting or misappropriation of assets that comes to our attention. We will also inform you of any other violations of laws or governmental regulations that comes to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audits and does not extend to any later periods for which we are not engaged as auditors.

Our audits will include obtaining an understanding of the entity and its environment, including internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures. An audit is not designed to provide assurance on internal control or to identify deficiencies in internal control. However, during the audit, we will communicate to you internal control related matters that are required to be communicated under professional standards.

phone: 850.438.6299   fax: 850.469.8071   toll free: 800.316.3057   e-mail: huttoandcarver@bellsouth.ne

Hutto & Carver-000001

Supervisory Committee
Page 2

You are responsible for establishing and maintaining internal controls, including monitoring ongoing activities; for the selection and application of accounting principles; and for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U.S. generally accepted accounting principles. You are also responsible for management decisions and functions; for designating an individual with suitable skill, knowledge, or experience to oversee the tax services and any other non-attest services we provide; and for evaluating the adequacy and results of those services and accepting responsibility for them.

You are responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. Your responsibilities include adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

You are responsible for the design and implementation of programs and controls to prevent and detect fraud and for informing us about all known or suspected fraud affecting the institution involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements. Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the institution received in communications from employees, former employees, regulators, or others. In addition, you are also responsible for identifying and ensuring that the financial institution complies with applicable laws and regulations.

We understand that your employees will prepare all cash, loans receivable, deposit, and other confirmation we request and will locate any loan documents and support for other transactions selected by us for testing.

In accordance with regulatory requirements, we, as your auditors, are required to make the following commitments:

1.  We will deliver final audit reports no later than the last day of December of the audit year. Those reports shall include the auditor's report and accompanying financial statements, internal control exceptions or reportable conditions noted during the engagement, and any fraud or illegal acts noted during the engagement.

2.  The audit workpapers are the property of Hutto & Carver, P.A. and constitute confidential information, as required by Section ET301 of the AICPA Code of Professional Conduct. However we will provide the National Credit Union Administration examiners with access to all of our original workpapers that are the basis of our opinion on the financial statements. If requested, access to such audit documentation will be provided under the supervision of Hutto & Carver, P.A. personnel. Furthermore, upon request, we may provide copies of audit documentation to the NCUA. The NCUA may intend, or decide, to distribute the copies or information contained therein to others, including other governmental agencies.

3.  Additionally, this engagement is an opinion audit that fulfills the requirements of a complete supervisory committee audit.

4.  The engagement workpapers will be retained for at least five years from the date of the report.

The information that we obtain in auditing is confidential, as required by Section ET301 of the AICPA Code of Professional Conduct. Therefore, your acceptance of this engagement letter will serve as your advance consent to our compliance with above commitments.

If the Credit Union plans any reproduction or publication of our reports, or any portion of them, copies of master or printer's proofs of the entire document should be submitted to us in sufficient time for the firm's review and approval.

We will be pleased, at your request, to attend any Supervisory Committee and Board of Director's meetings. We would also like to meet with you and other executives of the Credit Union at various times throughout each year to discuss current accounting and

Hutto & Carver-000002

Supervisory Committee
Page 3

auditing matters affecting your Credit Union. Whenever you feel such a meeting would be desirable, please let us know.

The fee for the audit year ending September 30, 2009, will not exceed $25,500 per year, excluding costs associated with the confirmation process. The fees for the audit years ending September 30, 2010 and 2011, will not exceed $23,000 per year excluding costs associated with the confirmation process. The costs associated with the confirmation process will be capped at $1,500. The Credit Union agrees to pay all postage, printing, and other costs associated with the circularization and confirmation of member accounts and other Credit Union accounts requiring verification as determined necessary by the firm and/or required by auditing standards generally accepted in the United States of America. The fee estimate is based on anticipated cooperation from your personnel and the assumption that unexpected circumstances will not be encountered during the audit. In the event circumstances arise which will materially affect these amounts, we will notify you immediately in order that all parties can arrive at a mutually agreed upon adjustment. In no event will this approximation be adjusted without mutual agreement. The firm will render invoices as work progresses. **The Supervisory Committee may terminate this contract at any time if it chooses to do so.**

We believe the foregoing correctly sets forth our understanding, but if you have any questions, please let us know. If you find the arrangements acceptable, please acknowledge your agreement by signing and returning to the firm one of the copies enclosed.

It is a pleasure for us to be of service to you and your Credit Union.

Very truly yours,

*Hutto & Carver, P.a.*

Hutto & Carver, P.A.

This letter correctly sets forth the understanding of Alabama One Credit Union:

_____          6/30/09
Chairman, Supervisory Committee                 Date

Hutto & Carver-000003

12.01


# HUTTO
# CARVER, P.A.
*CERTIFIED PUBLIC ACCOUNTANTS*

200 East Government Street, Suite 110
Pensacola, Florida 32502

SEPTEMBER 30, 2012, 2013, AND 2014
AUDIT ENGAGEMENT LETTER

July 12, 2012

To the Supervisory Committee of
Alabama One Credit Union

This letter will confirm our understanding of the services we will provide to Alabama One Credit Union (the Credit Union) for the three audit years ending September 30, 2012, 2013, and 2014. Our firm will audit the statements of financial condition of the Credit Union as of September 30, 2012 (2013 and 2014), and the related statements of income, changes in members' equity, and cash flows for the years then ended.

**AUDIT OBJECTIVES**

The objective of our audits is the expression of an opinion as to whether the Credit Union's financial statements are fairly presented, in all material respects, in conformity with accounting principles generally accepted in the United States of America. Our audits will be conducted in accordance with audit standards generally accepted in the United States of America and will include tests of accounting records and other procedures we consider necessary to enable us to express such an opinion. If our opinion is other than unqualified, we will discuss the reasons with the Supervisory Committee in advance. If, for any reason, we are unable to complete the audits or unable to express an opinion; we may decline to express an opinion or may not issue a report as a result of this engagement.

**AUDIT PROCEDURES**

Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, consideration of the allowance for loan losses and other estimates made by management, and direct confirmation of loans, deposits, investments, and certain other assets and liabilities by correspondence with selected members, creditors, safekeeping agents, and correspondent institutions. Certain audit procedures, such as direct verification of loans and deposits, may be on an unannounced basis. We will also request written representations from the Credit Union's attorneys as part of the engagement, and they may bill the Credit Union for responding to this inquiry. At the conclusion of our audits, we will require certain written representations from management about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audits will involve judgement about the number of transactions to be examined and the areas to be tested. We will plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the Credit Union or to acts by management or employees acting on behalf of the Credit Union.

Because an audit is designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform you of any material errors that come to our attention, and we will inform you of any fraudulent financial statements.

phone: 850.438.5299  •  fax: 850.469.8071  •  toll free:  800.316.3057  •  e-mail: officemanager@huttocarvercpa.com

12

Hutto & Carver-000004

Supervisory Committee
Page 2

financial reporting or misappropriation of assets that comes to our attention. We will also inform you of any other violations of laws or governmental regulations that come to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audits and does not extend to any later periods for which we are not engaged as auditors.

Our audits will include obtaining an understanding of the entity and its environment, including internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures. An audit is not designed to provide assurance on internal control or to identify deficiencies in internal control. However, during the audit, we will communicate to you and those charged with governance internal control related matters that are required to be communicated under professional standards.

We may from time to time, and depending on the circumstances, use third-party service providers. We understand the need for confidentiality of your records and information and the privacy of the information within your data system. We remain committed to maintaining the confidentiality and security of your information, and agree to take all steps reasonably necessary to prevent the unauthorized disclosure or use of this information. Accordingly, we maintain internal policies, procedures, and safeguards to protect confidentiality. Furthermore, we will remain responsible for the work provided by any such third-party service providers.

MANAGEMENT RESPONSIBILITIES

You are responsible for making all management decisions and performing all management functions; for designating an individual with suitable skill, knowledge, or experience to oversee all tax services and any other nonattest services we provide; and for evaluating the adequacy and results of those services and accepting responsibility for them.

are responsible for establishing and maintaining internal controls, including monitoring ongoing activities; for the selection and application of accounting principles; and for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U.S. generally accepted accounting principles. You are also responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. Your responsibilities include adjusting the financial statements to correct any material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

You are responsible for the design and implementation of programs and controls to prevent and detect fraud and for informing us about all known or suspected fraud affecting the institution involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements. Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the institution received in communications from employees, former employees, regulators, or others. In addition, you are also responsible for identifying and ensuring that the financial institution complies with applicable laws and regulations.

ENGAGEMENT ADMINISTRATION, FEES, AND OTHER

We understand that your employees will prepare all cash, loans receivable, deposit, and other confirmation we request and will locate any loan documents and support for other transactions selected by us for testing.

In accordance with regulatory requirements, we, as your auditors, are required to make the following commitments:

1.  We will deliver final audit reports no later than the last day of January of the audit year. Those reports shall include the auditor's report and accompanying financial statements, internal control exceptions or reportable

Hutto & Carver-000005

Supervisory Committee
Page 3

conditions noted during the engagement, and any fraud or illegal acts noted during the engagement.

2. The audit documentation for this engagement is the property of Hutto & Carver, P.A. and constitute confidential information, as required by Section ET301 of the AICPA Code of Professional Conduct. However, we will provide your regulators with access to all of our original workpapers that are the basis of our opinion on the financial statements. If requested, access to such audit documentation will be provided under the supervision of Hutto & Carver, P.A. personnel. Furthermore, upon request, we may provide copies of audit documentation to your regulators. Your regulators may intend, or decide, to distribute the copies or information contained therein to others, including other governmental agencies.

3. Additionally, this engagement is an opinion audit that fulfills the requirements of a complete supervisory committee audit.

4. The engagement workpapers will be retained for at least five years from the date of the report.

The information that we obtain in auditing is confidential, as required by Section ET301 of the AICPA Code of Professional Conduct. Therefore, your acceptance of this engagement letter will serve as your advance consent to our compliance with above commitments.

If the Credit Union plans any reproduction or publication of our reports, or any portion of them, copies of master or printer's proofs of the entire document should be submitted to us in sufficient time for the firm's review and approval.

We will be pleased, at your request, to attend any Supervisory Committee and Board of Director's meetings. We would also like to meet with and other executives of the Credit Union at various times throughout each year to discuss current accounting and auditing matters affecting your Credit Union. Whenever you feel such a meeting would be desirable, please let us know.

The fees for the fiscal audit years ending September 30, 2012, 2013, and 2014 will not exceed $26,500 per year excluding costs associated with the confirmation process. The costs associated with the confirmation process will be capped at $1,500. The Credit Union agrees to pay all postage, printing, and other costs associated with the circularization and confirmation of member accounts and other Credit Union accounts requiring verification as determined necessary by the firm and/or required by auditing standards generally accepted in the United States of America. The fee estimate is based on anticipated cooperation from your personnel and the assumption that unexpected circumstances will not be encountered during the audit. In the event circumstances arise which will materially affect these amounts, we will notify you immediately in order that all parties can arrive at a mutually agreed upon adjustment. In no event will this approximation be adjusted without mutual agreement. The firm will render invoices as work progresses. The Supervisory Committee may terminate this contract at any time if it chooses to do so.

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us. This letter will continue in effect until cancelled by either party.

It is a pleasure for us to be of service to you and your Credit Union.

Very truly yours,

*Hutto & Carver, P.A.*

Hutto & Carver, P.A.

Supervisory Committee
Page 4

This letter correctly sets forth the understanding of Alabama One Credit Union.

_____                    7/13/12
Chairman, Supervisory Committee                 Date

Hutto & Carver-000007

(  .E CREDIT UNION OF ALABAM.
1215 VETERANS MEMORIAL PARKWAY
TUSCALOOSA, ALABAMA 35404

REPRESENTATION LETTER

November 7, 2008

Hutto & Carver, P.A.
200 East Government Street, Suite 110
Pensacola, FL 32502

Dear Sir/Madam:

In connection with your audit of the statements of financial condition of The Credit Union of Alabama as of September 30, 2008 and 2007, and the related statements of income, retained earnings, and cash flows for the years then ended for the purpose of expressing an opinion as to whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of The Credit Union of Alabama in conformity with generally accepted accounting principles, we confirm that we are responsible for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U.S. generally accepted accounting principles. We are also responsible for adopting sound accounting policies, establishing and maintaining internal control, and preventing and detecting fraud.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgement of a reasonable person relying on the information would be changed or influenced by the omission or misstatement.

We confirm, to the best of our knowledge and belief the following representations made to you during your audit:

1. The financial statements referred to above are fairly presented in conformity with U.S. generally accepted accounting principles.

2. We have made available to you all:

   a. Financial records and related data.

   b. Minutes of the meetings of directors and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.

   c. All regulatory or examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies, including communications about supervisory actions or noncompliance with, or deficiencies in rules and regulations or supervisory actions.

3. There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices.

EXHIBIT
4-B

Hutto & Carver-000011

Hutto & Carver, P.A.
Page 2

4.  There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.

5.  We believe the effects of the uncorrected financial statement misstatements summarized in the attached schedule are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

6.  We acknowledge our responsibility for the design and implementation of programs and controls to prevent and detect fraud.

7.  We have no knowledge of any fraud or suspected fraud affecting the institution involving:

   a.  Management.

   b.  Employees who have significant roles in internal control.

   c.  Others where the fraud could have material effect on the financial statements.

8.  We have no knowledge of any allegations of fraud or suspected fraud affecting the institution received in communications from employees, former employees, regulators, or others.

9.  The institution has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

10. All of the following have been properly recorded or disclosed in the financial statements as applicable:

   a.  Related party transactions and related amounts receivable or payable, including loans, deposits, sales, purchases, transfers, leasing arrangements, and guarantees.

   b.  Contingent assets and liabilities, including loans charged off and outstanding letters of credit.

   c.  Commitments to originate, purchase, or sell loans and participations.

   d.  Commitments to purchase or sell securities, including commitments to purchase or sell securities under forward-placement, financial-futures contracts, and standby commitments.

   e.  Positions in financial futures contracts or other derivative securities.

   f.  The status of the institution's capital plan filed with regulators.

   g.  Sales of loans or other transfers of financial assets.

   h.  The methods and significant assumptions used result in a measure of fair value appropriate for financial statement measurement and disclosure purposes.

   i.  The following information about financial instruments with concentrations of credit risk has been properly disclosed in the financial statements:

      (1)  The common activity, region, or characteristic that identifies the concentration.

Hutto & Carver-000012

Hutto & Carver, P.A.
Page 3

> (2)   The maximum loss that could result if the counterparties completely failed to perform their obligations and any collateral for the amounts due were worthless to the institution.
>
> (3)   The institution's policy of requiring collateral to minimize the risk, the nature of this collateral, and information about the institution's access to the collateral.

j.   Lease obligations under long-term leases.

k.   Guarantees, whether written or oral, under which the institution is contingently liable.

11.   There are no estimates that may be subject to a material change in the near term that have not been properly disclosed in the financial statements. We understand that near term means the period within one year of the date of the financial statements. In addition, we have no knowledge of concentrations existing at the date of the financial statements that make the institution vulnerable to the risk of severe impact that have not been properly disclosed in the financial statements.

12.   There are no:

a.   Violations or possible violations of laws, regulations, or supervisory actions, whose effect should be considered for disclosure in the financial statements or as a basis for recording a loss contingency.

b.   Unasserted claims or assessments that our lawyer has advised us are probable of assertion and must be disclosed in accordance with Statement of Financial Accounting Standards No. 5.

c.   Other liabilities or gain or loss contingencies that are required to be accrued or disclosed by Statement of Financial Accounting Standards No. 5, including any liabilities resulting from acting in a fiduciary capacity.

13.   The institution has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged or deposited in escrow as security except as made known to you and disclosed in the notes to the financial statements.

14.   We have disclosed to you all of our:

a.   Nonperforming assets.

b.   Intentions to foreclose or repossess property.

15.   If applicable, provision has been made for:

a.   Losses, costs, or expenses that may be incurred in the collection of securities, loans, leases, and real estate.

b.   Losses, costs, or expenses that may be incurred in the disposition of other real estate owned.

c.   Liabilities for interest on deposits and other indebtedness, including subordinated capital notes and participation loans.

d.   Other than temporary declines in the value of investment securities and other investment assets.

Hutto & Carver-000013

Hutto & Carver, P.A.
Page 4

16.  The classification of securities and other investment assets as held-to-maturity, available-for-sale, or trading correctly reflects management's ability and intent.

17.  There are no regulatory examinations currently in progress for which we have not received examination reports.

18.  Related party transactions (including insider loans) have been entered into in compliance with existing regulations.

19.  We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

20.  The methodology for determining fair value disclosures is based on reasonable assumptions.

No events have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment to, or disclosure in, the financial statements.

Signature: _____          Title: Manager/CEO _____

**ALABAMA ONE CREDIT UNION**
**1215 VETERANS MEMORIAL PARKWAY**
**TUSCALOOSA, ALABAMA 35401**

REPRESENTATION LETTER

December 11, 2009

Hutto & Carver, P.A.
200 East Government Street, Suite 110
Pensacola, FL 32502

Dear Sir/Madam:

In connection with your audit of the statements of financial condition of Alabama One Credit Union as of September 30, 2009 and 2008, and the related statements of income, retained earnings, and cash flows for the years then ended for the purpose of expressing an opinion as to whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the Credit Union in conformity with generally accepted accounting principles, we confirm that we are responsible for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U.S. generally accepted accounting principles. We are also responsible for adopting sound accounting policies, establishing and maintaining internal control, and preventing and detecting fraud.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgement of a reasonable person relying on the information would be changed or influenced by the omission or misstatement.

We confirm, to the best of our knowledge and belief the following representations made to you during your audit:

1.   The financial statements referred to above are fairly presented in conformity with U.S. generally accepted accounting principles.

2.   We have made available to you all:

    a.   Financial records and related data.

    b.   Minutes of the meetings of directors and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.

    c.   All regulatory or examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies, including communications about supervisory actions or noncompliance with, or deficiencies in rules and regulations or supervisory actions.

3.   There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices.

Hutto & Carver-000015

Hutto & Carver, P.A.
Page 3

    (2)    The maximum loss that could result if the counterparties completely failed to perform their obligations and any collateral for the amounts due were worthless to the institution.

    (3)    The institution's policy of requiring collateral to minimize the risk, the nature of this collateral, and information about the institution's access to the collateral.

    j.    Lease obligations under long-term leases.

    k.    Guarantees, whether written or oral, under which the institution is contingently liable.

11.    There are no estimates that may be subject to a material change in the near term that have not been properly disclosed in the financial statements. We understand that near term means the period within one year of the date of the financial statements. In addition, we have no knowledge of concentrations existing at the date of the financial statements that make the institution vulnerable to the risk of severe impact that have not been properly disclosed in the financial statements.

12.    There are no:

    a.    Violations or possible violations of laws, regulations, or supervisory actions, whose effect should be considered for disclosure in the financial statements or as a basis for recording a loss contingency.

    b.    Unasserted claims or assessments that our lawyer has advised us are probable of assertion and must be disclosed in accordance with Statement of Financial Accounting Standards No. 5.

    c.    Other liabilities or gain or loss contingencies that are required to be accrued or disclosed by Statement of Financial Accounting Standards No. 5, including any liabilities resulting from acting in a fiduciary capacity.

13.    The institution has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged or deposited in escrow as security except as made known to you and disclosed in the notes to the financial statements.

14.    We have disclosed to you all of our:

    a.    Nonperforming assets.

    b.    Intentions to foreclose or repossess property.

15.    If applicable, provision has been made for:

    a.    Losses, costs, or expenses that may be incurred in the collection of securities, loans, leases, and real estate.

    b.    Losses, costs, or expenses that may be incurred in the disposition of other real estate owned.

    c.    Liabilities for interest on deposits and other indebtedness, including subordinated capital notes and participation loans.

    d.    Other than temporary declines in the value of investment securities and other investment assets.

Hutto & Carver, P.A.
Page 4

16.     The classification of securities and other investment assets as held-to-maturity, available-for-sale, or trading correctly reflects management's ability and intent.

17.     There are no regulatory examinations currently in progress for which we have not received examination reports.

18.     Related party transactions (including insider loans) have been entered into in compliance with existing regulations.

19.     We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

20.     The methodology for determining fair value disclosures is based on reasonable assumptions.

No events have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment to, or disclosure in, the financial statements.

Signature: _____          Title: Manager + CEO _____

ALABAMA ONE CREDIT UNION

1215 VETERANS MEMORIAL PARKWAY

TUSCALOOSA, ALABAMA  35401

March 11, 2010

Hutto & Carver, P.A.

200 East Government Street, Suite 110

Pensacola, FL  32502

In connection with your audit of the balance sheet of Alabama One Credit Union as of September 30, 2009, and the related statements of income, retained earnings and cash flows for the period then ended for the purpose of expressing an opinion as to whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of Alabama One Credit Union in conformity with U.S. generally accepted accounting principles, you were previously provided with a representation letter dated December 11, 2009. No information has come to my attention that would cause me to believe that any of those previous representations should be modified.

No events have occurred subsequent to September 30, 2009, and through the date of this letter that would require adjustment to or disclosure in the financial statements.

Signature: _____

Title: Manager and CEO

AFI-CL-3.3

Hutto & Carver-000018

**ALABAMA ONE CREDIT UNION**
**1215 VETERANS MEMORIAL PARKWAY**
**TUSCALOOSA, ALABAMA  35404**


REPRESENTATION LETTER


December 17, 2010


Hutto & Carver, P.A.
200 East Government Street, Suite 110
Pensacola, FL  32502

Dear Sir/Madam:

In connection with your audit of the statements of financial condition of Alabama One Credit Union as of September 30, 2010 and 2009, and the related statements of income, retained earnings, and cash flows for the years then ended for the purpose of expressing an opinion as to whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of Alabama One Credit Union in conformity with generally accepted accounting principles, we confirm that we are responsible for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U.S. generally accepted accounting principles. We are also responsible for adopting sound accounting policies, establishing and maintaining internal control, and preventing and detecting fraud.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgement of a reasonable person relying on the information would be changed or influenced by the omission or misstatement.

We confirm, to the best of our knowledge and belief the following representations made to you during your audit:

1.   The financial statements referred to above are fairly presented in conformity with U.S. generally accepted accounting principles.

2.   We have made available to you all:

   a.   Financial records and related data.

   b.   Minutes of the meetings of directors and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.

   c.   All regulatory or examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies, including communications about supervisory actions or noncompliance with, or deficiencies in rules and regulations or supervisory actions.

3.   There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices.

Hutto & Carver-000019

Hutto & Carver, P.A.
Page 2

4. There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.

5. We believe the effects of the uncorrected financial statement misstatements summarized in the attached schedule are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

6. We acknowledge our responsibility for the design and implementation of programs and controls to prevent and detect fraud.

7. We have no knowledge of any fraud or suspected fraud affecting the institution involving:

   a. Management.

   b. Employees who have significant roles in internal control.

   c. Others where the fraud could have material effect on the financial statements.

8. We have no knowledge of any allegations of fraud or suspected fraud affecting the institution received in communications from employees, former employees, regulators, or others.

9. The institution has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

10. All of the following have been properly recorded or disclosed in the financial statements as applicable:

   a. Related party transactions and related amounts receivable or payable, including loans, deposits, sales, purchases, transfers, leasing arrangements, and guarantees.

   b. Contingent assets and liabilities, including loans charged off and outstanding letters of credit.

   c. Commitments to originate, purchase, or sell loans and participations.

   d. Commitments to purchase or sell securities, including commitments to purchase or sell securities under forward-placement, financial-futures contracts, and standby commitments.

   e. Positions in financial futures contracts or other derivative securities.

   f. The status of the institution's capital plan filed with regulators.

   g. Sales of loans or other transfers of financial assets.

   h. The methods and significant assumptions used result in a measure of fair value appropriate for financial statement measurement and disclosure purposes.

   i. The following information about financial instruments with concentrations of credit risk has been properly disclosed in the financial statements:

      (1) The common activity, region, or characteristic that identifies the concentration.

Hutto & Carver-000020

Hutto & Carver, P.A.
Page 3

    (2)    The maximum loss that could result if the counterparties completely failed to perform their obligations and any collateral for the amounts due were worthless to the institution.

    (3)    The institution's policy of requiring collateral to minimize the risk, the nature of this collateral, and information about the institution's access to the collateral.

j.    Lease obligations under long-term leases.

k.    Guarantees, whether written or oral, under which the institution is contingently liable.

11.    There are no estimates that may be subject to a material change in the near term that have not been properly disclosed in the financial statements. We understand that near term means the period within one year of the date of the financial statements. In addition, we have no knowledge of concentrations existing at the date of the financial statements that make the institution vulnerable to the risk of severe impact that have not been properly disclosed in the financial statements.

12.    There are no:

a.    Violations or possible violations of laws, regulations, or supervisory actions, whose effect should be considered for disclosure in the financial statements or as a basis for recording a loss contingency.

b.    Unasserted claims or assessments that our lawyer has advised us are probable of assertion and must be disclosed in accordance with Statement of Financial Accounting Standards No. 5.

c.    Other liabilities or gain or loss contingencies that are required to be accrued or disclosed by Statement of Financial Accounting Standards No. 5, including any liabilities resulting from acting in a fiduciary capacity.

13.    The institution has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged or deposited in escrow as security except as made known to you and disclosed in the notes to the financial statements.

14.    We have disclosed to you all of our:

a.    Nonperforming assets.

b.    Intentions to foreclose or repossess property.

15.    If applicable, provision has been made for:

a.    Losses, costs, or expenses that may be incurred in the collection of securities, loans, leases, and real estate.

b.    Losses, costs, or expenses that may be incurred in the disposition of other real estate owned.

c.    Liabilities for interest on deposits and other indebtedness, including subordinated capital notes and participation loans.

d.    Other than temporary declines in the value of investment securities and other investment assets.

Hutto & Carver-000021

Hutto & Carver, P.A.
Page 4

16. The classification of securities and other investment assets as held-to-maturity, available-for-sale, or trading correctly reflects management's ability and intent.

17. There are no regulatory examinations currently in progress for which we have not received examination reports.

18. Related party transactions (including insider loans) have been entered into in compliance with existing regulations.

19. We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

20. The methodology for determining fair value disclosures is based on reasonable assumptions.

21. In regards to the preparation of the Federal Forms 990 and 990-T and Alabama Excise Tax Return, performed by you, we have:

    a. Made all management decisions and performed all management functions.

    b. Designated an individual with suitable skill, knowledge, or experience to oversee the services.

    c. Evaluated the adequacy and results of the services performed.

    d. Accepted responsibility for the results of the services.

    e. Established and maintained internal controls, including monitoring ongoing activities.

No events have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment to, or disclosure in, the financial statements.

Signature: _____   Title: Manager and CFO

**ALABAMA ONE CREDIT UNION**
**1215 VETERANS MEMORIAL PARKWAY**
**TUSCALOOSA, ALABAMA 35404**

REPRESENTATION LETTER

December 16, 2011

Hutto & Carver, P.A.
200 East Government Street, Suite 110
Pensacola, FL 32502

Dear Sir/Madam:

In connection with your audit of the statements of financial condition of Alabama One Credit Union as of September 30, 2011 and 2010, and the related statements of income, retained earnings, and cash flows for the years then ended for the purpose of expressing an opinion as to whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of Alabama One Credit Union in conformity with generally accepted accounting principles, we confirm that we are responsible for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U.S. generally accepted accounting principles. We are also responsible for adopting sound accounting policies, establishing and maintaining internal control, and preventing and detecting fraud.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgement of a reasonable person relying on the information would be changed or influenced by the omission or misstatement.

We confirm, to the best of our knowledge and belief the following representations made to you during your audit:

1.   The financial statements referred to above are fairly presented in conformity with U.S. generally accepted accounting principles.

2.   We have made available to you all:

    a.   Financial records and related data.

    b.   Minutes of the meetings of directors and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.

    c.   All regulatory or examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies, including communications about supervisory actions or noncompliance with, or deficiencies in rules and regulations or supervisory actions.

3.   There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices.

Hutto & Carver, P.A.
Page 2

4.   There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.

5.   We believe the effects of the uncorrected financial statement misstatements summarized in the attached schedule are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

6.   We acknowledge our responsibility for the design and implementation of programs and controls to prevent and detect fraud.

7.   We have no knowledge of any fraud or suspected fraud affecting the institution involving:

    a.   Management.

    b.   Employees who have significant roles in internal control.

    c.   Others where the fraud could have material effect on the financial statements.

8.   We have no knowledge of any allegations of fraud or suspected fraud affecting the institution received in communications from

Hutto & Carver-000023

employees, former employees, regulators, or others.

9.     The institution has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

10.     All of the following have been properly recorded or disclosed in the financial statements as applicable:

      a.     Related party transactions and related amounts receivable or payable, including loans, deposits, sales, purchases, transfers, leasing arrangements, and guarantees.

      b.     Contingent assets and liabilities, including loans charged off and outstanding letters of credit.

      c.     Commitments to originate, purchase, or sell loans and participations.

      d.     Commitments to purchase or sell securities, including commitments to purchase or sell securities under forward-placement, financial-futures contracts, and standby commitments.

      e.     Positions in financial futures contracts or other derivative securities.

      f.     The status of the institution's capital plan filed with regulators.

      g.     Sales of loans or other transfers of financial assets.

      h.     The methods and significant assumptions used result in a measure of fair value appropriate for financial statement measurement and disclosure purposes.

      i.     The following information about financial instruments with concentrations of credit risk has been properly disclosed in the financial statements:

          (1)     The common activity, region, or characteristic that identifies the concentration.

Hutto & Carver, P.A.
Page 3

          (2)     The maximum loss that could result if the counterparties completely failed to perform their obligations and any collateral for the amounts due were worthless to the institution.

          (3)     The institution's policy of requiring collateral to minimize the risk, the nature of this collateral, and information about the institution's access to the collateral.

      j.     Lease obligations under long-term leases.

      k.     Guarantees, whether written or oral, under which the institution is contingently liable.

      l.     Significant estimates and material concentrations known to management that are required to be disclosed in accordance with *FASB Accounting Standards Codification 275, Risk and Uncertainties.*

11.     There are no estimates that may be subject to a material change in the near term that have not been properly disclosed in the financial statements. We understand that near term means the period within one year of the date of the financial statements. In addition, we have no knowledge of concentrations existing at the date of the financial statements that make the institution vulnerable to the risk of severe impact that have not been properly disclosed in the financial statements.

12.     There are no:

      a.     Violations or possible violations of laws, regulations, or supervisory actions, whose effect should be considered for disclosure in the financial statements or as a basis for recording a loss contingency.

      b.     Unasserted claims or assessments that our lawyer has advised us are probable of assertion and must be disclosed in accordance with FASB ASC 450, *Contingencies,* (formerly Statement of Financial Accounting Standards No. 5).

      c.     Other liabilities or gain or loss contingencies that are required to be accrued or disclosed by FASB ASC 450, *Contingencies,* (formerly Statement of Financial Accounting Standards No. 5), including any liabilities resulting from acting in a fiduciary capacity.

13.     The institution has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged or deposited in escrow as security except as made known to you and disclosed in the notes to the financial statements.

14.     We have disclosed to you all of our:

      a.     Nonperforming assets.

Hutto & Carver-000024

     b.      Intentions to foreclose or repossess property.

15.    If applicable, provision has been made for:

     a.      Losses, costs, or expenses that may be incurred in the collection of securities, loans, leases, and real estate.

     b.      Losses, costs, or expenses that may be incurred in the disposition of other real estate owned.

Hutto & Carver, P.A.
Page 4

     c.      Liabilities for interest on deposits and other indebtedness, including subordinated capital notes and participation loans.

     d.      Other than temporary declines in the value of investment securities and other investment assets.

16.    We agree with the findings of appraisers used and have adequately considered the qualifications of the appraisers in determining the amounts and disclosures in the financial statements and underlying accounting records. We did not give or cause any instructions to be given to appraisers regarding the values or amounts derived in an attempt to bias their work, and we are not otherwise aware of any matters that have had an impact on the independence or objectivity of the appraisers.

17.    The classification of securities and other investment assets as held-to-maturity, available-for-sale, or trading correctly reflects management's ability and intent.

18.    There are no regulatory examinations currently in progress for which we have not received examination reports.

19.    Related party transactions (including insider loans) have been entered into in compliance with existing regulations.

20.    We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

21.    The methodology for determining fair value disclosures is based on reasonable assumptions.

22.    In regards to the preparation of the Federal Forms 990 and 990T, as well as the Alabama Excise (ET-1) tax returns, performed by you, we have:

     a.      Made all management decisions and performed all management functions.

     b.      Designated an individual with suitable skill, knowledge, or experience to oversee the services.

     c.      Evaluated the adequacy and results of the services performed.

     d.      Accepted responsibility for the results of the services.

     e.      Internal controls, including monitoring ongoing activities.

No events have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment to, or disclosure in, the financial statements.

Signature: _____    Title: Manager / CEO

ALABAMA ONE CREDIT UNION
1215 VETERANS MEMORIAL PARKWAY
TUSCALOOSA, ALABAMA 35404

Management Representation Letter

March 1, 2013

Hutto & Carver, P.A.

200 E. Government Street, Suite 110

Pensacola, FL 32502

This representation letter is provided in connection with your audit of the financial statements of Alabama One Credit Union and its subsidiaries, which comprise the statements of financial condition as of September 30, 2012, and 2011, and the related statements of income, changes in members' equity, and cash flows for the fiscal years then ended, and the related notes to the financial statements, for the purpose of expressing an opinion as to whether the financial statements are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States (U.S. GAAP).

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement. An omission or misstatement that is monetarily small in amount could be considered material as a result of qualitative factors.

We confirm, to the best of our knowledge and belief, as of March 1, 2013, the following representations made to you during your audit.

Financial Statements

- We have fulfilled our responsibilities, as set out in the terms of the audit engagement letter dated July 12, 2012.
- The financial statements referred to above are fairly presented in conformity with U.S. generally accepted accounting principles.
- We acknowledge our responsibility for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.
- We acknowledge our responsibility for the design, implementation, and maintenance of internal control to prevent and detect fraud.
- Significant assumptions we used in making accounting estimates, including those measured at fair value, are reasonable.
- Related party relationships and transactions have been appropriately accounted for and disclosed in accordance with the requirements of U.S. GAAP.
- All of the following have been properly recorded or disclosed in the financial statements as applicable:
  - Related party relationships and transactions and related amounts receivable or payable, including loans, deposits, sales, purchases, transfers, leasing arrangements, and guarantees.
  - Contingent assets and liabilities, including loans charged off and outstanding letters of credit.
  - Commitments to originate, purchase, or sell loans and participations.

Hutto & Carver-000026

Hutto & Carver, P.A.
Page 2

- o  Commitments to purchase or sell securities, including commitments to purchase or sell securities under forward-placement, financial-futures contracts, and standby commitments.
- o  Positions in financial futures contracts or other derivative securities.
- o  The status of the institution's capital plan filed with regulators.
- o  Sales of loans or other transfers of financial assets.
- o  The following information about financial instruments with concentrations of credit risk:
  - ▪  The common activity, region, or characteristic that identifies the concentration.
  - ▪  The maximum loss that could result if the counterparties completely failed to perform their obligations and any collateral for the amounts due were worthless to the institution.
  - ▪  The institution's policy of requiring collateral to minimize the risk, the nature of this collateral, and information about the institution's access to the collateral.
- o  Lease obligations under long-term leases.
- All events subsequent to the date of the financial statements and for which U.S. GAAP requires adjustment or disclosure have been adjusted or disclosed.
- We have disclosed to you all of our—
  - o  Nonperforming assets.
  - o  Intentions to foreclose or repossess property.
- If applicable, provision has been made for:
  - o  Losses, costs, or expenses that may be incurred in the collection of securities, loans, leases, and real estate.
  - o  Losses, costs, or expenses that may be incurred in the disposition of other real estate owned.
  - o  Liabilities for interest on deposits and other indebtedness, including subordinated capital notes and participation loans.
  - o  Other than temporary declines in the value of investment securities and other investment assets.
- We agree with the findings of appraisers used and have adequately considered the qualifications of the appraisers in determining the amounts and disclosures in the financial statements and underlying accounting records. We did not give or cause any instructions to be given to appraisers regarding the values or amounts derived in an attempt to bias their work, and we are not otherwise aware of any matters that have had an impact on the independence or objectivity of the appraisers.
- The classification of securities and other investment assets as held-to-maturity, available-for-sale, or trading correctly reflects management's ability and intent.
- The effects of uncorrected misstatements are immaterial, both individually and in the aggregate, to the financial statements as a whole. A list of the uncorrected misstatements is attached to the representation letter.
- The effects of all known actual or possible litigation, claims, and assessments have been accounted for and disclosed in accordance with U.S. GAAP.
- Material concentrations have been properly disclosed in accordance with U.S. GAAP.
- Guarantees, whether written or oral, under which the institution is contingently liable, have been properly recorded or disclosed in accordance with U.S. GAAP.
- The institution has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

Institution—Specific

Hutto & Carver-000027

Hutto & Carver, P.A.
Page 3

- There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices.
- Loans receivable and other receivables recorded in the financial statements represent valid claims against debtors for lending transactions, sales, or other charges arising on or before the balance sheet date, and the carrying amounts of those receivables are determined in accordance with generally accepted accounting principles.
- Arrangements with financial institutions involving compensating balances or other arrangements involving restrictions on cash balances, lines of credit, or similar arrangements have been properly disclosed.
- Loans to executive officers have been properly accounted for and disclosed.
- Agreements to repurchase assets previously sold have been properly disclosed. The following have been evaluated and properly accounted for, if applicable.

*Investments and Derivatives*
- Securities classification under FASB ASC 320 reflecting management's ability and intent to hold investments.
- Management considers the decline in value of debt or equity securities to be temporary.

*Accounts Payable and Other Liabilities*
- Contributions to employee benefit plans or bonuses not documented in the minutes.
- Pension payments made after the client's year end.
- Actuarial assumptions used to measure pension liabilities and costs are appropriate.
- Expected employer contributions to defined benefit pension and postretirement benefit plans for the next fiscal year, if material to the financial statements.

**Information Provided**

We have provided you with:

o Access to all information, of which we are aware, that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters.

o Additional information that you have requested from us for the purpose of the audit.

o Unrestricted access to persons within the institution from whom you determined it necessary to obtain audit evidence.

o Minutes of the meetings of stockholders, directors, and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.

o All regulatory or examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies, including communications about supervisory actions or noncompliance with, or deficiencies in, rules and regulations or supervisory actions.

- All material transactions have been recorded in the accounting records and are reflected in the financial statements.
- We have disclosed to you the results of our assessment of the risk that the financial statements may be materially misstated as a result of fraud.
- We have no knowledge of any fraud or suspected fraud that affects the institution and involves:

o Management,

o Employees who have significant roles in internal control, or

o Others where the fraud could have a material effect on the financial statements.

Hutto & Carver-000028

Hutto & Carver, P.A.
Page 4

- We have no knowledge of any allegations of fraud or suspected fraud affecting the Institution's financial statements communicated by employees, former employees, analysts, regulators, or others.

- We have complied with all aspects of contractual agreements that would have a material effect on the financial statements In the event of noncompliance.

- We have disclosed to you all known Instances of noncompliance or suspected noncompliance with laws and regulations, or supervisory actions, whose effects should be considered when preparing financial statements.

- We have disclosed to you all known actual or possible litigation, claims, and assessments, including any liabilities resulting from acting in a fiduciary capacity, whose effects should be considered when preparing the financial statements.

- We have disclosed to you the Identity of the Institution's related parties and all the related party relationships and transactions of which we are aware.

- Related party transactions (Including insider loans) have been entered into in compliance with existing regulations.

- The institution has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral or deposited in escrow as security.

- There are no regulatory examinations currently in progress for which we have not received examination reports.

Signature: _____

Title: Manager and CEO _____

Hutto & Carver-000029

**ALABAMA ONE CREDIT UNION**

**1215 VETERANS MEMORIAL PARKWAY**

**TUSCALOOSA, ALABAMA 35404**

**Management Representation Letter**

December 13, 2013

Hutto & Carver, P.A.
200 East Government Street, Suite 110
Pensacola, Florida 32502

This representation letter is provided in connection with your audit of the financial statements of Alabama One Credit Union, which comprise the statements of financial condition as of September 30, 2013 and 2012, and the related statements of income, comprehensive income, changes in members' equity, and cash flows for the years then ended, and the related notes to the financial statements, for the purpose of expressing an opinion as to whether the financial statements are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States (U.S. GAAP).

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement. An omission or misstatement that is monetarily small in amount could be considered material as a result of qualitative factors.

We confirm, to the best of our knowledge and belief, as of December 13, 2013, the following representations made to you during your audit.

**Financial Statements**

- We have fulfilled our responsibilities, as set out in the terms of the audit engagement letter dated July 12, 2012, including our responsibility for the preparation and fair presentation of the financial statements.
- The financial statements referred to above are fairly presented in conformity with U.S. GAAP.
- We acknowledge our responsibility for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.
- We acknowledge our responsibility for the design, implementation, and maintenance of internal control to prevent and detect fraud.
- Significant assumptions we used in making accounting estimates, including those measured at fair value, are reasonable.
- Related party relationships and transactions have been appropriately accounted for and disclosed in accordance with the requirements of U.S. GAAP.
- All of the following have been properly recorded or disclosed in the financial statements as applicable:
    - Related party relationships and transactions and related amounts receivable or payable, including loans, deposits, sales, purchases, transfers, leasing arrangements, and guarantees.
    - Contingent assets and liabilities, including loans charged off and outstanding letters of credit.
    - Commitments to originate, purchase, or sell loans and participations.

Hutto & Carver-000030

Hutto & Carver, P.A.
Page 2

- o  Commitments to purchase or sell securities, including commitments to purchase or sell securities under forward-placement, financial-futures contracts, and standby commitments.
- o  Positions in financial futures contracts or other derivative securities.
- o  The status of the institution's capital plan filed with regulators.
- o  Sales of loans or other transfers of financial assets.
- o  The following information about financial instruments with concentrations of credit risk:
    - ▪  The common activity, region, or characteristic that identifies the concentration.
    - ▪  The maximum loss that could result if the counterparties completely failed to perform their obligations and any collateral for the amounts due were worthless to the institution.
    - ▪  The institution's policy of requiring collateral to minimize the risk, the nature of this collateral, and information about the institution's access to the collateral.
- o  Lease obligations under long-term leases.

- • All events subsequent to the date of the financial statements and for which U.S. GAAP requires adjustment or disclosure have been adjusted or disclosed.
- • We have disclosed to you all of our—
    - o  Nonperforming assets.
    - o  Intentions to foreclose or repossess property.
- • If applicable, provision has been made for:
    - o  Losses, costs, or expenses that may be incurred in the collection of securities, loans, leases, and real estate.
    - o  Losses, costs, or expenses that may be incurred in the disposition of other real estate owned.
    - o  Liabilities for interest on deposits and other indebtedness, including subordinated capital notes and participation loans.
    - o  Other than temporary declines in the value of investment securities and other investment assets.
- • We agree with the findings of appraisers used and have adequately considered the qualifications of the appraisers in determining the amounts and disclosures in the financial statements and underlying accounting records. We did not give or cause any instructions to be given to appraisers regarding the values or amounts derived in an attempt to bias their work, and we are not otherwise aware of any matters that have had an impact on the independence or objectivity of the appraisers.
- • The classification of securities and other investment assets as held-to-maturity, available-for-sale, or trading correctly reflects management's ability and intent.
- • No transactions or activities are planned that would result in any recapture of the base-year, tax-basis bad debt reserve.
- • The effects of uncorrected misstatements are immaterial, both individually and in the aggregate, to the financial statements as a whole. A list of the uncorrected misstatements is attached to the representation letter.
- • The effects of all known actual or possible litigation, claims, and assessments have been accounted for and disclosed in accordance with U.S. GAAP.
- • Material concentrations have been properly disclosed in accordance with U.S. GAAP.
- • Guarantees, whether written or oral, under which the institution is contingently liable, have been properly recorded or disclosed in accordance with U.S. GAAP.
- • The institution has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

Hutto & Carver-000031

Hutto & Carver, P.A.
Page 3

**Institution—Specific**

- There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices.
- Loans receivable and other receivables recorded in the financial statements represent valid claims against debtors for lending transactions, sales, or other charges arising on or before the balance sheet date, and the carrying amounts of those receivables are determined in accordance with generally accepted accounting principles.
- Loans to executive officers have been properly accounted for and disclosed.

The following have been evaluated and properly accounted for, if applicable:

**Prepaids, Deferred Charges, Intangibles, and Other Assets**

- Material deferred charges.

**Investments and Derivatives**

- Securities classification under FASB ASC 320 reflecting management's ability and intent to hold investments.
- Management considers the decline in value of debt or equity securities to be temporary.
- The appropriateness and consistency of the measurement processes used by management in determining accounting estimates.
- That the disclosures related to accounting estimates are complete and appropriate.
- That no subsequent event has occurred that would require adjustment to the accounting estimates or disclosures included in the financial statements.

**Accounts Payable and Other Liabilities**

- Contributions to employee benefit plans or bonuses not documented in the minutes.
- Pension payments made after the client's year end.
- Actuarial assumptions used to measure pension liabilities and costs are appropriate.
- Expected employer contributions to defined benefit pension and postretirement benefit plans for the next fiscal year, if material to the financial statements.

**Information Provided**

- We have provided you with:
  - Access to all information, of which we are aware, that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters.
  - Additional information that you have requested from us for the purpose of the audit.
  - Unrestricted access to persons within the institution from whom you determined it necessary to obtain audit evidence.
  - Minutes of the meetings of stockholders, directors, committees of directors, credit/loan committee, asset/liability management committee, other relevant committees or summaries of actions of recent meetings for which minutes have not yet been prepared.
  - All regulatory or examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies, including communications about supervisory actions or noncompliance with, or deficiencies in, rules and regulations or supervisory actions.
- All material transactions have been recorded in the accounting records and are reflected in the financial statements.

Hutto & Carver-000032

Hutto & Carver, P.A.
Page 4

- We have disclosed to you the results of our assessment of the risk that the financial statements may be materially misstated as a result of fraud.

- We have no knowledge of any fraud or suspected fraud that affects the institution and involves:

  o Management,

  o Employees who have significant roles in internal control, or

  o Others where the fraud could have a material effect on the financial statements.

- We have no knowledge of any allegations of fraud or suspected fraud affecting the institution's financial statements communicated by employees, former employees, analysts, regulators, or others.

- We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

- We have no knowledge of any instances of noncompliance or suspected noncompliance with laws and regulations, or supervisory actions, whose effects should be considered when preparing financial statements.

- We have disclosed to you all known actual or possible litigation, claims, and assessments, including any liabilities resulting from acting in a fiduciary capacity, whose effects should be considered when preparing the financial statements.

- We have disclosed to you the identity of the institution's related parties and all the related party relationships and transactions of which we are aware.

- Related party transactions (including insider loans) have been entered into in compliance with existing regulations.

- The institution has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral or deposited in escrow as security.

- There are no regulatory examinations currently in progress for which we have not received examination reports.

Signature: _____

Title: Manager and CEO

Hutto & Carver-000033

21.00

PBC

## ALABAMA ONE CREDIT UNION
## 1215 VETERANS MEMORIAL PARKWAY
## TUSCALOOSA, ALABAMA 35404

Management Representation Letter

March 3, 2015

Hutto & Carver, P.A.
200 E. Government St. Suite 110
Pensacola, FL 32502

Ladies and Gentlemen:

This representation letter is provided in connection with your audit of the financial statements of Alabama One Credit Union, which comprise the statements of financial condition as of September 30, 2014 and 2013, and the related statements of income, changes in members' equity, comprehensive income, and cash flows for the periods then ended, and the related notes to the financial statements, for the purpose of expressing an opinion as to whether the financial statements are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States (U.S. GAAP).

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement. An omission or misstatement that is monetarily small in amount could be considered material as a result of qualitative factors.

We confirm, to the best of our knowledge and belief, as of March 3, 2015, the following representations made to you during your audit.

Financial Statements

1) We have fulfilled our responsibilities, as set out in the terms of the audit engagement letter dated July 13, 2012, including our responsibility for the preparation and fair presentation of the financial statements.

2) The financial statements referred to above are fairly presented in conformity with U.S. GAAP.

3) We acknowledge our responsibility for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

4) We acknowledge our responsibility for the design, implementation, and maintenance of internal control to prevent and detect fraud.

5) Significant assumptions we used in making accounting estimates, including those measured at fair value, are reasonable.

6) Related party relationships and transactions have been appropriately accounted for and disclosed in accordance with U.S. GAAP.

7) All of the following have been properly recorded or disclosed in the financial statements as applicable:

   a) Related party relationships and transactions and related amounts receivable or payable, including loans, deposits, sales, purchases, transfers, leasing arrangements, and guarantees.

   b) Contingent assets and liabilities, including loans charged off and outstanding letters of credit.

   c) Commitments to originate, purchase, or sell loans and participations.

Hutto & Carver-000034

Hutto & Carver, P.A.
Page 2

   d) Commitments to purchase or sell securities, including commitments to purchase or sell securities under forward-placement, financial-futures contracts, and standby commitments.

   e) Positions in financial futures contracts or other derivative securities.

   f) The status of the institution's capital plan filed with regulators.

   g) Sales of loans or other transfers of financial assets.

   h) The following information about financial instruments with concentrations of credit risk:

      i) The common activity, region, or characteristic that identifies the concentration.

      ii) The maximum loss that could result if the counterparties completely failed to perform their obligations and any collateral for the amounts due were worthless to the institution.

      iii) The institution's policy of requiring collateral to minimize the risk, the nature of this collateral, and information about the institution's access to the collateral.

   i) Lease obligations under long-term leases.

8) Significant events subsequent to the date of the financial statements and for which U.S. GAAP requires adjustment or disclosure have been adjusted or disclosed.

9) We have disclosed to you all of our-

   a) Nonperforming assets.

   b) Intentions to foreclose or repossess property.

10) If applicable, provision has been made for:

   a) Losses, costs, or expenses that may be incurred in the collection of securities, loans, leases, and real estate.

   b) Losses, costs, or expenses that may be incurred in the disposition of other real estate owned.

   c) Liabilities for interest on deposits and other indebtedness, including subordinated capital notes and participation loans.

   d) Other than temporary declines in the value of investment securities and other investment assets.

11) We accept the findings of appraisers used and have adequately considered the qualifications of the appraisers in determining the amounts and disclosures in the financial statements and underlying accounting records. We did not give or cause any instructions to be given to appraisers regarding the values or amounts derived in an attempt to bias their work, and we are not otherwise aware of any matters that have had an impact on the independence or objectivity of the appraisers.

12) The classification of securities and other investment assets as held-to-maturity, available-for-sale, or trading correctly reflects management's ability and intent.

13) No transactions or activities are planned that would result in any recapture of the base-year, tax-basis bad debt reserve.

14) The effects of uncorrected misstatements are immaterial, both individually and in the aggregate, to the financial statements as a whole. A list of the uncorrected misstatements is attached to the representation letter.

15) The effects of all known actual or possible litigation, claims, and assessments have been accounted for and disclosed in accordance with U.S. GAAP.

16) Material concentrations have been properly disclosed in accordance with U.S. GAAP.

17) Guarantees, whether written or oral, under which the institution is contingently liable, have been properly recorded or disclosed in accordance with U.S. GAAP.

18) The institution has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

Hutto & Carver-000035

Hutto & Carver, P.A.
Page 3

### Institution-Specific

19) There have been communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices, which have been disclosed to you and corrective action has been taken.

20) Loans receivable and other receivables recorded in the financial statements represent valid claims against debtors for lending transactions, sales, or other charges arising on or before the balance sheet date, and the carrying amounts of those receivables are determined in accordance with generally accepted accounting principles.

21) Arrangements with financial institutions involving compensating balances or other arrangements involving restrictions on cash balances, lines of credit, or similar arrangements have been properly disclosed.

22) Loans to executive officers have been properly accounted for and disclosed.

23) Agreements to repurchase assets previously sold have been properly disclosed.

24) Capital stock repurchase options or agreements or capital stock reserved for options, warrants, conversions, or other requirements have been properly disclosed.

25) We have reviewed long-lived assets and certain identifiable intangibles to be held and used for impairment whenever events or changes in circumstances have indicated that the carrying amount of assets might not be recoverable and have appropriately recorded the adjustment.

26) The following have been evaluated and properly accounted for, if applicable:

Prepaids, Deferred Charges, Intangibles, and Other Assets

- Impairment of goodwill and other intangible assets not subject to amortization.
- Material deferred charges.

Investments and Derivatives

- Securities classification under FASB ASC 320 reflecting management's ability and intent to hold investments.
- Management considers the decline in value of debt or equity securities to be temporary.
- Existence and completeness of derivatives and appropriate characteristics of hedges.
- Unusual considerations involved in determining the application of the equity method of accounting.
- Special purpose or variable interest entities.

Accounts Payable and Other Liabilities

- Contributions to employee benefit plans or bonuses not documented in the minutes.
- Pension payments made after the client's year end.
- Actuarial assumptions used to measure pension liabilities and costs are appropriate.
- Expected employer contributions to defined benefit pension and postretirement benefit plans for the next fiscal year, if material to the financial statements.

General

- Acknowledgment of oral communications made by the auditor.
- Transactions for which there is no written supporting documentation.
- Actions allowed by regulatory agencies that are not documented in writing or by legal references.
- GAAP changes/adoption.
- Future plans or commitments.
- Lawsuits, regulatory actions, etc.

Hutto & Carver, P.A.
Page 4

## Information Provided

27) We have provided you with:

a) Access to all information, of which we are aware, that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters.

b) Additional information that you have requested from us for the purpose of the audit.

c) Unrestricted access to persons within the institution from whom you determined it necessary to obtain audit evidence.

d) Minutes of the meetings of stockholders, directors, committees of directors, credit/loan committee, asset/liability management committee, other relevant committees or summaries of actions of recent meetings for which minutes have not yet been prepared.

e) All regulatory or examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies, including communications about supervisory actions or noncompliance with, or deficiencies in, rules and regulations or supervisory actions.

28) All material transactions have been recorded in the accounting records and are reflected in the financial statements.

29) We have disclosed to you the results of our assessment of the risk that the financial statements may be materially misstated as a result of fraud.

30) We have no knowledge of any fraud or suspected fraud that affects the institution and involves:

a) Management,

b) Employees who have significant roles in internal control, or

c) Others where the fraud could have a material effect on the financial statements.

31) We have no knowledge of any allegations of fraud or suspected fraud affecting the institution's financial statements communicated by employees, former employees, analysts, regulators, or others, which we have not disclosed to you.

32) We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

33) We have no knowledge of any instances of noncompliance or suspected noncompliance with laws and regulations, or supervisory actions, whose effects should be considered when preparing financial statements.

34) We have disclosed to you all known actual or possible litigation, claims, and assessments, including any liabilities resulting from acting in a fiduciary capacity, whose effects should be considered when preparing the financial statements.

35) We have disclosed to you the identity of the institution's related parties and all the related party relationships and transactions of which we are aware.

36) Related party transactions (including insider loans) have been entered into in compliance with existing regulations.

37) The institution has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral or deposited in escrow as security other than as disclosed.

38) There is an on-going regulatory examination currently in progress for which we have not received examination report.

## Other Services

39) In regard to the Federal Form 990 and 990T services performed by you, we have-

1) Assumed all management responsibilities.

2) Designated an individual (within senior management) with suitable skill, knowledge, or experience to oversee the services,

3) Evaluated the adequacy and results of the services performed.

Hutto & Carver-000037

Hutto & Carver, P.A.
Page 5

    4)   Accepted responsibility for the results of the services.

Signature: _____

Title: _Manager and CEO_____

Hutto & Carver-000038

## THE CREDIT UNION OF ALABAMA FEDERAL CREDIT UNION
### NOTES TO FINANCIAL STATEMENTS
### SEPTEMBER 30, 2008 AND 2007

## NOTE 1 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

The allowance for loan losses is established as losses are estimated to have occurred through a provision for loans losses charged to earnings. Loan losses are charged against the allowance when management believes the uncollectibility of a loan balance is confirmed. Subsequent recoveries, if any, are credited to the allowance.

The allowance for loan losses is evaluated on a regular basis by management and is based upon management's periodic review of the collectibility of the loans in light of historical experience, the nature and volume of the loan portfolio, adverse situations that may affect the borrower's ability to repay, estimated value of any underlying collateral, and prevailing economic conditions. This evaluation is inherently subjective as it requires estimates that are susceptible to significant revisions as more information becomes available.

The Credit Union's allowance for loan and lease losses is that amount considered adequate to absorb probable losses in the portfolio based on management's evaluations of the size and current risk characteristics of the loan portfolio. Such evaluation considers prior loss experience, the risk rating distribution of the portfolios, the impact of current internal and external influences on credit loss and the levels of nonperforming loans. Specific allowances for loan losses are established for large impaired loans on a individual basis as required per SFAS No. 114. The specific allowance established for these loans and leases is based on a thorough analysis of the most probable source of repayment, including the present value of the loan's expected future cash flow, the loan's estimated market value, or the estimated fair value of the underlying collateral. General allowances are established for loans that can be grouped into pools based on similar characteristics as described in SFAS No. 5. In this process, general allowance factors are based on an analysis of historical charge-off experience and expected losses given default derived from the Credit Union's internal risk rating process. These factors are developed and applied to the portfolio in terms of loan type. The qualitative factors associated with the allowance are subjective and require a high degree of management judgment. These factors include the credit quality statistics, recent economic uncertainty, losses incurred from recent events, and lagging data.



**OTHER REAL ESTATE OWNED**

Real estate properties acquired through or in lieu of loan foreclosure are initially recorded at the lower of the Credit Union's carrying amount or fair value less estimated selling cost at the date of foreclosure. Any write-downs based on the asset's fair value at the date of acquisition are charged to the allowance for loan losses. After foreclosure, property held for sale is carried at the lower of the new cost basis or fair value less cost to sell. Impairment losses on property to be held and used are measured as the amount by which the carrying amount of property exceeds its value. Costs of significant property improvement are capitalized, whereas costs relating to holding property are expensed. Valuations are periodically performed by management, and any subsequent write-downs are recorded as a charge to operations, if necessary, to reduce the carrying value of a property to the lower of its costs or fair value less cost to sell.

EXHIBIT
4-C



# HUTTO
# CARVER, P.A.
### CERTIFIED PUBLIC ACCOUNTANTS

200 East Government Street, Suite 110
Pensacola, Florida 32502
November 7, 2008



EXHIBIT
4-D

Supervisory Committee
The Credit Union of Alabama Federal Credit Union
1215 Veteran's Memorial Parkway
Tuscaloosa, AL 35404

Dear Committee Members:

In planning and performing our audit of the financial statements of The Credit Union of Alabama Federal Credit Union for the year ended September 30, 2008, in accordance with auditing standards generally accepted in the United States of America, we considered the Credit Union's internal control over financial reporting (internal control) as a basis for designing our auditing procedures for the purpose of expressing our opinion on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of the Credit Union's internal control. Our consideration of internal control included procedures to evaluate the design of controls relevant to an audit of financial statements and to determine whether they have been implemented, but it did not include procedures to test the operating effectiveness of controls. Accordingly, we do not express an opinion on the effectiveness of the Credit Union's internal controls.

Our consideration of internal control was for the limited purpose described in the preceding paragraph and would not necessarily identify all deficiencies in internal control that might be significant deficiencies or material weaknesses. In addition, because of inherent limitations in internal control, including the possibility of management override of controls, misstatements due to error or fraud may occur and not be detected by such controls.

Professional standards require that we provide you with the following information.

- **Our Responsibility**   Our responsibility as auditors is limited to the period covered by our audit and does not extend to any later periods for which we are not engaged as auditors. Our audit does ensure that based on the audit, the financial statements are free of material misstatement and are in conformity with accounting principles generally accepted in the United States of America. Our audit does not relieve you or management of your responsibilities.

- **Accounting Policies**   Management is responsible for the selection and use of appropriate accounting policies. There were no new or significant changes in accounting policies that would affect the financial statements.

- **Accounting Estimates**   Accounting estimates are an integral part of the financial statements prepared by management and are based on management's knowledge and experience about past and current events and assumptions about future events. Certain accounting estimates are particularly sensitive because of their significance to the financial statements and because of the possibility that future events affecting them may differ significantly from those expected. The most sensitive estimate affecting the financial statements is the allowance for loan loss account. Management's estimate of the allowance account is based on historical loss levels and an analysis of the collectibility of individual accounts. We evaluated the key factors and assumptions used to develop the allowance in determining that it is reasonable in relation to the financial statements taken as a whole.

- **Disagreements with Management**   There were no disagreements or difficulties with management in completing this engagement, and there was no undue pressure placed on our firm to present financial data in a manner inconsistent with acceptable accounting principles.

- **Misstatements**   Standards require us to accumulate all known and likely misstatements identified during the audit, other than those that are trivial, and communicate them to the appropriate level of management. There were no



Supervisory Committee
Page 2

significant accounting adjustments that we are aware of, either recorded or unrecorded, that have not been disclosed to you.

- **Management Representations**   We have requested certain representations from management that are included in a management representation letter.
- **Management Consultations with Other Accountants**   In some cases, management may decide to consult with other accountants about auditing and accounting matters, similar to obtaining a "second opinion" on certain situations. If a consultation involves application of an accounting principle to the Credit Union's financial statements or a determination of the type of auditor's opinion that may be expressed on those statements, our professional standards require the consulting accountant to check with us to determine that the consultant has all the relevant facts. To our knowledge, there were no such consultations with other accountants.

Auditing standards further require our firm to report to you significant deficiencies or material weaknesses in internal control. A control deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis. A significant deficiency is a control deficiency, or combination of control deficiencies, that adversely affects the entity's ability to initiate, authorize, record, process, or report financial data reliably in accordance with generally accepted accounting principles such that there is more than a remote likelihood that a misstatement of the entity's financial statements that is more than inconsequential will not be prevented or detected by the entity's internal control. A material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the financial statements will not be prevented or detected by the entity's internal control.

Our consideration of internal control was for the limited purpose described in the first paragraph and would not necessarily identify all deficiencies in internal control that might be significant deficiencies or material weaknesses. We did not identify any significant deficiencies or material weaknesses in internal control as defined above. The following items do not represent significant deficiencies or material weaknesses; therefore, we are not required to communicate them to you. However, these observations resulted from the application of auditing procedures and are provided for your information.



Supervisory Committee
Page 3

Comment Two

As an informational item, while reviewing credit concentration relationships, we noted the following credit concentration which in total was significant to both outstanding credits and commitments to extend credit.

| Member Name | Loan Amount |
|---|---|
| Danny Butler | |
| DB Enterprises | |
| Dunn & Butler | |
| Foster Water Treatment, LLC | |
| Frances Butler | |
| Michael Dunn | |
| Dunn Auto Sales | |
| Total loans as of September 30, 2008, excluding unfunded LOCs | |
| Loan disbursed to Butler Enterprises in October 2008 | |
| | |
| Unfunded Commitments as of September 30, 2008 | |



Total outstanding exposure

We did review collateral values supporting the loans and found they were supported by property appraisals. However, two of the Danny Butler loans which were secured by real property reflected a loan-to-value in the high 90% range. While the loans appear to be within policy, and there were adequate support indicating the members have the ability to repay the loans, the Board may wish to consider requesting that management provide a monthly report identifying significant loan relationships and/or commitments.



Supervisory Committee
Page 4



In conclusion, the Credit Union strong earning and net worth places it in the financial position to provide new and improved financial services to its members.

This report is intended solely for the information and use of the Supervisory Committee, Management, the Board of Directors, and your regulatory agency.

Sincerely,

*Hutto & Carver, P.C.*

Hutto & Carver, P.A.

FILED

2016 Sep-22  PM 02:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
MORTGAGE Book 2015 Page 50135
Recorded: 9/5/2015 8:23:36 AM
W. Hardy McCollum, Probate Judge
Tuscaloosa County, Alabama
Term/Cashier: PRO-RECORDING2/HHIX
Tran: 793899
Probate Judge Fee $2.00
Recording Fee - By Page Count $30.00
Mortgage Tax $2,700.00
Source of Title $1.25
Total: $2,733.25
```

## Source of Title
**Deed Book:** _2008_
**Page:** _11907_    Parcel 1

_Deed Book 2005._
_Page 72_   Parcel 2

Space Above This Line For Recording Data

This instrument was prepared by Loan Operations / Jennifer Stepter, Capstone Bank, 2301 University Boulevard, Tuscaloosa, AL 35401

# MORTGAGE
### (With Future Advance Clause)

DATE AND PARTIES.  The date of this Mortgage (Security Instrument) is August 21, 2015.  The parties and their addresses are:

MORTGAGOR:
    SMITH'S MARINA & DRYDOCK, INC.
    An Alabama Corporation
    12175 VIEWPOINT ROAD
    NORTHPORT, AL 35475-0000

    BEASLEY PROPERTIES, LLC
    An Alabama Limited Liability Company
    12175 VIEWPOINT ROAD
    NORTHPORT, AL 35475-0000

LENDER:
    CAPSTONE BANK
    Organized and existing under the laws of Alabama
    2301 University Blvd
    PO BOX 1488
    Tuscaloosa, AL 35401

1. CONVEYANCE.  For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debts and Mortgagor's performance under this Security Instrument, Mortgagor does hereby grant, bargain, convey, sell and mortgage to Lender, with power of sale, the following described property:

For a complete legal description, see attached Exhibit "A", said Exhibit "A" being made a part of this description by said reference.

The property is located in Tuscaloosa County at 12175 Viewpoint Road, Northport, Alabama 35475.

Initials 
Page 1

SMITH'S MARINA & DRYDOCK, INC.
Alabama Mortgage
AL/4JSTEPTER00000000009462054082115N          Wolters Kluwer Financial Services ©1996, 2015 Bankers Systems™





EXHIBIT
5

MORTGAGE Book 2015 Page 50136

Tuscaloosa County, Alabama

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, wells, ditches and water stock, crops, timber, all diversion payments or third party payments made to crop producers and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described (all referred to as Property). When the Secured Debts are paid in full and all underlying agreements have been terminated, this Security Instrument will become null and void. This Security Instrument will remain in effect until the Secured Debts and all underlying agreements have been terminated in writing by Lender.

**2. SECURED DEBTS AND FUTURE ADVANCES.** The term "Secured Debts" includes and this Security Instrument will secure each of the following:

A. **Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 2030008500, dated August 21, 2015, from SMITH'S MARINA & DRYDOCK, INC. (Borrower) to Lender, with a loan amount of $1,800,000.00.

B. **Future Advances.** All future advances from Lender to SMITH'S MARINA & DRYDOCK, INC. under the Specific Debts executed by SMITH'S MARINA & DRYDOCK, INC. in favor of Lender after this Security Instrument. If more than one person signs this Security Instrument, each agrees that this Security Instrument will secure all future advances that are given to SMITH'S MARINA & DRYDOCK, INC. either individually or with others who may not sign this Security Instrument. All future advances are secured by this Security Instrument even though all or part may not yet be advanced. All future advances are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future advances in any amount. Any such commitment must be agreed to in a separate writing.

C. **All Debts.** All present and future debts from SMITH'S MARINA & DRYDOCK, INC. to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt. If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances. Any such commitment must be in writing. This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and Lender does not obtain a "statement of purpose," as defined and required by federal law governing securities. This Security Instrument will not secure any other debt if Lender fails, with respect to that other debt, to fulfill any necessary requirements or conform to any limitations of Regulations Z and X that are required for loans secured by the Property.

D. **Sums Advanced.** All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

**3. PAYMENTS.** Mortgagor agrees that all payments under the Secured Debts will be paid when due and in accordance with the terms of the Secured Debts and this Security Instrument.

**4. NON-OBLIGATED MORTGAGOR.** Any Mortgagor, who is not also identified as a Borrower in the Secured Debts section of this Security Instrument and who signs this Security Instrument, is referred to herein as a Non-Obligated Mortgagor for purposes of subsection 7(d)(4) of 12 C.F.R. 1002 (Regulation B) which implements the Equal Credit Opportunity Act (ECOA). By signing this Security Instrument, the Non-Obligated Mortgagor does mortgage and assign their rights and interests in the Property to secure payment of the Secured Debts, to create a valid lien, to pass clear title, to waive inchoate rights and to assign earnings or rights to payment under any lease or rent of the Property. However, the Non-Obligated Mortgagor is not personally liable for the Secured Debts by virtue of signing this Security Instrument. Nothing in this section shall be construed to modify or otherwise affect the Non-Obligated Mortgagor's obligations, if any, that were separately made with Lender in a separate agreement and duly signed by the Non-Obligated Mortgagor in the context of that separate agreement.

**5. WARRANTY OF TITLE.** Mortgagor warrants that Mortgagor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell and mortgage with the power of sale the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.



MORTGAGE Book 2015 Page 50137

Tuscaloosa County, Alabama

**6. PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:

   A. To make all payments when due and to perform or comply with all covenants.

   B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.

   C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

**7. CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

**8. DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law, as applicable.

**9. TRANSFER OF AN INTEREST IN THE MORTGAGOR.** If Mortgagor is an entity other than a natural person (such as a corporation, partnership, limited liability company or other organization), Lender may demand immediate payment if:

   A. A beneficial interest in Mortgagor is sold or transferred.

   B. There is a change in either the identity or number of members of a partnership or similar entity.

   C. There is a change in ownership of more than 25 percent of the voting stock of a corporation, partnership, limited liability company or similar entity.

However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Security Instrument.

**10. WARRANTIES AND REPRESENTATIONS.** Mortgagor makes to Lender the following warranties and representations which will continue as long as this Security Instrument is in effect:

   A. Power. Mortgagor is duly organized, and validly existing and in good standing in all jurisdictions in which Mortgagor operates. Mortgagor has the power and authority to enter into this transaction and to carry on Mortgagor's business or activity as it is now being conducted and, as applicable, is qualified to do so in each jurisdiction in which Mortgagor operates.

   B. Authority. The execution, delivery and performance of this Security Instrument and the obligation evidenced by this Security Instrument are within Mortgagor's powers, have been duly authorized, have received all necessary governmental approval, will not violate any provision of law, or order of court or governmental agency, and will not violate any agreement to which Mortgagor is a party or to which Mortgagor is or any of Mortgagor's property is subject.

   C. Name and Place of Business. Other than previously disclosed in writing to Lender, Mortgagor has not changed Mortgagor's name or principal place of business within the last 10 years and has not used any other trade or fictitious name. Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve Mortgagor's existing name, trade names and franchises.

**11. PROPERTY CONDITION, ALTERATIONS, INSPECTION, VALUATION AND APPRAISAL.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor will not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor, and of any loss or damage to the Property.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that

MORTGAGE Book 2015 Page 50138

Tuscaloosa County, Alabama

become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Security Instrument. Mortgagor will not partition or subdivide the Property without Lender's prior written consent.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time and frequency for the purpose of inspecting, valuating, or appraising the Property. Lender will give Mortgagor notice at the time of or before an on-site inspection, valuation, or appraisal for on-going due diligence or otherwise specifying a reasonable purpose. Any inspection, valuation or appraisal of the Property will be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection, valuation or appraisal for its own purpose, except as otherwise provided by law.

12. AUTHORITY TO PERFORM. If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor will not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

13. DEFAULT. Mortgagor will be in default if any of the following events (known separately and collectively as an Event of Default) occur:

A. Payments. Mortgagor or Borrower fail to make a payment in full when due.

B. Insolvency or Bankruptcy. The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against Mortgagor, Borrower, or any co-signer, endorser, surety or guarantor of this Security Instrument or any other obligations Borrower has with Lender.

C. Business Termination. Mortgagor merges, dissolves, reorganizes, ends its business or existence, or a partner or majority owner dies or is declared legally incompetent.

D. Failure to Perform. Mortgagor fails to perform any condition or to keep any promise or covenant of this Security Instrument.

E. Other Documents. A default occurs under the terms of any other document relating to the Secured Debts.

F. Other Agreements. Mortgagor is in default on any other debt or agreement Mortgagor has with Lender.

G. Misrepresentation. Mortgagor makes any verbal or written statement or provides any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

H. Judgment. Mortgagor fails to satisfy or appeal any judgment against Mortgagor.

I. Forfeiture. The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

J. Name Change. Mortgagor changes Mortgagor's name or assumes an additional name without notifying Lender before making such a change.

K. Property Transfer. Mortgagor transfers all or a substantial part of Mortgagor's money or property. This condition of default, as it relates to the transfer of the Property, is subject to the restrictions contained in the DUE ON SALE section.

L. Property Value. Lender determines in good faith that the value of the Property has declined or is impaired.

M. Material Change. Without first notifying Lender, there is a material change in Mortgagor's business, including ownership, management, and financial conditions.

N. Insecurity. Lender determines in good faith that a material adverse change has occurred in Borrower's financial condition from the conditions set forth in Borrower's most recent financial statement before the date of this Security Instrument or that the prospect for payment or performance of the Secured Debts is impaired for any reason.

MORTGAGE Book 2015 Page 50139
Tuscaloosa County, Alabama

**14. REMEDIES.** On or after the occurrence of an Event of Default, Lender may use any and all remedies Lender has under state or federal law or in any document relating to the Secured Debts, including, without limitation, the power to sell the Property. Any amounts advanced on Mortgagor's behalf will be immediately due and may be added to the balance owing under the Secured Debts. Lender may make a claim for any and all insurance benefits or refunds that may be available on Mortgagor's default.

Subject to any right to cure, required time schedules or any other notice rights Mortgagor may have under federal and state law, Lender may make all or any part of the amount owing by the terms of the Secured Debts immediately due and foreclose this Security Instrument in a manner provided by law upon the occurrence of an Event of Default or anytime thereafter.

If Lender initiates a judicial foreclosure, Lender will give the notices as required by applicable law. If Lender invokes the power of sale, Lender will publish the notice of sale, and arrange to sell all or part of the Property, as required by applicable law. Lender or its designee may purchase the Property at any sale. Lender will apply the proceeds of the sale in the manner required by applicable law. The sale of any part of the Property will only operate as a foreclosure of the sold Property, so any remaining Property will continue to secure any unsatisfied Secured Debts and Lender may further foreclose under the power of sale or by judicial foreclosure.

Upon any sale of the Property, Lender will make and deliver a special or limited warranty deed that conveys the property sold to the purchaser or purchasers. Under this special or limited warranty deed, Lender will covenant that Lender has not caused or allowed a lien or an encumbrance to burden the Property and that Lender will specially warrant and defend the Property's title to the purchaser or purchasers at the sale against all lawful claims and demand of all persons claiming by, through or under Lender. The recitals in any deed of conveyance will be prima facie evidence of the facts set forth therein.

All remedies are distinct, cumulative and not exclusive, and Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debts after the balance is due or is accelerated or after foreclosure proceedings are filed will not constitute a waiver of Lender's right to require full and complete cure of any existing default. By not exercising any remedy, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

**15. REDEMPTION.** The period of redemption after sale on foreclosure will be one year. Any agreement to extend the redemption period must be in writing.

**16. COLLECTION EXPENSES AND ATTORNEYS' FEES.** On or after the occurrence of an Event of Default, to the extent permitted by law, Mortgagor agrees to pay all expenses of collection, enforcement, valuation, appraisal or protection of Lender's rights and remedies under this Security Instrument or any other document relating to the Secured Debts. Mortgagor agrees to pay expenses for Lender to inspect, valuate, appraise and preserve the Property and for any recordation costs of releasing the Property from this Security Instrument. Expenses include, but are not limited to, attorneys' fees, court costs and other legal expenses. These expenses are due and payable immediately. If not paid immediately, these expenses will bear interest from the date of payment until paid in full at the highest interest rate in effect as provided for in the terms of the Secured Debts. In addition, to the extent permitted by the United States Bankruptcy Code, Mortgagor agrees to pay the reasonable attorneys' fees incurred by Lender to protect Lender's rights and interests in connection with any bankruptcy proceedings initiated by or against Mortgagor.

**17. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substance," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

Mortgagor represents, warrants and agrees that:

SMITH'S MARINA & DRYDOCK, INC.
Alabama Mortgage
AL/4JSTEPTER0000000000946205400211 6N          Wolters Kluwer Financial Services ©1996, 2015 Bankers Systems™

Initials _____
Page 5

MORTGAGE Book 2015 Page 50140
Tuscaloosa County, Alabama

A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

D. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law. Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

E. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are and will remain in full compliance with any applicable Environmental Law.

F. Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

G. Mortgagor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

H. Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

I. Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Mortgagor's obligations under this section at Mortgagor's expense.

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Security Instrument and in return Mortgagor will provide Lender with collateral of at least equal value to the Property without prejudice to any of Lender's rights under this Security Instrument.

L. Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section will survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

18. CONDEMNATION. Mortgagor will give Lender prompt notice of any pending or threatened action by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a

SMITH'S MARINA & DRYDOCK, INC.
Alabama Mortgage
AL/4JSTEPTER00000000000946206406211 6N

Wolters Kluwer Financial Services ©1996, 2015 Bankers Systems™

Initials 
Page 6

MORTGAGE Book 2015 Page 50141
Tuscaloosa County, Alabama

condemnation or other taking of all or any part of the Property. Such proceeds will be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

**19. INSURANCE.** Mortgagor agrees to keep the Property insured against the risks reasonably associated with the Property. Mortgagor will maintain this insurance in the amounts Lender requires. This insurance will last until the Property is released from this Security Instrument. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debts. Mortgagor may choose the insurance company, subject to Lender's approval, which will not be unreasonably withheld.

All insurance policies and renewals shall include a standard "mortgage clause" (or "lender loss payable clause") endorsement that names Lender as "mortgagee" and "loss payee". If required by Lender, all insurance policies and renewals will also include an "additional insured" endorsement that names Lender as an "additional insured". If required by Lender, Mortgagor agrees to maintain comprehensive general liability insurance and rental loss or business interruption insurance in amounts and under policies acceptable to Lender. The comprehensive general liability insurance must name Lender as an additional insured. The rental loss or business interruption insurance must be in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing).

Mortgagor will give Lender and the insurance company immediate notice of any loss. All insurance proceeds will be applied to restoration or repair of the Property or to the Secured Debts, at Lender's option. If Lender acquires the Property in damaged condition, Mortgagor's rights to any insurance policies and proceeds will pass to Lender to the extent of the Secured Debts.

Mortgagor will immediately notify Lender of cancellation or termination of insurance. If Mortgagor fails to keep the Property insured, Lender may obtain insurance to protect Lender's interest in the Property and Mortgagor will pay for the insurance on Lender's demand. Lender may demand that Mortgagor pay for the insurance all at once, or Lender may add the insurance premiums to the balance of the Secured Debts and charge interest on it at the rate that applies to the Secured Debts. This insurance may include coverages not originally required of Mortgagor, may be written by a company other than one Mortgagor would choose, and may be written at a higher rate than Mortgagor could obtain if Mortgagor purchased the insurance. Mortgagor acknowledges and agrees that Lender or one of Lender's affiliates may receive commissions on the purchase of this insurance.

**20. ESCROW FOR TAXES AND INSURANCE.** Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

**21. WAIVERS.** Except to the extent prohibited by law, Mortgagor waives all appraisement rights relating to the Property.

**22. APPLICABLE LAW.** This Security Instrument is governed by the laws of Alabama, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**23. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** Each Mortgagor's obligations under this Security Instrument are independent of the obligations of any other Mortgagor. Lender may sue each Mortgagor individually or together with any other Mortgagor. Lender may release any part of the Property and Mortgagor will still be obligated under this Security Instrument for the remaining Property. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument will bind and benefit the successors and assigns of Lender and Mortgagor.

**24. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Security Instrument may not be amended or modified by oral agreement. No amendment or modification of this Security Instrument is effective unless made in writing and executed by Mortgagor and Lender. This Security Instrument and any other documents relating to the Secured Debts are the complete and final expression of the agreement. If any provision of this Security Instrument is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

MORTGAGE Book 2015 Page 50142
Tuscaloosa County, Alabama

25. INTERPRETATION. Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Security Instrument.

26. NOTICE, ADDITIONAL DOCUMENTS AND RECORDING FEES. Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Mortgagor will be deemed to be notice to all Mortgagors. Mortgagor will inform Lender in writing of any change in Mortgagor's name, address or other application information. Mortgagor will provide Lender any other, correct and complete information Lender requests to effectively mortgage or convey the Property. Mortgagor agrees to pay all expenses, charges and taxes in connection with the preparation and recording of this Security Instrument. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and to confirm Lender's lien status on any Property, and Mortgagor agrees to pay all expenses, charges and taxes in connection with the preparation and recording thereof. Time is of the essence.

SIGNATURES. By signing under seal, Mortgagor agrees to the terms and covenants contained in this Security Instrument. Mortgagor also acknowledges receipt of a copy of this Security Instrument.

MORTGAGOR:

SMITH'S MARINA & DRYDOCK, INC.

By _____   Date   8-21-15   (Seal)
John G Beasley, President

BEASLEY PROPERTIES, LLC

By _____   Date   8-21-15   (Seal)
John G Beasley, Manager

MORTGAGE Book 2015 Page 50143
Tuscaloosa County, Alabama

ACKNOWLEDGMENT.

STATE OF ALABAMA, COUNTY OF TUSCALOOSA ss.

I, Jennifer F. Stepter, a notary public, in and for said County in said State, hereby certify that John G Beasley, whose name(s) as President of the SMITH'S MARINA & DRYDOCK, INC. a corporation, is/are signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he/she/they, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation. Given under my hand this the 21st day of August 2015.

My commission expires:

December 3, 2016

(Notary Public)
Jennifer F. Stepter

STATE OF ALABAMA, COUNTY OF TUSCALOOSA ss.

I, Jennifer F. Stepter, a notary public, in and for said County in said State, hereby certify that John G Beasley, whose name(s) as Manager of the BEASLEY PROPERTIES, LLC, a Limited Liability Company, is/are signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he/she/they, in his/her/their capacity as such Manager, executed the same voluntarily on the day the same bears date. Given under my hand this the 21st day of August 2015.

My commission expires:

December 3, 2016

(Notary Public)
Jennifer F. Stepter

SMITH'S MARINA & DRYDOCK, INC.
Alabama Mortgage
AL/4JSTEPTER00000000000462054082115N                    Wolters Kluwer Financial Services ©1998, 2015 Bankers Systems™

Initials ___  Page 0

MORTGAGE Book 2015 Page 50144
Tuscaloosa County, Alabama

EXHIBIT "A"

All that certain lot or parcel of land situated in the County of Tuscaloosa, State of Alabama, and being more particularly described as follows:

Parcel I:
Lot 1 Smith Marina Subdivision, a map or plat of which is recorded in Plat Book 2008, at Pages 203 and 204 in the Probate Office of Tuscaloosa County, Alabama, reference to which is hereby made in aid of and as a part of this description.

Parcel II:
Lot 2 Smith Marina Subdivision, a map or plat of which is recorded in Plat Book 2008, at Pages 203 and 204 in the Probate Office of Tuscaloosa County, Alabama, reference to which is hereby made in aid of and as a part of this description.

IN THE CIRCUIT COURT OF TUSCALOOSA COUNTY, ALABAMA

| | | |
|---|---|---|
| ALABAMA ONE CREDIT UNION, | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION NUMBER** |
| v. | ) | **CV-2015-901234** |
| | ) | |
| PAUL TOPPINS, et al, | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF ALABAMA ONE CREDIT UNION'S AMENDED RESPONSES TO DEFENDANTS RICHARD A. MALOYAND MALOY AND COMPANY, INC.'S FIRST INTERROGATORIES

COMES NOW Plaintiff Alabama One Credit Union ("Alabama One") and hereby amends the following previously-filed responses to Defendants Richard A. Maloy and Maloy and Company, Inc.'s (the "Maloy Defendants") first Interrogatories:

## GENERAL OBJECTIONS

1.      Plaintiff objects to each and every discovery request to the extent that the information called for, if any, was obtained and prepared in anticipation of litigation or for trial, and Defendant has made no showing that it has substantial need for the materials in the preparation of its case and that it is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means. Plaintiff further objects to each and every discovery requests to the extent that the information called for, if any, is privileged, constitutes work product and/or is not discoverable under the *Alabama Rules of Civil Procedure.*

2.      Plaintiff objects to each and every request to the extent that it is vague, overly broad and unduly burdensome and/or calls for a legal conclusion.

3.      Plaintiff objects to each and every request to the extent that it calls for information that is not material or relevant and information that is not reasonably calculated to lead to the discovery of admissible evidence.

4.      Plaintiff objects to the "Definitions" contained in the Request for Production to the extent that they are vague, ambiguous and unintelligible, and to the extent that they seek to impose burdens upon Plaintiff greater than the burdens imposed by the *Alabama Rules of Civil Procedure.*

5.      Plaintiff objects to each and every request to the extent that it calls for documents that are already in the possession of Defendant.

6.      Plaintiff objects to each and every request to the extent that it is not limited in scope and time.

7.      Plaintiff objects to each and every discovery request to the extent that it seeks an answer involving an opinion or contention that relates to fact or the application of law to fact before discovery has been completed or a pretrial conference has been conducted.

## AMENDED INTERROGATORIES

1.      Please state the name and last known address and phone number of each executive, officer, employee, or official of Alabama One that you claim Maloy had an agreement with to issue "made to order" appraisals as alleged in paragraph 43 of your Complaint.

2.

**RESPONSE: Alabama One is currently without sufficient knowledge or information to accurately answer this question, given that discovery has just commenced in this case and no depositions have taken place.**

3.      Please state the dollar amount lost by Alabama One as a result of the "2009 Alabama One Loan," the "2012 Loan Modification" and/or the Maloy appraisal of Smith's marina and property described in the Complaint.

**RESPONSE: Alabama One lost at least $2,000 (exclusive of interest and punitive damages) as a result of the 2009 Alabama One Loan, the 2012 Loan Modification, and/or the Maloy appraisal of Smith's marina. Alabama One paid Maloy $2,000 as consideration for an accurate appraisal that complied with USPAP. Alabama One did not receive what it paid for; instead, it received an inaccurate appraisal violating numerous USPAP provisions. An independent review of Maloy's appraisal even referred to it as fraudulent.**

4.      Described in detail each loss suffered by Alabama One resulting from any aspect of the 2009 Alabama One Loan, the 2012 Mortgage Modification and/or the Maloy appraisal of Smith's marina and property.

**RESPONSE: Alabama One objects to this Interrogatory as duplicative of other discovery requests. Subject to, and without waiving the foregoing objection, Alabama One refers Maloy to its answer to Interrogatory #2.**

5.      Please list and itemize (including the date and the precise amount of any shortfall) any failure to pay a periodic payment to Alabama One on the 2009 Alabama One Loan both before and after the 2012 Mortgage Modification.

**RESPONSE: There were no failures to pay a periodic payment to Alabama One on the 2009 Alabama One Loan. There were no shortfalls on any of the payments made to Alabama One on the 2009 Alabama One Loan.**

6.      Please list all amounts of money owed to Alabama One by the mortgagor on the 2009 Alabama One Loan and/or the 2012 Mortgage One Modification at the time Capstone Bank recorded its mortgage on September 5, 2015.

**RESPONSE:** There were no amounts of money owed to Alabama One by the mortgagor on the 2009 Alabama One Loan at the time Capstone Bank recorded its mortgage on September 5, 2015.

7.      Was Alabama One paid in full for all amounts it was owed pursuant to the 2009 Alabama One Loan and/or the 2012 Mortgage One Modification, including payment of any arrears, on or before the time Capstone Bank recorded its mortgage on September 5, 2015? If not, please state and itemize what amounts were owed to Alabama One on September 5, 2015 pursuant to the 2009 Alabama One Loan and/or the 2012 Mortgage One modification?

**RESPONSE:** Alabama One objects to this Interrogatory as duplicative of other discovery requests. Subject to, and without waiving the foregoing objection, Alabama One refers Maloy to its answer to Interrogatory #5.

12.      Have you, or anyone on your behalf, spoken with or interviewed any officer, agent or employee of Maloy in connection with your investigation of this matter or the claims in this case? If so, please provide the name, address and phone number of the current custodian of any notes, transcripts, statements or recordings of said investigation.

**RESPONSE:** No one on Alabama One's behalf has spoken with or interviewed any officer, agent or employee of Maloy.

15.      Please identify by full name and last known address and telephone number, each employee, officer, or agent of Alabama One who had contact with Maloy regarding the appraisal of Smith's marina and property.

**RESPONSE:** Alabama One currently knows the following current or former employees, officers, or agents of Alabama One had contact with Maloy regarding the appraisal of Smith's marina and property:

Ms. Janet Tubbs
Alabama One Credit Union
1215 Veterans Memorial Parkway
Tuscaloosa, AL 35404

16.      Please identify by name, address and position / title each person who assisted in answering these interrogatories and/or searched for or gathered all documents produced in response to the requests for production served contemporaneously herewith.

**RESPONSE:**

William E. McCartney
REYNOLDS, REYNOLDS & LITTLE, LLC
2115 11th St.
Tuscaloosa, AL 35401

John C. Guin
CAMPBELL GUIN, LLC
505 20th Street North, Ste. 1600
Birmingham, AL 35203

Thomas E. Baddley, Jr.
BADDLEY & MAURO, LLC
850 Shades Creek Pkwy, Ste. 310
Birmingham, AL 35209

Respectfully submitted,

/s/ John C. Guin
Attorney for Plaintiff

**OF COUNSEL:**

Andrew P. Campbell
A. Todd Campbell
John C. Guin
CAMPBELL, GUIN, LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
Telephone: (205) 224-0750
andy.campbell@campbellguin.com
todd.campbell@campbellguin.com
john.guin@campbellguin.com

Thomas E. Baddley, Jr.
Jeffrey P. Mauro
John Parker Yates
BADDLEY & MAURO, LLC
850 Shades Creek Pkwy, Ste. 310
Birmingham, AL 35209-4510
jpy@baddleymauro.com
tbaddley@baddleymauro.com
jpmauro@baddleymauro.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the 17th day of June, 2016, I filed the foregoing using the E-File System which will automatically serve the following counsel of record:

William J. Gamble, Jr.
A. Grady Williams, IV
Joseph M. Aguirre
Phelps Dunbar, LLP
101 Dauphin Street, Suite 1000
Mobile, AL 36602
Will.gamble@phelps.com
Bo.williams@phelps.com
Joseph.aguirre@phelps.com

*Counsel for Defendant Hutto & Carver, P.A.*

Barry v. Frederick
Brandi B. Frederick
The Frederick Firm
5409 Trace Ridge Lane
Birmingham, AL 35244
barry@frederickfirm.net
brandi@frederickfirm.net

*Counsel for Defendants Barry V. Frederick;*
*Brandi B. Frederick and The Frederick Firm*

David R. Wells
Whitaker, Mudd, Luke & Wells, LLC
2011 4th Avenue North
Birmingham, AL 35203
dwells@wmslawfirm.com

*Counsel for Defendants Mary Jane Watson and*
*Green and Company Real Estate Services*

Michael A. Vercher
Jonathan M. Hooks
Christian & Small, LLP
505 20th Street North, Suite 1800
Birmingham, AL 35203
mavercher@csattorneys.com
jmhooks@csattorneys.com

*Counsel for Defendants Richard A. Maloy and Maloy and Company, Inc.*

James D. Turner
Turner & Turner
1426 22nd Avenue
Tuscaloosa, AL 35401
Jturner003@aol.com

*Counsel for Dick Holley and*
*West Alabama Appraisal*

Greg Brockwell
Leitman Siegal & Payne PC
404 N. 20th Street, Suite 2000
Birmingham, AL 35203

*Counsel for Defendants Jeven R. Sloan*
*and Loewinsohn Flegle Deary, LLP*

Joseph E. Stott
Scott, Sullivan, Streetman & Fox, P.C.
2450 Valleydale Road
Birmingham, AL 35244
jstott@sssandf.com

*Counsel for Defendant Paul Toppins*

                                                    */s John C. Guin*
                                                    Of Counsel

NO TAX
COLLECTED

2009   21595
Recorded in the Above
MORTGAGE  Book & Page
03-18-2009 10:43:16 AM
Source Of Title: DEED 2008 / 10207
W. Hardy McCollum - Probate Judge
Tuscaloosa County, Alabama

SOURCE OF TITLE: DEED BOOK 2008, AT PAGE 10207.

---

Space Above This Line For Recording Data

This Instrument was prepared by DEBBI  NICHOLS , 1215 VETERANS MEMORIAL PKWY, TUSCALOOSA, Alabama 35404

## MORTGAGE

**DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is March 11, 2009.  The parties and their addresses are:

MORTGAGOR:
SMITH'S MARINA & DRYDOCK, INC.
An Alabama Corporation
12176 VIEWPOINT ROAD
NORTHPORT, Alabama 35476

LENDER:
ALABAMA ONE CREDIT UNION
Organized and existing under the laws of Alabama
1215 Veterans Memorial Pkwy.
Tuscaloosa, Alabama 35404

**1. CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debts and Mortgagor's performance under this Security Instrument, Mortgagor grants, bargains, conveys, sells and mortgages to Lender, with power of sale, the following described property:

LOTS 22-A, 22-B & 22-C RESURVEY OF LOT 22 VIEW POINT, A MAP OR PLAT OF WHICH IS RECORDED IN PLAT BOOK 13, AT PAGE 26 IN THE PROBATE OFFICE OF TUSCALOOSA COUNTY, ALABAMA, AND REFERENCE TO WHICH IS HEREBY MADE IN AID OF AND AS A PART OF THIS DESCRIPTION

The property is located in TUSCALOOSA County at 12176 VIEWPOINT ROAD, NORTHPORT, Alabama 35476.
Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, wells, ditches and water stock, crops, timber, all diversion payments or third party payments made to crop producers and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described (all referred to as Property).  When the Secured Debts are paid in full and all underlying agreements have been terminated, this Security Instrument will become null and void.    This Security Instrument will remain in effect until the Secured Debts and all underlying agreements have been terminated in writing by Lender.

---

SMITH'S MARINA & DRYDOCK, INC.
Alabama Mortgage
AL/4debbinic000220000584G18031109Y

©1996 Bankers Systems, Inc., St. Cloud, MN  Expere℠

Initials _____
Page 1

2009   21596
MORTGAGE   Book & Page

**2. MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time will not exceed $2,200,000.00. This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

**3. SECURED DEBTS.** The term "Secured Debts" includes and this Security Instrument will secure each of the following:

A. **Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 64829-32, dated March 11, 2009, from Mortgagor to Lender, with a loan amount of $2,200,000.00 and maturing on April 1, 2012.

B. **All Debts.** All present and future debts from Mortgagor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt. If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances. Any such commitment must be in writing. In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent security interest in the Mortgagor's principal dwelling that is created by this Security Instrument. This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and Lender does not obtain a "statement of purpose," as defined and required by federal law governing securities.

C. **Sums Advanced.** All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

**4. PAYMENTS.** Mortgagor agrees that all payments under the Secured Debts will be paid when due and in accordance with the terms of the Secured Debts and this Security Instrument.

**5. WARRANTY OF TITLE.** Mortgagor warrants that Mortgagor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell and mortgage with the power of sale the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

**6. PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:

A. To make all payments when due and to perform or comply with all covenants.

B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.

C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

**7. CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

**8. DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable.

**9. TRANSFER OF AN INTEREST IN THE MORTGAGOR.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Lender may demand immediate payment if:

A. A beneficial interest in Mortgagor is sold or transferred.

B. There is a change in either the identity or number of members of a partnership or similar entity.

C. There is a change in ownership of more than 25 percent of the voting stock of a corporation or similar entity.



2009   21597
MORTGAGE Book & Page

However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Security Instrument.

**10. WARRANTIES AND REPRESENTATIONS.** Mortgagor makes to Lender the following warranties and representations which will continue as long as this Security Instrument is in effect:

**A. Power.** Mortgagor is duly organized, and validly existing and in good standing in all jurisdictions in which Mortgagor operates. Mortgagor has the power and authority to enter into this transaction and to carry on Mortgagor's business or activity as it is now being conducted and, as applicable, is qualified to do so in each jurisdiction in which Mortgagor operates.

**B. Authority.** The execution, delivery and performance of this Security Instrument and the obligation evidenced by this Security Instrument are within Mortgagor's powers, have been duly authorized, have received all necessary governmental approval, will not violate any provision of law, or order of court or governmental agency, and will not violate any agreement to which Mortgagor is a party or to which Mortgagor is or any of Mortgagor's property is subject.

**C. Name and Place of Business.** Other than previously disclosed in writing to Lender, Mortgagor has not changed Mortgagor's name or principal place of business within the last 10 years and has not used any other trade or fictitious name. Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve Mortgagor's existing name, trade names and franchises.

**11. PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor will not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor, and of any loss or damage to the Property.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Security Instrument. Mortgagor will not partition or subdivide the Property without Lender's prior written consent.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender will give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property will be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

**12. AUTHORITY TO PERFORM.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor will not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

**13. DEFAULT.** Mortgagor will be in default if any of the following occur:

**A. Payments.** Mortgagor fails to make a payment in full when due.

**B. Insolvency or Bankruptcy.** The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against Mortgagor, Borrower, or any co-signer, endorser, surety or guarantor of this Security Instrument or any other obligations Borrower has with Lender.

**C. Business Termination.** Mortgagor merges, dissolves, reorganizes, ends its business or existence, or a partner or majority owner dies or is declared legally incompetent.



2009   21598
MORTGAGE   Book & Page

**D. Failure to Perform.** Mortgagor fails to perform any condition or to keep any promise or covenant of this Security Instrument.

**E. Other Documents.** A default occurs under the terms of any other document relating to the Secured Debts.

**F. Other Agreements.** Mortgagor is in default on any other debt or agreement Mortgagor has with Lender.

**G. Misrepresentation.** Mortgagor makes any verbal or written statement or provides any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

**H. Judgment.** Mortgagor fails to satisfy or appeal any judgment against Mortgagor.

**I. Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

**J. Name Change.** Mortgagor changes Mortgagor's name or assumes an additional name without notifying Lender before making such a change.

**K. Property Transfer.** Mortgagor transfers all or a substantial part of Mortgagor's money or property. This condition of default, as it relates to the transfer of the Property, is subject to the restrictions contained in the DUE ON SALE section.

**L. Property Value.** Lender determines in good faith that the value of the Property has declined or is impaired.

**M. Material Change.** Without first notifying Lender, there is a material change in Mortgagor's business, including ownership, management, and financial conditions.

**N. Insecurity.** Lender determines in good faith that a material adverse change has occurred in Mortgagor's financial condition from the conditions set forth in Mortgagor's most recent financial statement before the date of this Security Instrument or that the prospect for payment or performance of the Secured Debts is impaired for any reason.

**14. REMEDIES.** On or after default, Lender may use any and all remedies Lender has under state or federal law or in any document relating to the Secured Debts, including, without limitation, the power to sell the Property. Any amounts advanced on Mortgagor's behalf will be immediately due and may be added to the balance owing under the Secured Debts. Lender may make a claim for any and all insurance benefits or refunds that may be available on Mortgagor's default.

Subject to any right to cure, required time schedules or any other notice rights Mortgagor may have under federal and state law, Lender may make all or any part of the amount owing by the terms of the Secured Debts immediately due and foreclose this Security Instrument in a manner provided by law upon the occurrence of a default or anytime thereafter.

If Lender initiates a judicial foreclosure, Lender will give the notices as required by applicable law. If Lender invokes the power of sale, Lender will publish the notice of sale, and arrange to sell all or part of the Property, as required by applicable law. Lender or its designee may purchase the Property at any sale. Lender will apply the proceeds of the sale in the manner required by applicable law. The sale of any part of the Property will only operate as a foreclosure of the sold Property, so any remaining Property will continue to secure any unsatisfied Secured Debts and Lender may further foreclose under the power of sale or by judicial foreclosure.

Upon any sale of the Property, Lender will make and deliver a special or limited warranty deed that conveys the property sold to the purchaser or purchasers. Under this special or limited warranty deed, Lender will covenant that Lender has not caused or allowed a lien or an encumbrance to burden the Property and that Lender will specially warrant and defend the Property's title of the purchaser or purchasers at the sale against all lawful claims and demand of all persons claiming by, through or under Lender. The recitals in any deed of conveyance will be prima facie evidence of the facts set forth therein.

All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debts after the balance is due or is accelerated or after foreclosure proceedings are filed will not constitute a waiver of Lender's right to require full and complete cure of any existing default. By not exercising any remedy, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

**15. REDEMPTION.** The period of redemption after sale on foreclosure will be one year. Any agreement to extend the redemption period must be in writing.

**16. COLLECTION EXPENSES AND ATTORNEYS' FEES.** On or after Default, to the extent permitted by law, Mortgagor agrees to pay all expenses of collection, enforcement or protection of Lender's rights and remedies under this Security Instrument or any other document relating to the Secured Debts. Mortgagor agrees to pay

SMITH'S MARINA & DRYDOCK, INC.
Alabama Mortgage
AL/4debbinic00022000005848018031109Y

©1996 Bankers Systems, Inc., St. Cloud, MN  Experts

Initials
Page 4

expenses for Lender to inspect and preserve the Property and for any recordation costs of releasing the Property from this Security Instrument. Expenses include, but are not limited to, reasonable attorneys' fees not exceeding 15 percent of the unpaid debt after default and for an attorney who is not Lender's salaried employee, court costs, and other legal expenses. These expenses are due and payable immediately. If not paid immediately, these expenses will bear interest from the date of payment until paid in full at the highest interest rate in effect as provided for in the terms of the Secured Debts. In addition, to the extent permitted by the United States Bankruptcy Code, Mortgagor agrees to pay the reasonable attorneys' fees incurred by Lender to protect Lender's rights and interests in connection with any bankruptcy proceedings initiated by or against Mortgagor.

**17. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substance," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

**2009    21599**
**MORTGAGE Book & Page**

Mortgagor represents, warrants and agrees that:

A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

D. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law. Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

E. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are and will remain in full compliance with any applicable Environmental Law.

F. Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

G. Mortgagor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

H. Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

I. Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Mortgagor's obligations under this section at Mortgagor's expense.

SMITH'S MARINA & DRYDOCK, INC.
Alabama Mortgage
AL/4dubbinlc00022000005848018031109Y

©1996 Bankers Systems, Inc., St. Cloud, MN Expert

Initials _____
Page 6

2009    21600
MORTGAGE  Book & Page

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Security Instrument and in return Mortgagor will provide Lender with collateral of at least equal value to the Property without prejudice to any of Lender's rights under this Security Instrument.

L. Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section will survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

18. CONDEMNATION. Mortgagor will give Lender prompt notice of any pending or threatened action by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds will be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

19. INSURANCE. Mortgagor agrees to keep the Property insured against the risks reasonably associated with the Property. Mortgagor will maintain this insurance in the amounts Lender requires. This insurance will last until the Property is released from this Security Instrument. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debts. Mortgagor may choose the insurance company, subject to Lender's approval, which will not be unreasonably withheld.

All insurance policies and renewals will include a standard "mortgage clause" and, where applicable, "loss payee clause." If required by Lender, Mortgagor agrees to maintain comprehensive general liability insurance and rental loss or business interruption insurance in amounts and under policies acceptable to Lender. The comprehensive general liability insurance must name Lender as an additional insured. The rental loss or business interruption insurance must be in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing).

Mortgagor will give Lender and the insurance company immediate notice of any loss. All insurance proceeds will be applied to restoration or repair of the Property or to the Secured Debts, at Lender's option. If Lender acquires the Property in damaged condition, Mortgagor's rights to any insurance policies and proceeds will pass to Lender to the extent of the Secured Debts.

Mortgagor will immediately notify Lender of cancellation or termination of insurance. If Mortgagor fails to keep the Property insured, Lender may obtain insurance to protect Lender's interest in the Property and Mortgagor will pay for the insurance on Lender's demand. Lender may demand that Mortgagor pay for the insurance all at once, or Lender may add the insurance premiums to the balance of the Secured Debts and charge interest on it at the rate that applies to the Secured Debts. This insurance may include coverages not originally required of Mortgagor, may be written by a company other than one Mortgagor would choose, and may be written at a higher rate than Mortgagor could obtain if Mortgagor purchased the insurance. Mortgagor acknowledges and agrees that Lender or one of Lender's affiliates may receive commissions on the purchase of this insurance.

20. ESCROW FOR TAXES AND INSURANCE. Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

21. CO-SIGNERS. If Mortgagor signs this Security Instrument but is not otherwise obligated to pay the Secured Debts, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debts and Mortgagor does not agree by signing this Security Instrument to be personally liable on the Secured Debts. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws.

22. WAIVERS. Except to the extent prohibited by law, Mortgagor waives all appraisement rights relating to the Property.

SMITH'S MARINA & DRYDOCK, INC.
Alabama Mortgage
AL/4debblnlc00022000006848018031108Y

©1996 Bankers Systems, Inc., St. Cloud, MN  Experta

Initials
Page 6

2009   21601
MORTGAGE  Book & Page

**23. APPLICABLE LAW.** This Security Instrument is governed by the laws of Alabama, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**24. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** Each Mortgagor's obligations under this Security Instrument are independent of the obligations of any other Mortgagor. Lender may sue each Mortgagor individually or together with any other Mortgagor. Lender may release any part of the Property and Mortgagor will still be obligated under this Security Instrument for the remaining Property. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument will bind and benefit the successors and assigns of Lender and Mortgagor.

**25. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Security Instrument may not be amended or modified by oral agreement. No amendment or modification of this Security Instrument is effective unless made in writing and executed by Mortgagor and Lender. This Security Instrument and any other documents relating to the Secured Debts are the complete and final expression of the agreement. If any provision of this Security Instrument is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**26. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Security Instrument.

**27. NOTICE, FINANCIAL REPORTS, ADDITIONAL DOCUMENTS AND RECORDING TAXES.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Mortgagor will be deemed to be notice to all Mortgagors. Mortgagor will inform Lender in writing of any change in Mortgagor's name, address or other application information. Mortgagor will provide Lender any financial statements or information Lender requests. All financial statements and information Mortgagor gives Lender will be correct and complete. Mortgagor agrees to pay all expenses, charges and taxes in connection with the preparation and recording of this Security Instrument. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and to confirm Lender's lien status on any Property, and Mortgagor agrees to pay all expenses, charges and taxes in connection with the preparation and recording thereof. Time is of the essence.

**28. AGREEMENT TO ARBITRATE.** Lender or Mortgagor may submit to binding arbitration any dispute, claim or other matter in question between or among Lender and Mortgagor that arises out of or relates to this Transaction (Dispute), except as otherwise indicated in this section or as Lender and Mortgagor agree to in writing. For purposes of this section, this Transaction includes this Security Instrument and any other document relating to the Secured Debts, and proposed loans or extensions of credit that relate to this Security Instrument. Lender or Mortgagor will not arbitrate any Dispute within any "core proceedings" under the United States bankruptcy laws. Lender and Mortgagor must consent to arbitrate any Dispute concerning the Secured Debt secured by real estate at the time of the proposed arbitration. Lender may foreclose or exercise any powers of sale against real property securing the Secured Debt underlying any Dispute before, during or after any arbitration. Lender may also enforce the Secured Debt secured by this real property and underlying the Dispute before, during or after any arbitration. Lender or Mortgagor may, whether or not any arbitration has begun, pursue any self-help or similar remedies, including taking property or exercising other rights under the law; seek attachment, garnishment, receivership or other provisional remedies from a court having jurisdiction to preserve the rights of or to prevent irreparable injury to Lender or Mortgagor; or foreclose against any property by any method or take legal action to recover any property. Foreclosing or exercising a power of sale, beginning and continuing a judicial action or pursuing self-help remedies will not constitute a waiver of the right to compel arbitration.

The arbitrator will determine whether a Dispute is arbitrable. A single arbitrator will resolve any Dispute, whether individual or joint in nature, or whether based on contract, tort, or any other matter at law or in equity. The arbitrator may consolidate any Dispute with any related disputes, claims or other matters in question not arising

SMITH'S MARINA & DRYDOCK, INC.
Alabama Mortgage
AL/4debbinic00022000005848018031109Y

©1996 Bankers Systems, Inc., St. Cloud, MN Expereᵈ

Initials
Page 7

out of this Transaction. Any court having jurisdiction may enter a judgment or decree on the arbitrator's award. The judgment or decree will be enforced as any other judgment or decree.

Lender and Mortgagor acknowledge that the agreements, transactions or the relationships which result from the agreements or transactions between and among Lender and Mortgagor involve interstate commerce. The United States Arbitration Act will govern the interpretation and enforcement of this section.

The American Arbitration Association's Commercial Arbitration Rules, in effect on the date of this Security Instrument, will govern the selection of the arbitrator and the arbitration process, unless otherwise agreed to in this Security Instrument or another writing.

**29. WAIVER OF TRIAL FOR ARBITRATION.** Lender and Mortgagor understand that the parties have the right or opportunity to litigate any Dispute through a trial by judge or jury, but that the parties prefer to resolve Disputes through arbitration instead of litigation. If any Dispute is arbitrated, Lender and Mortgagor voluntarily and knowingly waive the right to have a trial by jury or judge during the arbitration.

**SIGNATURES.** By signing under seal, Mortgagor agrees to the terms and covenants contained in this Security Instrument. Mortgagor also acknowledges receipt of a copy of this Security Instrument.

MORTGAGOR:

SMITH'S MARINA & DRYDOCK, INC.

By _____ (Seal)
JOHN BEASLEY, PRESIDENT

_____
(Witness)

_____
(Attest)

LENDER:

ALABAMA ONE CREDIT UNION

By _____ (Seal)
Tammy Ewing

_____
(Witness)

_____
(Attest)

2009   21602
Recorded in the Above
MORTGAGE  Book & Page
03-18-2009  10:43:16 AM

ACKNOWLEDGMENT.
(Business or Entity)

_____STATE_____ OF __ALABAMA__ , __COUNTY__ OF __TUSCALOOSA__ ss.
I, __CHRISTIE GARNER__ , a notary public, in and for said County in said State, hereby certify that JOHN BEASLEY, whose name(s) as PRESIDENT of the SMITH'S MARINA & DRYDOCK, INC. a corporation, is/are signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he/she/they, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation. Given under my hand this the ____11TH____ day of __MARCH__ , _2009_ .

My commission expires: 1/26/13

(Notary Public)

2009   21603
Recorded in the Above
MORTGAGE Book & Page
03-18-2009 10:43:16 AM
Source Of Title: DEED 2008 / 10207
W. Hardy McCollum - Probate Judge
Tuscaloosa County, Alabama


(Lender Acknowledgment)

__STATE__ OF __ALABAMA__ , __COUNTY__ OF __TUSCALOOSA__ ss.
I, __CHRISTIE GARNER__ , a notary public, in and for said County in said State, hereby certify that Tammy Ewing, whose name(s) as __BUSINESS LENDING MANAGER__ of ALABAMA ONE CREDIT UNION, a corporation, is/are signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he/she/they, as such officer(s) and with full authority, executed the same voluntary for and as the act of said corporation. Given under my hand this the ____11TH____ day of __MARCH__ , _2009_ .

My commission expires: 1/26/13

(Notary Public)

Book/Pg: 2009/21595
Tera/Cashier: SCAN1 / klatner
Tran: 8719,557963,69547B
Recorded: 03-18-2009 10:44:24
NTX NO TAX COLLECTED          0.00
PJF Probate Judge Fee          2.00
REC Recording Fee             23.50
SOT Source of Title            1.00
Total Fees:   $ 26.50

NO TAX
COLLECTED

2012   30363
Recorded in the Above
MORTGAGE  Book & Page
05-11-2012 04:04:15 PM
Source Of Title: DEED 2008 / 10207
W. Hardy McCollum - Probate Judge
Tuscaloosa County, Alabama

Source of Title: Deed Book 2008
                 Page 10207

---

Space Above This Line For Recording Data

This Instrument was prepared by DEBBI  NICHOLS , 1215 VETERANS MEMORIAL PKWY, TUSCALOOSA, AL 36404

## MODIFICATION OF MORTGAGE

**DATE AND PARTIES.** The date of this Real Estate Modification (Modification) is May 2, 2012. The parties and their addresses are:

MORTGAGOR:
    SMITH'S MARINA & DRYDOCK, INC.
    An Alabama Corporation
    12175 VIEWPOINT ROAD
    NORTHPORT, AL 35476

LENDER:
    ALABAMA ONE CREDIT UNION
    Organized and existing under the laws of Alabama
    1215 Veterans Memorial Pkwy.
    Tuscaloosa, AL  35404

**1. BACKGROUND.** Mortgagor and Lender entered into a security instrument dated MARCH 11, 2009 and recorded on MARCH 18, 2009 (Security Instrument).  The Security Instrument was recorded in the records of TUSCALOOSA County, Alabama at MORTGAGE BOOK 2009, PAGE 21595 and covered the following described Property:

Lots 22-A, 22-B & 22-C Resurvey of Lot 22 View Point, a map or plat of which is recorded in Plat Book 13, at Page 25 in the Probate Office of Tuscaloosa County, Alabama, and reference to which is hereby made in aid of and as a part of this description.

The property is located in TUSCALOOSA County at 12175 VIEWPOINT ROAD, NORTHPORT, Alabama 35476.

**2. MODIFICATION.** For value received, Mortgagor and Lender agree to modify the Security Instrument as provided for in this Modification.

The Security Instrument is modified as follows:

   A. **Secured Debt.** The secured debt provision of the Security Instrument is modified to read:

---

SMITH'S MARINA & DRYDOCK, INC.
Alabama Real Estate Modification
AL/4debbinic00225400007854006050112V                    Wolters Kluwer Financial Services ©1996, 2012 Bankers Systems™        Initials ____
                                                                                                                                Page 1

(1) Secured Debts. The term "Secured Debts" includes and this Security Instrument will secure each of the following:

(a) Specific Debts. The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 64829-32, dated March 11, 2009, from Mortgagor to Lender, with a loan amount of $1,991,662.79.

(b) All Debts. All present and future debts from Mortgagor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt. If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances. Any such commitment must be in writing. In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent security interest in the Mortgagor's principal dwelling that is created by this Security Instrument. This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and Lender does not obtain a "statement of purpose," as defined and required by federal law governing securities. This Modification will not secure any other debt if Lender fails, with respect to that other debt, to fulfill any necessary requirements or limitations of Sections 19(a), 32, or 35 of Regulation Z.

(c) Sums Advanced. All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

**3. WARRANTY OF TITLE.** Mortgagor warrants that Mortgagor continues to be lawfully seized of the estate conveyed by the Security Instrument and has the right to grant, bargain, convey, sell and mortgage with the power of sale the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

**4. CONTINUATION OF TERMS.** Except as specifically amended in this Modification, all of the terms of the Security Instrument shall remain in full force and effect.

**5. ADDITIONAL TERMS.** THE MATURITY DATE, VIZ: APRIL 1, 2012, REFERENCED IN PARAGRAPH 3(A) ON ORIGINAL MORTGAGE IS HEREBY DELETED.

**SIGNATURES.** By signing under seal, Mortgagor agrees to the terms and covenants contained in this Modification. Mortgagor also acknowledges receipt of a copy of this Modification.

MORTGAGOR:

SMITH'S MARINA & DRYDOCK, INC.

By_____ (Seal)
JOHN G BEASLEY, PRESIDENT

_____
(Witness)

_____
(Attest)

2012    30364
Recorded in the Above
MORTGAGE Book & Page
05-11-2012 04:04:15 PM

SMITH'S MARINA & DRYDOCK, INC.
Alabama Real Estate Modification
AL/4debbin/c00225400007854006050112Y

Wolters Kluwer Financial Services ©1996, 2012 Bankers Systems™

Initials_____
Page 2

LENDER:

ALABAMA ONE CREDIT UNION

By _____ (Seal)
Tammy Ewing

_____
(Witness)

_____
(Attest)

```
2012   30365
Recorded in the Above
MORTGAGE  Book & Page
05-11-2012  04:04:15 PM
Source Of Title: DEED 2008 / 10207
W. Hardy McCollum - Probate Judge
Tuscaloosa County, Alabama
Book/Pg: 2012/30363
Term/Cashier: SCAN1 / klatner
Tran: 10608.665927.842194
Recorded: 05-11-2012 16:04:49
NTX NO TAX COLLECTED              0.00
PJF Probate Judge Fee             2.00
REC Recording Fee                 8.50
SOT Source of Title               1.00
Total Fees:  $ 11.50
```

ACKNOWLEDGMENT.
(Business or Entity)

_____ County ____ OF _Tuscaloosa_____, State ____ OF _Alabama_____ ss.

I, __Janet Tubbs_____, a notary public, in and for said County in said State, hereby certify that JOHN G BEASLEY, whose name(s) as PRESIDENT of the SMITH'S MARINA & DRYDOCK, INC. a corporation, is/are signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he/she/they, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation. Given under my hand this the __2nd_____ day of __May_____, __2012____.

My commission expires: _____

_____
(Notary Public)

(Lender Acknowledgment)

_____ County ____ OF _Tuscaloosa_____, State ____ OF _Alabama_____ ss.

I, __Janet Tubbs_____, a notary public, in and for said County in said State, hereby certify that Tammy Ewing, whose name(s) as _Business Lending Manager_____ of ALABAMA ONE CREDIT UNION, a corporation, is/are signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he/she/they, as such officer(s) and with full authority, executed the same voluntary for and as the act of said corporation. Given under my hand this the __2nd_____ day of _May____, __2012____.

My commission expires: _____

_____
(Notary Public)

SMITH'S MARINA & DRYDOCK, INC.
Alabama Real Estate Modification
AL/4dshbinlc00225400007854000050112Y

Wolters Kluwer Financial Services ©1996, 2012 Bankers Systems™

Initials _____
Page 3

SOURCE OF TITLE

DEED BK. *2008* PAGE *10207*

2008   36617
Recorded in the Above
MORTGAGE  Book & Page
05-05-2008 10:49:42 AM
Source Of Title: 2008 / 10207
W. Hardy McCollum - Probate Judge
Tuscaloosa County, Alabama

NO TAX COLLECTED.

---

Space Above This Line For Recording Data

This instrument was prepared by DEBBI   NICHOLS , 1215 VETERANS MEMORIAL PKWY, TUSCALOOSA, Alabama 35404

# MORTGAGE
### (With Future Advance Clause)

---

**DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is April 30, 2008. The parties and their addresses are:

MORTGAGOR:
**SMITH'S MARINA & DRYDOCK, INC.**
An Alabama Corporation
12175 VIEWPOINT ROAD
NORTHPORT, Alabama 35476

LENDER:
**THE CREDIT UNION OF ALABAMA FCU**
Organized and existing under the laws of Alabama
1215 Veterans Memorial Pkwy.
Tuscaloosa, Alabama  35404

1. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debts and Mortgagor's performance under this Security Instrument, Mortgagor grants, bargains, conveys, sells and mortgages to Lender, with power of sale, the following described property:

LOTS 22-A, 22-B & 22-C RESURVEY OF LOT 22 VIEW POINT, A MAP OR PLAT OF WHICH IS RECORDED IN PLAT BOOK 13, AT PAGE 25 IN THE PROBATE OFFICE OF TUSCALOOSA COUNTY, ALABAMA, AND REFERENCE TO WHICH IS HEREBY MADE IN AID OF AND AS A PART OF THIS DESCRIPTION.

The property is located in TUSCALOOSA County at 12175 VIEWPOINT ROAD, NORTHPORT, Alabama 35476. Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, wells, ditches and water stock, crops, timber, all diversion payments or third party payments made to crop producers and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described (all referred to as Property). When the Secured Debts are paid in full and all underlying agreements have been terminated, this Security Instrument will become null

---

SMITH'S MARINA & DRYDOCK, INC.
Alabama Mortgage
AL/4debbinic00022000005848020043008Y

©1996 Bankers Systems, Inc., St. Cloud, MN  *Experts*

Initials _____
Page 1

2008   36618
MORTGAGE   Book & Page

and void.   This Security Instrument will remain in effect until the Secured Debts and all underlying agreements have been terminated in writing by Lender.

**2. MAXIMUM OBLIGATION LIMIT.**  The total principal amount secured by this Security Instrument at any one time will not exceed $1,600,000.00.  This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument.  Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

**3. SECURED DEBTS.**  The term "Secured Debts" includes and this Security Instrument will secure each of the following:

**A. Specific Debts.**  The following debts and all extensions, renewals, refinancings, modifications and replacements.  A promissory note or other agreement, No. 64829-21, dated April 30, 2008, from Mortgagor to Lender, with a loan amount of $1,600,000.00 and maturing on May 15, 2009.  One or more of the debts secured by this Security Instrument contains a future advance provision.

**B. All Debts.**  All present and future debts from Mortgagor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt.  If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument.  Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances.  Any such commitment must be in writing.  In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent security interest in the Mortgagor's principal dwelling that is created by this Security Instrument.  This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices.  This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and Lender does not obtain a "statement of purpose," as defined and required by federal law governing securities.

**C. Sums Advanced.**  All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

**4. PAYMENTS.**   Mortgagor agrees that all payments under the Secured Debts will be paid when due and in accordance with the terms of the Secured Debts and this Security Instrument.

**5. WARRANTY OF TITLE.**   Mortgagor warrants that Mortgagor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell and mortgage with the power of sale the Property.  Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

**6. PRIOR SECURITY INTERESTS.**   With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:

**A.** To make all payments when due and to perform or comply with all covenants.

**B.** To promptly deliver to Lender any notices that Mortgagor receives from the holder.

**C.** Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

**7. CLAIMS AGAINST TITLE.**   Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due.  Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment.  Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument.  Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

**8. DUE ON SALE OR ENCUMBRANCE.**  Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property.  This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable.

**9. TRANSFER OF AN INTEREST IN THE MORTGAGOR.**  If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Lender may demand immediate payment if:

**A.** A beneficial interest in Mortgagor is sold or transferred.

**B.** There is a change in either the identity or number of members of a partnership or similar entity.

2008  36619
MORTGAGE  Book & Page

C. There is a change in ownership of more than 25 percent of the voting stock of a corporation or similar entity. However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Security Instrument.

**10. WARRANTIES AND REPRESENTATIONS.**   Mortgagor makes to Lender the following warranties and representations which will continue as long as this Security Instrument is in effect:

   **A. Power.**  Mortgagor is duly organized, and validly existing and in good standing in all jurisdictions in which Mortgagor operates.  Mortgagor has the power and authority to enter into this transaction and to carry on Mortgagor's business or activity as it is now being conducted and, as applicable, is qualified to do so in each jurisdiction in which Mortgagor operates.

   **B. Authority.**  The execution, delivery and performance of this Security Instrument and the obligation evidenced by this Security Instrument are within Mortgagor's powers, have been duly authorized, have received all necessary governmental approval, will not violate any provision of law, or order of court or governmental agency, and will not violate any agreement to which Mortgagor is a party or to which Mortgagor is or any of Mortgagor's property is subject.

   **C. Name and Place of Business.**  Other than previously disclosed in writing to Lender, Mortgagor has not changed Mortgagor's name or principal place of business within the last 10 years and has not used any other trade or fictitious name.  Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve Mortgagor's existing name, trade names and franchises.

**11. PROPERTY CONDITION, ALTERATIONS AND INSPECTION.**  Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary.  Mortgagor will not commit or allow any waste, impairment, or deterioration of the Property.  Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent.  Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent.  Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor, and of any loss or damage to the Property.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance.  Such replacement of personal property will be deemed subject to the security interest created by this Security Instrument.  Mortgagor will not partition or subdivide the Property without Lender's prior written consent.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property.  Lender will give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for the inspection.  Any inspection of the Property will be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

**12. AUTHORITY TO PERFORM.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed.  Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance.  Lender's right to perform for Mortgagor will not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument.  If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

**13. DEFAULT.**  Mortgagor will be in default if any of the following occur:

   **A. Payments.**  Mortgagor fails to make a payment in full when due.

   **B. Insolvency or Bankruptcy.**  The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against Mortgagor, Borrower, or any co-signer, endorser, surety or guarantor of this Security Instrument or any other obligations Borrower has with Lender.

   **C. Business Termination.**  Mortgagor merges, dissolves, reorganizes, ends its business or existence, or a partner or majority owner dies or is declared legally incompetent.

2008  36620
MORTGAGE  Book & Page

**D. Failure to Perform.** Mortgagor fails to perform any condition or to keep any promise or covenant of this Security Instrument.

**E. Other Documents.** A default occurs under the terms of any other document relating to the Secured Debts.

**F. Other Agreements.** Mortgagor is in default on any other debt or agreement Mortgagor has with Lender.

**G. Misrepresentation.** Mortgagor makes any verbal or written statement or provides any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

**H. Judgment.** Mortgagor fails to satisfy or appeal any judgment against Mortgagor.

**I. Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

**J. Name Change.** Mortgagor changes Mortgagor's name or assumes an additional name without notifying Lender before making such a change.

**K. Property Transfer.** Mortgagor transfers all or a substantial part of Mortgagor's money or property. This condition of default, as it relates to the transfer of the Property, is subject to the restrictions contained in the DUE ON SALE section.

**L. Property Value.** Lender determines in good faith that the value of the Property has declined or is impaired.

**M. Material Change.** Without first notifying Lender, there is a material change in Mortgagor's business, including ownership, management, and financial conditions.

**N. Insecurity.** Lender determines in good faith that a material adverse change has occurred in Mortgagor's financial condition from the conditions set forth in Mortgagor's most recent financial statement before the date of this Security Instrument or that the prospect for payment or performance of the Secured Debts is impaired for any reason.

**14. REMEDIES.** On or after default, Lender may use any and all remedies Lender has under state or federal law or in any document relating to the Secured Debts, including, without limitation, the power to sell the Property. Any amounts advanced on Mortgagor's behalf will be immediately due and may be added to the balance owing under the Secured Debts. Lender may make a claim for any and all insurance benefits or refunds that may be available on Mortgagor's default.

Subject to any right to cure, required time schedules or any other notice rights Mortgagor may have under federal and state law, Lender may make all or any part of the amount owing by the terms of the Secured Debts immediately due and foreclose this Security Instrument in a manner provided by law upon the occurrence of a default or anytime thereafter.

If Lender initiates a judicial foreclosure, Lender will give the notices as required by applicable law. If Lender invokes the power of sale, Lender will publish the notice of sale, and arrange to sell all or part of the Property, as required by applicable law. Lender or its designee may purchase the Property at any sale. Lender will apply the proceeds of the sale in the manner required by applicable law. The sale of any part of the Property will only operate as a foreclosure of the sold Property, so any remaining Property will continue to secure any unsatisfied Secured Debts and Lender may further foreclose under the power of sale or by judicial foreclosure.

Upon any sale of the Property, Lender will make and deliver a special or limited warranty deed that conveys the property sold to the purchaser or purchasers. Under this special or limited warranty deed, Lender will covenant that Lender has not caused or allowed a lien or an encumbrance to burden the Property and that Lender will specially warrant and defend the Property's title of the purchaser or purchasers at the sale against all lawful claims and demand of all persons claiming by, through or under Lender. The recitals in any deed of conveyance will be prima facie evidence of the facts set forth therein.

All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debts after the balance is due or is accelerated or after foreclosure proceedings are filed will not constitute a waiver of Lender's right to require full and complete cure of any existing default. By not exercising any remedy, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

**15. REDEMPTION.** The period of redemption after sale on foreclosure will be one year. Any agreement to extend the redemption period must be in writing.

**16. COLLECTION EXPENSES AND ATTORNEYS' FEES.** On or after Default, to the extent permitted by law, Mortgagor agrees to pay all expenses of collection, enforcement or protection of Lender's rights and remedies under this Security Instrument or any other document relating to the Secured Debts. Mortgagor agrees to pay

SMITH'S MARINA & DRYDOCK, INC.
Alabama Mortgage
AL/4debbinic00022000005848020043008Y

©1996 Bankers Systems, Inc., St. Cloud, MN   Experts

Initials _____
Page 4

2008   36621
MORTGAGE  Book & Page

expenses for Lender to inspect and preserve the Property and for any recordation costs of releasing the Property from this Security Instrument. Expenses include, but are not limited to, reasonable attorneys' fees not exceeding 15 percent of the unpaid debt after default and for an attorney who is not Lender's salaried employee, court costs, and other legal expenses. These expenses are due and payable immediately. If not paid immediately, these expenses will bear interest from the date of payment until paid in full at the highest interest rate in effect as provided for in the terms of the Secured Debts. In addition, to the extent permitted by the United States Bankruptcy Code, Mortgagor agrees to pay the reasonable attorneys' fees incurred by Lender to protect Lender's rights and interests in connection with any bankruptcy proceedings initiated by or against Mortgagor.

**17. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substance," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

Mortgagor represents, warrants and agrees that:

A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

D. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law. Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

E. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are and will remain in full compliance with any applicable Environmental Law.

F. Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

G. Mortgagor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

H. Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

I. Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Mortgagor's obligations under this section at Mortgagor's expense.

2008  36622
MORTGAGE  Book & Page

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Security Instrument and in return Mortgagor will provide Lender with collateral of at least equal value to the Property without prejudice to any of Lender's rights under this Security Instrument.

L. Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section will survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

**18. CONDEMNATION.** Mortgagor will give Lender prompt notice of any pending or threatened action by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds will be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

**19. INSURANCE.** Mortgagor agrees to keep the Property insured against the risks reasonably associated with the Property. Mortgagor will maintain this insurance in the amounts Lender requires. This insurance will last until the Property is released from this Security Instrument. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debts. Mortgagor may choose the insurance company, subject to Lender's approval, which will not be unreasonably withheld.

All insurance policies and renewals will include a standard "mortgage clause" and, where applicable, "loss payee clause." If required by Lender, Mortgagor agrees to maintain comprehensive general liability insurance and rental loss or business interruption insurance in amounts and under policies acceptable to Lender. The comprehensive general liability insurance must name Lender as an additional insured. The rental loss or business interruption insurance must be in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing).

Mortgagor will give Lender and the insurance company immediate notice of any loss. All insurance proceeds will be applied to restoration or repair of the Property or to the Secured Debts, at Lender's option. If Lender acquires the Property in damaged condition, Mortgagor's rights to any insurance policies and proceeds will pass to Lender to the extent of the Secured Debts.

Mortgagor will immediately notify Lender of cancellation or termination of insurance. If Mortgagor fails to keep the Property insured, Lender may obtain insurance to protect Lender's interest in the Property and Mortgagor will pay for the insurance on Lender's demand. Lender may demand that Mortgagor pay for the insurance all at once, or Lender may add the insurance premiums to the balance of the Secured Debts and charge interest on it at the rate that applies to the Secured Debts. This insurance may include coverages not originally required of Mortgagor, may be written by a company other than one Mortgagor would choose, and may be written at a higher rate than Mortgagor could obtain if Mortgagor purchased the insurance. Mortgagor acknowledges and agrees that Lender or one of Lender's affiliates may receive commissions on the purchase of this insurance.

**20. ESCROW FOR TAXES AND INSURANCE.** Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

**21. CO-SIGNERS.** If Mortgagor signs this Security Instrument but is not otherwise obligated to pay the Secured Debts, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debts and Mortgagor does not agree by signing this Security Instrument to be personally liable on the Secured Debts. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws.

**22. WAIVERS.** Except to the extent prohibited by law, Mortgagor waives all appraisement rights relating to the Property.

**23. CONSTRUCTION LOAN.** This Security Instrument secures an obligation incurred for the construction of an improvement on the Property.

2008   36623
MORTGAGE   Book & Page

**24. APPLICABLE LAW.** This Security Instrument is governed by the laws of Alabama, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**25. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** Each Mortgagor's obligations under this Security Instrument are independent of the obligations of any other Mortgagor. Lender may sue each Mortgagor individually or together with any other Mortgagor. Lender may release any part of the Property and Mortgagor will still be obligated under this Security Instrument for the remaining Property. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument will bind and benefit the successors and assigns of Lender and Mortgagor.

**26. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Security Instrument may not be amended or modified by oral agreement. No amendment or modification of this Security Instrument is effective unless made in writing and executed by Mortgagor and Lender. This Security Instrument and any other documents relating to the Secured Debts are the complete and final expression of the agreement. If any provision of this Security Instrument is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**27. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Security Instrument.

**28. NOTICE, FINANCIAL REPORTS, ADDITIONAL DOCUMENTS AND RECORDING TAXES.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Mortgagor will be deemed to be notice to all Mortgagors. Mortgagor will inform Lender in writing of any change in Mortgagor's name, address or other application information. Mortgagor will provide Lender any financial statements or information Lender requests. All financial statements and information Mortgagor gives Lender will be correct and complete. Mortgagor agrees to pay all expenses, charges and taxes in connection with the preparation and recording of this Security Instrument. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and to confirm Lender's lien status on any Property, and Mortgagor agrees to pay all expenses, charges and taxes in connection with the preparation and recording thereof. Time is of the essence.

**29. AGREEMENT TO ARBITRATE.** Lender or Mortgagor may submit to binding arbitration any dispute, claim or other matter in question between or among Lender and Mortgagor that arises out of or relates to this Transaction (Dispute), except as otherwise indicated in this section or as Lender and Mortgagor agree to in writing. For purposes of this section, this Transaction includes this Security Instrument and any other document relating to the Secured Debts, and proposed loans or extensions of credit that relate to this Security Instrument. Lender or Mortgagor will not arbitrate any Dispute within any "core proceedings" under the United States bankruptcy laws.

Lender and Mortgagor must consent to arbitrate any Dispute concerning the Secured Debt secured by real estate at the time of the proposed arbitration. Lender may foreclose or exercise any powers of sale against real property securing the Secured Debt underlying any Dispute before, during or after any arbitration. Lender may also enforce the Secured Debt secured by this real property and underlying the Dispute before, during or after any arbitration.

Lender or Mortgagor may, whether or not any arbitration has begun, pursue any self-help or similar remedies, including taking property or exercising other rights under the law; seek attachment, garnishment, receivership or other provisional remedies from a court having jurisdiction to preserve the rights of or to prevent irreparable injury to Lender or Mortgagor; or foreclose against any property by any method or take legal action to recover any property. Foreclosing or exercising a power of sale, beginning and continuing a judicial action or pursuing self-help remedies will not constitute a waiver of the right to compel arbitration.

The arbitrator will determine whether a Dispute is arbitrable. A single arbitrator will resolve any Dispute, whether individual or joint in nature, or whether based on contract, tort, or any other matter at law or in equity. The arbitrator may consolidate any Dispute with any related disputes, claims or other matters in question not arising

out of this Transaction.  Any court having jurisdiction may enter a judgment or decree on the arbitrator's award. The judgment or decree will be enforced as any other judgment or decree.

Lender and Mortgagor acknowledge that the agreements, transactions or the relationships which result from the agreements or transactions between and among Lender and Mortgagor involve interstate commerce.  The United States Arbitration Act will govern the interpretation and enforcement of this section.

The American Arbitration Association's Commercial Arbitration Rules, in effect on the date of this Security Instrument, will govern the selection of the arbitrator and the arbitration process, unless otherwise agreed to in this Security Instrument or another writing.

**30. WAIVER OF TRIAL FOR ARBITRATION.**  Lender and Mortgagor understand that the parties have the right or opportunity to litigate any Dispute through a trial by judge or jury, but that the parties prefer to resolve Disputes through arbitration instead of litigation.  If any Dispute is arbitrated, Lender and Mortgagor voluntarily and knowingly waive the right to have a trial by jury or judge during the arbitration.

**SIGNATURES.**  By signing under seal, Mortgagor agrees to the terms and covenants contained in this Security Instrument.  Mortgagor also acknowledges receipt of a copy of this Security Instrument.

MORTGAGOR:

SMITH'S MARINA & DRYDOCK, INC.

By _____ (Seal)
JOHN BEASLEY, PRESIDENT

_____
(Witness)

_____
(Attest)

LENDER:

The Credit Union of Alabama FCU

By _____ (Seal)
Tammy Ewing

_____
(Witness)

_____
(Attest)

2008   36624
Recorded in the Above
MORTGAGE  Book & Page
05-05-2008  10:49:42 AM

**ACKNOWLEDGMENT.**
(Business or Entity)

STATE ___ OF __ALABAMA___ , _COUNTY___ OF _TUSCALOOSA_ ss.
I, _CHRISTIE GARNER_____, a notary public, in and for said County in said State, hereby certify that JOHN BEASLEY, whose name(s) as PRESIDENT of the SMITH'S MARINA & DRYDOCK, INC. a corporation, is/are signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he/she/they, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation. Given under my hand this the ___30TH___ day of _APRIL____, _2008____.

My commission expires: 1/26/09

_____
(Notary Public)

2008    36625
Recorded in the Above
MORTGAGE  Book & Page
05-05-2008 10:49:42 AM
Source Of Title: 2008 / 10207
W. Hardy McCollum - Probate Judge
Tuscaloosa County, Alabama
Book/Ps: 2008/36617
Term/Cashier: SCAN1 / klatner
Tran: 8152.528503.652248
Recorded: 05-05-2008 10:50:54
NTX NO TAX COLLECTED              0.00
PJF Probate Judge Fee            2.00
REC Recording Fee               23.50
SOT Source of Title              1.00

(Lender Acknowledgment)

STATE ___ OF __ALABAMA___ , _COUNTY___ OF _TUSCALOOSA_ ss.
I, _CHRISTIE GARNER_____, a notary public, in and for said County in said State, hereby certify that Tammy Ewing, whose name(s) as _BUSINESS LENDING MANAGER_ of The Credit Union of Alabama FCU, a corporation, is/are signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he/she/they, as such officer(s) and with full authority, executed the same voluntary for and as the act of said corporation. Given under my hand this the ___30TH___ day of _APRIL_____, _2008____.

My commission expires: 1/26/09

_____
(Notary Public)

SMITH'S MARINA & DRYDOCK, INC.
Alabama Mortgage
AL/4debbinic0002200000584802004300BY

©1996 Bankers Systems, Inc., St. Cloud, MN Experts™

Initials ____
Page 9

REV00022284

FILED

2016 Sep-22  PM 02:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

To:       samhutto@bellsouth.net[samhutto@bellsouth.net]
From:     David Harris
Sent:     Tue 7/28/2009 12:04:39 PM
Importance:    Normal
Subject:  2008 Audit
MAIL_RECEIVED:    Tue 7/28/2009 12:04:41 PM
<u>MEMORANDUM FOR 09-30-08 HUTTO & CARVER AUDIT.doc</u>

Sam,

We were reviewing some material from last year's audit and determined that we never sent you a copy of the memo to the Supervisory Committee list our response to the comments made at that audit.  I have attached a copy of the memo.  If you already have one, then uuuuuuuuuuyou can just disregard this one.

Thanks,


*David R. Harris*
**Chief Financial Officer**

ALABAMA ONE
Credit Union

1215 Veterans Memorial Parkway
Tuscaloosa, Alabama 35404
P: 205.342.0125 | 800.225.0110
F: 205.342.0111
www.alabamaone.org

The information transmitted is intended only for a specific person or entity. It may contain confidential, proprietary, and/or privileged material. If you received this in error, or if you know or have reason to believe you are not the intended recipient regardless of the address used, you may not review, retransmit, disseminate, or otherwise use this information and instead should contact the sender and delete and destroy all copies of the material that you have.



EXHIBIT
6

REV00022285

# MEMORANDUM

**To:**       **Supervisory Committee**

**From:**     **David Harris**

**Subject:**  **REPLY TO HUTTO & CARVER, PC 09/30/07 AUDIT COMMENTS**

**Date:**     **February 17, 2009**



**Comment Two:**  Refers to concentrations of credit with member Danny Butler, his business interests, and his personal debt.  A monthly report to the Board outlining the progress of these loans was suggested and will be done.



FILED
2016 Sep-22  PM 02:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE CIRCUIT COURT OF TUSCALOOSA COUNTY, ALABAMA

| | | |
|---|---|---|
| **ALABAMA ONE CREDIT UNION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION NUMBER** |
| | ) | **CV-2015-901234** |
| **v.** | ) | |
| | ) | |
| **PAUL TOPPINS, et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF ALABAMA ONE CREDIT UNION'S RESPONSES TO
DEFENDANT HUTTO & CARVER'S SECOND SET OF INTERROGATORIES**

COMES NOW Plaintiff Alabama One Credit Union ("Alabama One") and hereby objects and responds to Defendant Hutto & Carver, P.A.'s ("Hutto and Carver") Second Set of Interrogatories as follows:

## GENERAL OBJECTIONS

1. Plaintiff objects to each and every discovery request to the extent that the information called for, if any, was obtained and prepared in anticipation of litigation or for trial, and Defendant has made no showing that it has substantial need for the materials in the preparation of its case and that it is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means. Plaintiff further objects to each and every discovery requests to the extent that the information called for, if any, is privileged, constitutes work product and/or is not discoverable under the *Alabama Rules of Civil Procedure*.

2. Plaintiff objects to each and every request to the extent that it is vague, overly broad and unduly burdensome and/or calls for a legal conclusion.

3. Plaintiff objects to each and every request to the extent that it calls for information that is not material or relevant and information that is not reasonably calculated to lead to the discovery of admissible evidence.

4. Plaintiff objects to the "Definitions" contained in the Request for Production to the extent that they are vague, ambiguous and unintelligible, and to the extent that they seek to impose burdens upon Plaintiff greater than the burdens imposed by the *Alabama Rules of Civil Procedure*.

5. Plaintiff objects to each and every request to the extent that it calls for documents that are already in the possession of Defendant.



EXHIBIT
7

6.     Plaintiff objects to each and every request to the extent that it is not limited in scope and time.

7.     Plaintiff objects to each and every discovery request to the extent that it seeks an answer involving an opinion or contention that relates to fact or the application of law to fact before discovery has been completed or a pretrial conference has been conducted.

## INTERROGATORIES

1.     Identify the name, address, position and/or title of each and every person that assisted in answering the Interrogatories and Request for Admissions, and the name, address, position and/or title of each and every person that searched for, gathered and/or assisted in searching for and/or gathering any and all documents produced in response to the Requests for Production of Documents propounded by Hutto & Carver.

**RESPONSE:**

John C. Guin
Attorney
CAMPBELL, GUIN, WILLIAMS, GUY & GIDIERE, LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
Telephone: (205) 224-0750

A. Todd Campbell
Attorney
CAMPBELL, GUIN, WILLIAMS, GUY & GIDIERE, LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
Telephone: (205) 224-0750

Andrew P. Campbell
Attorney
CAMPBELL, GUIN, WILLIAMS, GUY & GIDIERE, LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
Telephone: (205) 224-0750

Ryan R. Hendley
Attorney
REYNOLDS, REYNOLDS & LITTLE, LLC

2

2115 11th Street
Tuscaloosa, AL 35401
Post Office Box 2863
Telephone: (205) 391-0073

William Wells
President
ALABAMA ONE CREIDT UNION
1215 Veterans Memorial Pkwy
Tuscaloosa, AL 35404

Whitney Oswalt
Chief Financial Officer
ALABAMA ONE CREIDT UNION
1215 Veterans Memorial Pkwy
Tuscaloosa, AL 35404

  2.   Identify and itemize in detail the damages that you are explicitly claiming against Hutto & Carver, including in your answer what role Hutto & Carver had with regard to each item of damage.

**RESPONSE:** Alabama One is claiming the following damages against Hutto & Carver: (1) the amount that Alabama One lost as a result of bad loans it would not have made had Hutto & Carver performed its auditing and accounting duties in a non-negligent manner; (2) the amount paid to Hutto & Carver for its negligent auditing and accounting services; (3) interest on the amount lost; and/or (4) all costs of this proceeding.

Alabama One is still gathering information regarding the exact amount of its claimed loss and other potential claims for damages against Alabama One. Alabama One reserves its right to supplement its answer to this Interrogatory as necessary.

  3.   If your answer to interrogatory # 2 includes any reference to actual losses incurred on problem loans, identify in detail how you contend an accounting firm, which is reviewing loans *after* they have been made, can be liable for a loan that goes bad, including in your answer any factual, trade standard and/or legal authority you contend supports this position.

**RESPONSE:** Alabama One objects to this Interrogatory on the grounds that it is vague, ambiguous, argumentative, overly broad, and unduly burdensome. Alabama One further objects to this Interrogatory on the grounds that it improperly seeks (1) seeks information

that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence; and (2) legal conclusions.

       4.     If your answer to interrogatory # 2 includes any reference to actual losses incurred on problem loans, identify in detail how the Alabama One itself (through its employers, officers, and/or agents) did not cause or contribute in any way to those loan losses.

**RESPONSE**: Alabama One objects to this Interrogatory on the grounds that it is vague, ambiguous, argumentative, and unduly burdensome. Alabama One further objects to this Interrogatory on the grounds that it improperly seeks legal conclusions.

       5.     If your answer to interrogatory # 2 includes any reference to actual losses incurred on problem loans, identify in detail what role the collateral appraisals have in Alabama One making the loans and what role the collateral appraisal have in any accounting work done by Hutto & Carver.

**RESPONSE**: Alabama One objects to this Interrogatory on the grounds that it is vague, ambiguous, and unduly burdensome. Alabama One further objects to this Interrogatory on the grounds that it calls for a narrative response, and is thus better answered by deposition testimony.

       6.     In your Complaint you allege that despite years of reviewing and auditing Alabama One's financials, Defendant Hutto either failed to uncover or willfully disregarded the gross mismanagement alleged in Your Complaint, including the fact that much of Alabama One's collateral was critically overvalued. As to this allegation, state each and every fact upon which you base this allegation; the name, address, and telephone number of each and every person who has knowledge of the above allegation; the specific knowledge that each of the aforementioned persons has, or is likely to have; the relationship of that person to you; and identify any documents which support your contention.

**RESPONSE**: As an initial matter, Alabama One notes that this Interrogatory includes <u>at least</u> three subparts: (1) identify "each and every fact" upon which Alabama One bases the above-described allegation; (2) identify "every person who has knowledge" of the above-

described allegation (including identifying that person's name, address, telephone number, and relationship to Alabama One, along with a description of the person's "specific knowledge"); and (3) identify "any documents" which support the above-described allegation. As such, this Interrogatory constitutes three separate Interrogatories.

Further, Alabama One objects to this Interrogatory on the grounds that it is vague, ambiguous, unduly burdensome at this stage of the litigation, and that it improperly propounds a "contention interrogatory" before discovery is complete or even substantially complete. *See, e.g., In re Checking Account Overdraft Litig.*, MDL 2036, 2010 WL 5136043, at *3 (S.D. Fla. Dec. 16, 2010) ("Compelling parties to respond partially to such [contention] interrogatories early in the litigation when they will likely simply be asked to respond again, upon completion of document review or other phases of discovery, lacks finality and compounds the time, effort and costs of the litigation."); *see also B. Braun Med. Inc. v. Abbott Labs.*, 155 F.R.D. 525, 527 (E.D. Pa. 1994) ("Contention interrogatories ask a party: to state whether it makes a specified contention; to state all the facts upon which it bases a contention; to take a position, and explain or defend that position, with respect to how the law applies to facts; or to state the legal or theoretical basis for a contention."); *In re eBay Seller Antitrust Litig.*, C 07-1882 JF (RS), 2008 WL 5212170, at *1 (N.D. Cal. Dec. 11, 2008) ("Courts using their Rule 33(a)(2) discretion generally disfavor contention interrogatories asked before discovery is undertaken. In fact, courts tend to deny contention interrogatives filed before substantial discovery has taken place, but grant them if discovery is almost complete."); *In re Domestic Air Transp. Antitrust Litig.*, 1:90-CV-2485-MHS, 1992 WL 120351, at *1 (N.D. Ga. Apr. 8, 1992) ("Without such controls, substantial time, money, and energy may be wasted on contention interrogatories that are either premature or overinclusive."); *Bonutti Skeletal Innovations LLC v. Linvatec Corp.*, 6:12-CV-1379-ORL-22, 2014 WL 186123, at *4 (M.D. Fla. Jan. 16, 2014) ("The Court also finds that at this stage of the litigation, Interrogatory No. 16 [a 'contention interrogatory'] is premature, oppressive and overbroad. The interrogatory does not target specific claims Linvatec believes are unclear, or which might be subject to early resolution. Instead, it is all-encompassing.").

Alabama One additionally objects to this Interrogatory on the grounds that it improperly seeks information that is protected by the work-product doctrine. This so because the Interrogatory requests Alabama One to identify "any documents which support your contention." The "'selection and compilation of documents by counsel . . .' may reveal an attorney's thought process and fall within the protection of the work product doctrine." *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, C01-20418JW, 2005 WL 1459555, at *6 (N.D. Cal. June 21, 2005) (quoting *Sporck v. Peil*, 759 F. 2d 312, 316) (3d Cir. 1985). Discovery requests violate the work-product doctrine when they "require . . . counsel to engage in a process of selective compilation of documents they believe 'tend to prove' their case." *P.J. ex rel. Jensen v. Utah*, 247 F.R.D. 664, 673 (D. Utah 2007); *see also United Oil Co., Inc. v. Parts Assocs., Inc.*, 227 F.R.D. 404, 414 (D.Md.2005) (concluding that interrogatories seeking information that "tend[ed] to support" positions taken by the defendant "appear[ed] to seek work-product in terms of requiring the responding counsel to decide what information 'tends to support' a particular legal position").

Finally, Alabama One objects to this Interrogatory on the grounds that is improperly seeks legal conclusions.

7.     In Your Complaint you allege that Defendant Hutto & Carver negligently and wantonly breached a duty to use reasonable care and skill in performing accounting and auditing services for Alabama One by failing to realize or willfully disregarding that much of Alabama One's collateral was critically overvalued due to the gross mismanagement of Alabama One. As to this allegation, state each and every fact upon which you base this allegation; the name, address, and telephone number of each and every person who has knowledge of the above allegation; the specific knowledge that each of the aforementioned persons has, or is likely to have; the relationship of that person to you; and identify any documents which support your contention.

RESPONSE: As an initial matter, Alabama One notes that this Interrogatory includes at least three subparts: (1) identify "each and every fact" upon which Alabama One bases the above-described allegation; (2) identify "every person who has knowledge" of the above-described allegation (including identifying that person's name, address, telephone number, and relationship to Alabama One, along with a description of the person's "specific knowledge"); and (3) identify "any documents" which support the above-described allegation. As such, this Interrogatory constitutes three separate Interrogatories.

Further, Alabama One objects to this Interrogatory on the grounds that it is vague, ambiguous, unduly burdensome at this stage of the litigation, and that it improperly propounds a "contention interrogatory" before discovery is complete or even substantially complete. *See, e.g., In re Checking Account Overdraft Litig.*, MDL 2036, 2010 WL 5136043, at *3 (S.D. Fla. Dec. 16, 2010) ("Compelling parties to respond partially to such [contention] interrogatories early in the litigation when they will likely simply be asked to respond again, upon completion of document review or other phases of discovery, lacks finality and compounds the time, effort and costs of the litigation."); *see also B. Braun Med. Inc. v. Abbott Labs.*, 155 F.R.D. 525, 527 (E.D. Pa. 1994) ("Contention interrogatories ask a party: to state whether it makes a specified contention; to state all the facts upon which it bases a contention; to take a position, and explain or defend that position, with respect to how the law applies to facts; or to state the legal or theoretical basis for a contention."); *In re eBay Seller Antitrust Litig.*, C 07-1882 JF (RS), 2008 WL 5212170, at *1 (N.D. Cal. Dec. 11, 2008) ("Courts using their Rule 33(a)(2) discretion generally disfavor contention interrogatories asked before discovery is undertaken. In fact, courts tend to deny contention interrogatives filed before substantial discovery has taken place, but grant them

*if discovery is almost complete.*"); *In re Domestic Air Transp. Antitrust Litig.*, 1:90-CV-2485-MHS, 1992 WL 120351, at *1 (N.D. Ga. Apr. 8, 1992) ("Without such controls, substantial time, money, and energy may be wasted on contention interrogatories that are either premature or overinclusive."); *Bonutti Skeletal Innovations LLC v. Linvatec Corp.*, 6:12-CV-1379-ORL-22, 2014 WL 186123, at *4 (M.D. Fla. Jan. 16, 2014) ("The Court also finds that at this stage of the litigation, Interrogatory No. 16 [a 'contention interrogatory'] is premature, oppressive and overbroad. The interrogatory does not target specific claims Linvatec believes are unclear, or which might be subject to early resolution. Instead, it is all-encompassing.").

Alabama One additionally objects to this Interrogatory on the grounds that it improperly seeks information that is protected by the work-product doctrine. This so because the Interrogatory requests Alabama One to identify "any documents which support your contention." The "'selection and compilation of documents by counsel . . .' may reveal an attorney's thought process and fall within the protection of the work product doctrine." *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, C01-20418JW, 2005 WL 1459555, at *6 (N.D. Cal. June 21, 2005) (quoting *Sporck v. Peil*, 759 F. 2d 312, 316) (3d Cir. 1985). Discovery requests violate the work-product doctrine when they "require . . . counsel to engage in a process of selective compilation of documents they believe 'tend to prove' their case." *P.J. ex rel. Jensen v. Utah*, 247 F.R.D. 664, 673 (D. Utah 2007); *see also United Oil Co., Inc. v. Parts Assocs., Inc.*, 227 F.R.D. 404, 414 (D.Md.2005) (concluding that interrogatories seeking information that "tend[ed] to support" positions taken by the defendant "appear[ed] to seek work-product in terms of requiring the responding counsel to decide what information 'tends to support' a particular legal position").

Finally, Alabama One objects to this Interrogatory on the grounds that is improperly seeks legal conclusions.

8.      In your Complaint you allege that Defendant Hutto & Carver negligently and wantonly breached a duty to use reasonable care and skill in performing accounting and auditing services for Alabama One by issuing incorrect opinions that Alabama One's financial statements were fairly stated. As to this allegation, state each and every fact upon which you base this allegation; the name, address, and telephone number of each and every person who has knowledge of the above allegation; the specific knowledge that each of the aforementioned persons has, or is likely to have; the relationship of that person to you; and identify any documents which support your contention.

7

RESPONSE: As an initial matter, Alabama One notes that this Interrogatory includes at least three subparts: (1) identify "each and every fact" upon which Alabama One bases the above-described allegation; (2) identify "every person who has knowledge" of the above-described allegation (including identifying that person's name, address, telephone number, and relationship to Alabama One, along with a description of the person's "specific knowledge"); and (3) identify "any documents" which support the above-described allegation. As such, this Interrogatory constitutes three separate Interrogatories.

Further, Alabama One objects to this Interrogatory on the grounds that it is vague, ambiguous, unduly burdensome at this stage of the litigation, and that it improperly propounds a "contention interrogatory" before discovery is complete or even substantially complete. *See, e.g., In re Checking Account Overdraft Litig.*, MDL 2036, 2010 WL 5136043, at *3 (S.D. Fla. Dec. 16, 2010) ("Compelling parties to respond partially to such [contention] interrogatories early in the litigation when they will likely simply be asked to respond again, upon completion of document review or other phases of discovery, lacks finality and compounds the time, effort and costs of the litigation."); *see also B. Braun Med. Inc. v. Abbott Labs.*, 155 F.R.D. 525, 527 (E.D. Pa. 1994) ("Contention interrogatories ask a party: to state whether it makes a specified contention; to state all the facts upon which it bases a contention; to take a position, and explain or defend that position, with respect to how the law applies to facts; or to state the legal or theoretical basis for a contention."); *In re eBay Seller Antitrust Litig.*, C 07-1882 JF (RS), 2008 WL 5212170, at *1 (N.D. Cal. Dec. 11, 2008) ("Courts using their Rule 33(a)(2) discretion generally disfavor contention interrogatories asked before discovery is undertaken. In fact, courts tend to deny contention interrogatories filed before substantial discovery has taken place, but grant them if discovery is almost complete."); *In re Domestic Air Transp. Antitrust Litig.*, 1:90-CV-2485-MHS, 1992 WL 120351, at *1 (N.D. Ga. Apr. 8, 1992) ("Without such controls, substantial time, money, and energy may be wasted on contention interrogatories that are either premature or overinclusive."); *Bonutti Skeletal Innovations LLC v. Linvatec Corp.*, 6:12-CV-1379-ORL-22, 2014 WL 186123, at *4 (M.D. Fla. Jan. 16, 2014) ("The Court also finds that at this stage of the litigation, Interrogatory No. 16 [a 'contention interrogatory'] is premature, oppressive and overbroad. The interrogatory does not target specific claims Linvatec believes are unclear, or which might be subject to early resolution. Instead, it is all-encompassing.").

Alabama One additionally objects to this Interrogatory on the grounds that it improperly seeks information that is protected by the work-product doctrine. This so because the Interrogatory requests Alabama One to identify "any documents which support your contention." The "'selection and compilation of documents by counsel . . .' may reveal an attorney's thought process and fall within the protection of the work product doctrine." *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, C01-20418JW, 2005 WL 1459555, at *6 (N.D. Cal. June 21, 2005) (quoting *Sporck v. Peil*, 759 F. 2d 312, 316) (3d Cir. 1985). Discovery requests violate the work-product doctrine when they "require . . . counsel to engage in a process of selective compilation of documents they believe 'tend to prove' their case." *P.J. ex rel. Jensen v. Utah*, 247 F.R.D. 664, 673 (D. Utah 2007); *see also United Oil Co., Inc. v. Parts Assocs., Inc.*, 227 F.R.D. 404, 414 (D.Md.2005) (concluding that

interrogatories seeking information that "tend[ed] to support" positions taken by the defendant "appear[ed] to seek work-product in terms of requiring the responding counsel to decide what information 'tends to support' a particular legal position").

Finally, Alabama One objects to this Interrogatory on the grounds that is improperly seeks legal conclusions.

9.     In your Complaint you allege that Defendant Hutto & Carver was unjustly enriched by receiving over $400,000 in fees from Alabama One for the negligent and wanton accounting and auditing services it performed, and now therefore now holds money which in equity and good conscience belongs to Alabama One. As to this allegation, state each and every fact upon which you base this allegation; the name, address, and telephone number of each and every person who has knowledge of the above allegation; the specific knowledge that each of the aforementioned persons has, or is likely to have; the relationship of that person to you; and identify any documents which support your contention.

RESPONSE: As an initial matter, Alabama One notes that this Interrogatory includes at least three subparts: (1) identify "each and every fact" upon which Alabama One bases the above-described allegation; (2) identify "every person who has knowledge" of the above-described allegation (including identifying that person's name, address, telephone number, and relationship to Alabama One, along with a description of the person's "specific knowledge"); and (3) identify "any documents" which support the above-described allegation. As such, this Interrogatory constitutes three separate Interrogatories.

Further, Alabama One objects to this Interrogatory on the grounds that it is vague, ambiguous, unduly burdensome at this stage of the litigation, and that it improperly propounds a "contention interrogatory" before discovery is complete or even substantially complete. *See, e.g., In re Checking Account Overdraft Litig.*, MDL 2036, 2010 WL 5136043, at *3 (S.D. Fla. Dec. 16, 2010) ("Compelling parties to respond partially to such [contention] interrogatories early in the litigation when they will likely simply be asked to respond again, upon completion of document review or other phases of discovery, lacks finality and compounds the time, effort and costs of the litigation."); *see also B. Braun Med. Inc. v. Abbott Labs.*, 155 F.R.D. 525, 527 (E.D. Pa. 1994) ("Contention interrogatories ask a party: to state whether it makes a specified contention; to state all the facts upon which it bases a contention; to take a position, and explain or defend that position, with respect to how the law applies to facts; or to state the legal or theoretical basis for a contention."); *In re eBay Seller Antitrust Litig.*, C 07-1882 JF (RS), 2008 WL 5212170, at *1 (N.D. Cal. Dec.

11, 2008) ("Courts using their Rule 33(a)(2) discretion generally disfavor contention interrogatories asked before discovery is undertaken. In fact, courts tend to deny contention interrogatives filed before substantial discovery has taken place, but grant them if discovery is almost complete."); *In re Domestic Air Transp. Antitrust Litig.*, 1:90-CV-2485-MHS, 1992 WL 120351, at *1 (N.D. Ga. Apr. 8, 1992) ("Without such controls, substantial time, money, and energy may be wasted on contention interrogatories that are either premature or overinclusive."); *Bonutti Skeletal Innovations LLC v. Linvatec Corp.*, 6:12-CV-1379-ORL-22, 2014 WL 186123, at *4 (M.D. Fla. Jan. 16, 2014) ("The Court also finds that at this stage of the litigation, Interrogatory No. 16 [a 'contention interrogatory'] is premature, oppressive and overbroad. The interrogatory does not target specific claims Linvatec believes are unclear, or which might be subject to early resolution. Instead, it is all-encompassing.").

Alabama One additionally objects to this Interrogatory on the grounds that it improperly seeks information that is protected by the work-product doctrine. This so because the Interrogatory requests Alabama One to identify "any documents which support your contention." The "'selection and compilation of documents by counsel . . .' may reveal an attorney's thought process and fall within the protection of the work product doctrine." *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, C01-20418JW, 2005 WL 1459555, at *6 (N.D. Cal. June 21, 2005) (quoting *Sporck v. Peil*, 759 F. 2d 312, 316) (3d Cir. 1985). Discovery requests violate the work-product doctrine when they "require . . . counsel to engage in a process of selective compilation of documents they believe 'tend to prove' their case." *P.J. ex rel. Jensen v. Utah*, 247 F.R.D. 664, 673 (D. Utah 2007); *see also United Oil Co., Inc. v. Parts Assocs., Inc.*, 227 F.R.D. 404, 414 (D.Md.2005) (concluding that interrogatories seeking information that "tend[ed] to support" positions taken by the defendant "appear[ed] to seek work-product in terms of requiring the responding counsel to decide what information 'tends to support' a particular legal position").

Finally, Alabama One objects to this Interrogatory on the grounds that is improperly seeks legal conclusions.

10.     In paragraph 44 of your Complaint you reference commercial property that served as collateral for loans made by Alabama One, specifically a Texaco truck stop in Livingston, Alabama. As to the loan(s) for which this property served as collateral, state the loan number; the date such loan was made; the total amount of the loan; the name, address and telephone number of the individual and/or business to whom the loan was made; the name, address telephone number and official position of the Alabama One who approved the loan; the total amount currently owed on the loan; and the current status of the loan.

**RESPONSE:** Alabama One objects to this Interrogatory on the ground that it improperly seeks confidential consumer information that is prohibited from disclosure before a Protective Order has been entered in this case.

11.    In Paragraph 44 of your Complaint you reference commercial property that served as collateral for loans made by Alabama One, specifically a water treatment plan in Fosters, Alabama. As to the loan(s) for which this property served as collateral, state the loan number; the date such loan was made; the total amount of the loan; the name, address and telephone number of the individual and/or business to whom the loan was made; the name, address telephone number and official position of the Alabama One who approved the loan; the total amount currently owed on the loan; and the current status of the loan.

**RESPONSE:** Alabama One objects to this Interrogatory on the ground that it improperly seeks confidential consumer information that is prohibited from disclosure before a Protective Order has been entered in this case.

12.    In paragraph 44 of your Complaint you reference commercial property that served as collateral for loans made by Alabama One, specifically a marina in Northport, Alabama. As to the loan(s) for which this property served as collateral, state the loan number; the date such loan was made; the total amount of the loan; the name, address and telephone number of the individual and/or business to whom the loan was made; the name, address telephone number and official position of the Alabama One who approved the loan; the total amount currently owed on the loan; and the current status of the loan.

**RESPONSE:** Alabama One objects to this Interrogatory on the ground that it improperly seeks confidential consumer information that is prohibited from disclosure before a Protective Order has been entered in this case.

13.    In paragraph 48 of your Complaint you reference real property related to loans made by Alabama One, specifically certain real property located in Fosters, Alabama and originally appraised by Defendant Dick Holley at $3,635,000. As to the loan(s) for which this

11

property served as collateral, state the loan number; the date such loan was made; the total amount of the loan; the name, address and telephone number of the individual and/or business to whom the loan was made; the name, address telephone number and official position of the Alabama One who approved the loan; the total amount currently owed on the loan; and the current status of the loan.

**RESPONSE**: Alabama One objects to this Interrogatory on the ground that it improperly seeks confidential consumer information that is prohibited from disclosure before a Protective Order has been entered in this case.

14.   In paragraph 72 of your Complaint you reference commercial property that was to be used as collateral for loans made by Alabama One, specifically real property located at 12175 Viewpoint Road in Northport, Alabama. As to the loan(s) for which this property served as collateral, state the loan number; the date such loan was made; the total amount of the loan; the name, address and telephone number of the individual and/or business to whom the loan was made; the name, address telephone number and official position of the Alabama One who approved the loan; the total amount currently owed on the loan; and the current status of the loan.

**RESPONSE**: Alabama One objects to this Interrogatory on the ground that it improperly seeks confidential consumer information that is prohibited from disclosure before a Protective Order has been entered in this case.

15.   As to each and every loan extended by Alabama One to Danny Butler and any and all Butler-related entities from 2007 to the present, state the loan number; the date such loan was made; the total amount of the loan; the name, address and telephone number of the individual and/or business to whom the loan was made; the name, address telephone number and official position of the Alabama One who approved the loan; the total amount currently owed on the loan; and the current status of the loan.

**RESPONSE:** Alabama One objects to this Interrogatory on the ground that it improperly seeks confidential consumer information that is prohibited from disclosure before a Protective Order has been entered in this case.

16. Identify each and every step the Alabama Credit Union Administration regulators took in response to the 2008 through 2012 audit communication letters proved by Defendant Hutto & Carver.

**RESPONSE:** Alabama One objects to this Interrogatory on the grounds that it is vague and ambiguous. Alabama One additionally objects to this Request on the grounds that it is seeks information that is privileged and/or protected from disclosure under Ala. Code § 5-3A-11 and/or 12 CFR 792.11.

17. Identify by name, home address, and home telephone numbers all persons who have personal knowledge of facts material to the issues in this case, whether favorable or unfavorable to your position, and briefly describe their knowledge.

**RESPONSE:** Alabama One objects to this Interrogatory on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome. *See, e.g., In re Priceline.com Inc. Sec. Litig.*, 233 F.R.D. 83, 88 (D. Conn. 2005) ("Plaintiffs' interrogatory 23 is overly broad because it seeks the name of each person who may have knowledge of an investigation irrespective of the extent of that person's knowledge."); *Liberty Mut. Ins. Co. v. Tedford*, No. CIV A 3:07CV73-A-A, 2008 WL 2080930, at *1 (N.D. Miss. May 13, 2008) (holding as overbroad an interrogatory requesting the answering party to "identify all persons who participated in or have knowledge of claims handling activities by Liberty Mutual pertinent to the claims asserted against Franklin in the underlying state court civil action.").

18. State the name, address and identity of each person whom you expect to call as an expert witness at trial, state the substance of the facts and opinions to which each such expert is expected to testify and give the summary of the grounds for each opinion of such expert.

**RESPONSE:** Alabama One states that discovery has just begun, and it has not yet made a decision as to every witness it will call as an expert witness as trial.

However, Alabama One states that it currently intends to call the following person as an expert witness at trial:

13

**ALDRIDGE BORDEN & CO., PC**
74 Commerce St.
Montgomery, AL 36104

Alabama One is still gathering information regarding the remainder of information requested by this Interrogatory. Alabama One reserves its right to supplement its answer to this Interrogatory as necessary.

    19.    Identify each and every person or entity with whom you have communicated or who you have in his/her/its capacity as representative or agent of Hutto & Carver, or anyone acting on its behalf, regarding the alleged occurrences of wrongdoing and for each, state in detail the date of such contact or communication; the matter (phone, letter, email, personal contact) in which the contact or communication occurred; the substance of such contact or communication; and identify all persons witnessing, overhearing or involved in such contact or communication.

RESPONSE: Alabama One objects to this Interrogatory on the grounds that it is vague and ambiguous. Alabama One additionally objects to this Request on the grounds that it seeks information that is protected by the work-product doctrine and that Hutto & Carver can identify its own representatives or agents. *See Todd v. Tempur-Sealy Int'l, Inc.*, No. 13-CV-04984-JST(MEJ), 2015 WL 1022886, at *3 (N.D. Cal. Mar. 6, 2015) (denying a motion to compel because "Defendants [did] not show[] they [were] unable to determine the identity of their own former employees") (internal quotation marks and citations omitted).

    20.    Identify each and every person from whom a written, recorded and/or transcribed statement has been taken which relates in any way to the alleged occurrences of wrongdoing made the basis of this Complaint or to this litigation. (NOTE: THIS INTERROGATORY DOES NOT REQUEST THE CONTENT OF SUCH STATEMENT, BUT MERELY THE IDENTITY OR PERSOMS FROM WHOM STATEMENTS HAVE BEEN TAKEN).

RESPONSE: Alabama One objects to this Interrogatory on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome. *See, e.g., In re Priceline.com Inc. Sec. Litig.*, 233 F.R.D. 83, 88 (D. Conn. 2005) ("Plaintiffs' interrogatory 23 is overly broad because it seeks the name of each person who may have knowledge of an investigation irrespective of the extent of that person's knowledge."); *Liberty Mut. Ins. Co. v. Tedford*, No. CIV A 3:07CV73-A-A, 2008 WL 2080930, at *1 (N.D. Miss. May 13, 2008) (holding as overbroad an interrogatory requesting the answering party to "identify all persons who

participated in or have knowledge of claims handling activities by Liberty Mutual pertinent to the claims asserted against Franklin in the underlying state court civil action."). Alabama One additionally objects to this Request on the grounds that it seeks information that is protected by the work-product doctrine.

21.  If any investigation was made by any agent, servant or employee of Plaintiff into the facts and circumstances surrounding the occurrences made the subject of this lawsuit, please state the names of those involved in the investigation(s), the dates on which they occurred, whether any report or other documentation was created as a result, and who received any report.

**RESPONSE:** Alabama One objects to this Interrogatory on the grounds that it is vague and ambiguous. Alabama One additionally objects to the portion of this Interrogatory asking it to identify "who received any report" on the grounds that it is overly broad and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to, and without waiving the foregoing objections, Alabama One states as follows:

Names of Those Involved in the Investigation(s):

**BATTLE & WINN LLP**
Harlan F. Winn III
Adam P. Plant

**ALDRIDGE BORDEN & CO., PC**
W. Dane Floyd
Jason A. Westbrook

Date of Investigation(s): November 10, 210

A report was created regarding the investigation by Battle & Winn, LLP and Aldridge Borden & Co., PC.

Respectfully submitted,

/s/ John C. Guin
Attorneys for Plaintiffs

**OF COUNSEL:**

Andrew P. Campbell
A. Todd Campbell
John C. Guin
CAMPBELL, GUIN, LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
Telephone: (205) 224-0750
andy.campbell@campbellguin.com
todd.campbell@campbellguin.com
john.guin@campbellguin.com

Thomas E. Baddley, Jr.
Jeffrey P. Mauro
John Parker Yates
BADDLEY & MAURO, LLC
850 Shades Creek Pkwy, Ste. 310
Birmingham, AL 35209-4510
jpy@baddleymauro.com
tbaddley@baddleymauro.com
jpmauro@baddleymauro.com

16

## CERTIFICATE OF SERVICE

I hereby certify that on this the 8th day of February 2016, I served the foregoing via email and U.S. Mail to the following counsel of record:

William J. Gamble, Jr.
A. Grady Williams, IV
Joseph M. Aguirre
Phelps Dunbar, LLP
101 Dauphin Street, Suite 1000
Mobile, AL 36602
Will.gamble@phelps.com
Bo.williams@phelps.com
Joseph.aguirre@phelps.com

*Counsel for Defendant Hutto & Carver, P.A.*

Barry v. Frederick
Brandi B. Frederick
The Frederick Firm
5409 Trace Ridge Lane
Birmingham, AL 35244
barry@frederickfirm.net
brandi@frederickfirm.net

*Counsel for Defendants Barry V. Frederick;*
*Brandi B. Frederick and The Frederick Firm*

David R. Wells
Whitaker, Mudd, Luke & Wells, LLC
2011 4th Avenue North
Birmingham, AL 35203
dwells@wmslawfirm.com

*Counsel for Defendants Mary Jane Watson and*
*Green and Company Real Estate Services*

Michael A. Vercher
Jonathan M. Hooks
Christian & Small, LLP
505 20th Street North, Suite 1800
Birmingham, AL 35203

17

mavercher@csattorneys.com
jmhooks@csattorneys.com

*Counsel for Defendants Richard A.*
*Maloy and Maloy and Company, Inc.*

James D. Turner
Turner & Turner
1426 22nd Avenue
Tuscaloosa, AL 35401
Jturner003@aol.com

*Counsel for Dick Holley and*
*West Alabama Appraisal*

Jeven Sloan
Loewinsohn Flegle Deary, LLP
420 20th Street North, Suite 2000
Birmingham, AL 35203
jevens@lfdlaw.com

*Counsel for Defendants Jeven R. Sloan*
*and Loewinsohn Flegle Deary, LLP*

Joseph E. Stott
Scott, Sullivan, Streetman & Fox, P.C.
2450 Valleydale Road
Birmingham, AL 35244
jstott@sssandf.com

*Counsel for Defendant Paul Toppins*

/s *John C. Guin*
Of Counsel

FILED
2016 Sep-22  PM 02:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE CIRCUIT OF TUSCALOOSA COUNTY, ALABAMA

ALABAMA ONE CREDIT UNION,        )
                                 )
        Plaintiff,               )
                                 )
v.                               )        CV-2015-901234
                                 )
PAUL TOPPINS; et al.,            )
                                 )
        Defendants.              )

PLAINTIFF'S FIRST SET OF DISCOVERY
REQUESTS TO DEFENDANT HUTTO & CARVER, P.A.

COMES NOW Plaintiff, Alabama One Credit Union, pursuant to Rules 26, 33 and 34 of the *Alabama Rules of Civil Procedure*, and propounds the following interrogatories and requests for production of documents to be answered by Defendant Hutto & Carver, P.A. in the manner and form prescribed by law.

DEFINITIONS AND INSTRUCTIONS

As used herein, the following words are defined as follows:

(a)     "You" or "Your" shall mean Defendant Hutto & Carver, P.A. and/or any of its agents, employees, successors and assigns, whether acting directly or through any representative and/or agent, including but not limited to attorneys, accountants, or other agents and including any incorporated or unincorporated businesses.

(b)     "Identify" shall mean:

(1)     When used with respect to an individual, to state his full name (as well as any pseudonyms, aliases, nicknames, prior names, his present or last known addresses, (including without limitation, municipal addresses, post office box addresses, universal resource locators (URLs), instant messaging (IM)

1



accounts, and e-mail addresses), and all telephone numbers (including, without limitation, mobile telephone numbers, business telephone numbers, home telephone numbers, facsimile numbers, and pager numbers), his social security number, his present or last known position and business affiliation, and his position and business affiliation referenced in the Request;

(2)   When used with respect to a corporation, partnership, business trust, limited liability company, or other business entity or commercial enterprise, to state its full name (as well as any trade names, stock symbols, "d/b/a" names, or other names), its last known principal business address, registered office address (including without limitation, municipal addresses, post office box addresses, universal resource locators (URLs), instant messaging (IM) accounts, and e-mail addresses), and all telephone numbers (including, without limitation, mobile telephone numbers, business telephone numbers, home telephone numbers, facsimile numbers, and pager numbers) and to identify its principal officers and registered agent for service of process;

(3)   When used with respect to a document, to state the date of the document's preparation, the author, the specific type of document (e.g., letter, memorandum, e-mail, telex, diary, tape recording, etc.), and the document's present or last known location and to identify its last known custodian;

(4)   When used with respect to any type of communication, to state the dates thereof, to identify all persons who participated in such communications and the substance of said communications, and whether the communications were oral or written; additionally, to state the place and the approximate time that the communications took place and to identify all

2

persons in whose presence the communications occurred and all documents related to the communication.

(c)    "Document" shall mean any writing or recording (whether printed, typed, photocopied, handwritten, recorded, stored, or produced or reproduced by any mechanical, physical, electronic, or other process) or any other compilation of information that is in the possession, custody, or control of you or your affiliates, and includes, without limitation, any and all:

(1)    accounts, accountant's and other worksheets, advertisements, advertising circulars, advisories, affidavits, agendas, agreements, appointment books, articles, bank statements, balance sheets, books, brochures, bulletins, calendars, charts, checks, check ledgers, circulars, communications (intra-office, inter-office, external, and other), computer printouts, contracts, correspondence, data sheets, desk-pads, diaries, drafts, drawings, e-mails, forms, flyers, forecasts, graphs, guidelines, handwritten matter, indexes, instructions, invoices, ledgers, letters, lists, logs, magazine clippings, manuals, materials, memoranda, minutes, newspaper clippings, notebooks, notes, note entries, pamphlets, papers, periodicals, posters, post-it notes, projections, prospectuses, receipts, records, reports, rules, signs, statements, studies, summaries, surveys, telecopies, telegrams, telephone messages, telexes, transcripts, translations, vouchers, and work papers;

(2)    graphic, video, or audio records or representations or any kind (including, without limitation, photographs, phono records, audio cassettes, audio tapes, compact discs, charts, drawings, graphs, microfiche, microfilm, videotapes, recordings, films, and motion pictures);

(3)    computerized, electric, electronic, magnetic, mechanical, and optical

3

records or representations of any kind, including, without limitation, data processing cards, tapes, cassettes, discs, recordings, and computer memories, (including, without limitation, .wav files, .mp3 files, .mid files, and .ram files); and

(4)     drafts and final versions, and all originals as well as carbons, photographic or other copies, telecopies, reproductions or facsimiles that differ from originals in any respect (including, but without limitation, differences due to handwritten notes, editing, interlineations, blind copies, omissions, time/date stamps or imprints, or any other alterations).

(d)     The unqualified term "person" shall mean an individual, an individual corporation, limited liability company, partnership, business trust, unincorporated association, or business or governmental entity.

(e)     "Affiliate" shall mean with respect to any person, one who controls, is controlled by, or under the common control of another with, that person.

(f)     "Plaintiff" or "Alabama One" shall mean Plaintiff Alabama One Credit Union and/or any agent acting on its behalf, including but not limited to attorneys, accountants, or other agents.

(g)     "Communication" and "correspondence" shall mean any transmission of information by written, oral, pictorial, or otherwise perceptible means, including, but not limited to, correspondence, telegraphs, cables, telephone conversations, personal conversations, e-mails, facsimiles, "instant messages" (IMs), and the like.

(h)     "Related to" shall mean concerning, supporting, contradicting, reflecting, constituting, referring to, pertaining to, or relating to in any way.

(i)     These Requests are considered to be continuing in character.  Answers should be modified or supplemented as you obtain further or different information prior to the trial of this

4

case.

(j)     Separate answers should be given to all Requests – they should not be joined together and accorded a common answer.

(k)     Each Request should be restated in full prior to providing an answer thereto.

(l)     Where exact information cannot be furnished, estimated information is to be supplied. Where estimated information is used, the response should indicate this fact and an explanation should be given as to the basis of how the estimation was made and the reason exact information was not furnished.

(m)     Where knowledge, information, or documents are requested of you, such requests include knowledge, information or documents in the possession of your affiliates, agents, representatives, and attorneys.

(n)     Unless the context of the Request requires otherwise, references to the single include the plural and references to gender include both masculine and feminine.

(o)     If any requested documents are not produced on the basis that said documents are not in your custody and/or control, said documents should be identified, and the person in whose custody you believe said documents can be found should likewise be identified.

(p)     If any document, communication, or other requested information of any type whatsoever is withheld on the basis that such information is privileged or confidential, please identify, with specificity, the document, communication or other requested information as well as the basis for asserting said privilege or confidentiality. In doing so, please produce this information within a privilege log as set forth in Rule 26(b)(6)(A) of the *Alabama Rules of Civil Procedure*.

(q)     Any term not otherwise defined herein shall have the same meaning ascribed to it in the Complaint.

(r)     Please produce all documents pursuant to the following specifications:

5

(1)   Please produce all documents in .tif format using optical character recognition ("OCR") with each document constituting a separate .tif file with .DAT load files and electronic Bates labels;

(2)   The .DAT load files are for the loading of metadata and native files, and should include the metadata filed listed in Exhibit A;

(3)   Images should be produced as single-page .tif images in an images directory with the associated Opticon load file;

(4)   Text files produced in a single-page format should also be produced in the images directory. Text files produced as in a multi-page format should be produced in a separate text directory;

(5)   Excel spreadsheet and Power Point slides should be produced in native format with all native files named as the first image of the corresponding image file in a separate Native directory.

(s)   The "Fosters Water Treatment Plant" shall mean that water treatment plant referred to in ¶ 44 of Plaintiff's Complaint.

(t)   The "Marina" shall mean that marina, or site, having an address of 12175 Viewpoint Road and referred to in ¶ 44 of Plaintiff's Complaint

(u)   The "Truck Stop" shall mean that truck stop, or site, having an address off of Highway 28 in Livingston, AL and referred to in ¶ 44 of Plaintiff's Complaint.

(v)   "Danny Butler" shall mean that individual referred to in ¶ 19 of Plaintiff's Complaint.

(w)   The "Butler Cabin" shall mean that real property having an address of 14401 Holley Springs Lane and referred to in ¶ 72 of Plaintiff's Complaint.

## INTERROGATORIES

1. Please identify all persons that assisted in responding to these interrogatories and requests for production of documents.

2. Please identify all years in which You performed auditing services for Alabama One.

3. Please identify the total amounts of money You have billed and collected from Alabama One for accounting, auditing, or similar services for the period of January 1, 2008 through the present.

4. Please identify all audits that your performed for or at the request of Alabama One for the period of January 1, 2008 through the present.

5. Please identify each and every person You believe may have knowledge of any of the facts, matters, claims, or defenses made the subject of this action and/or all persons having knowledge of discoverable matters, including full names, present or last known addresses, places of employment, job titles, and telephone numbers.

6. State the name, address, and telephone number of every person You expect to testify as an expert witness, whether at trial, in support of or in opposition to any motion, or as part of any other proceeding or matter in this action. For each person so identified, state the subject matter on which the expert is expected to testify; the substance of the facts and opinions as to which the expert is expected to testify; and a summary of the grounds for each opinion.

## REQUESTS FOR PRODUCTION

1. Please produce all files on all matters related to Your services provided to Alabama One for the period of January 1, 2008 through the present.

2. Please produce all audits You created for, or at the request of, Alabama One for the period of January 1, 2008 through the present.

3.     Please produce all documents and correspondence related to the auditing and/or accounting services You rendered for, or at the request of, Alabama One, including, but not limited to, retention agreements, work papers, vouchers, invoices, notes and receipts for the period of January 1, 2008 through the present.

4.     Please produce all documents evidencing the total amounts of money You have billed and collected from Alabama One for accounting, auditing, or similar services for the period of January 1, 2008 through the present.

5.     Please produce all of Your unredacted invoices for any and all services rendered and expenses incurred through Your engagement with Alabama One for the period of January 1, 2008 through the present.

6.     Please produce all opinion letters issued by You to Alabama One for the period of January 1, 2008 through the present.

7.     Please produce all documents related to Your records retention policy.

8.     Please produce all documents related to Your malpractice insurance policy and/or any other applicable insurance policy.

9.     Please produce all of Your correspondence related to the Alabama Credit Union Association's Preliminary Warning Letter issued to Alabama One on August 20, 2014.

10.     Please produce all of Your correspondence related to the Alabama Credit Union Association for the period of January 1, 2008 through the present.

11.     Please produce all of Your correspondence related to any appraisals requested and/or completed for, or at the request of, Alabama One for the period of January 1, 2008 through the present.

12.     Please produce all of Your correspondence related to the Fosters Water Treatment Plant for the period of January 1, 2008 through the present.

8

13.    Please produce all of Your correspondence related to the National Credit Union Association for the period of January 1, 2008 through the present.

14.    Please produce all of Your correspondence related to the Marina for the period of January 1, 2008 through the present.

15.    Please produce all of Your correspondence related to the Truck Stop for the period of January 1, 2008 through the present.

16.    Please produce all documents related to Danny Butler and/or any of Danny Butler's entities.

17.    Please produce all documents related to Danny Butler's loans and/or any of Danny Butler's entities' loans from Alabama One.

18.    Please produce all of Your correspondence related to Danny Butler and/or any of Danny Butler's entities.

19.    Please produce all of Your correspondence related to Danny Butler's loans and/or any of Danny Butler's entities' loans.

20.    Please produce all of Your correspondence related to the subject matter of this lawsuit.

21.    Please produce all documents You have identified, or have been requested to identify, or have otherwise referenced, in Your responses to the above-stated Interrogatories.

22.    Please produce all documents You intend to use at the trial of this action.

23.    Produce all of Your correspondence with any Defendant in this action.

/s/ Todd Campbell
Counsel for Plaintiff

9

**OF COUNSEL:**

Andrew P. Campbell
A. Todd Campbell
John C. Guin
Campbell, Guin, Williams
Guy & Gidiere, LLC
505 N. 20th Street, Suite 1600
Birmingham, AL 35203
205.224.0750
Fax 205.383.2641
andy.campbell@campbellguin.com
todd.campbell@campbellguin.com
john.guin@campbellguin.com

John Parker Yates
Thomas E. Baddley, Jr.
Jeffrey P. Mauro
BADDLEY & MAURO, L.L.C.
850 Shades Creek Parkway, Suite 310
Birmingham, Alabama 35209-4510
Tel. (205) 939-0090
Fac. (205) 939-0064
jpy@baddleymauro.com
tbaddley@baddleymauro.com
jpmauro@baddleymauro.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on December 23, 2015, served a true and correct copy of the foregoing on the following parties by U.S. mail:

**Hutto & Carver PA**
William J. Gamble, Jr.
A. Grady "Bo" Williams, IV
PHELPS DUNBAR LLP
101 Dauphin Street, Suite 1000
Mobile, AL 36602
P.O. Box 2727
Mobile, AL 36652-2727
Will.gamble@phelps.com
Bo.williams@phelps.com

**Richard A. Maloy**
Maloy & Company Inc.
Michael A. Vercher
Christian & Small LLP
505 20th Street North, Suite 1800
Birmingham, AL 35203
205.795.6588
mavercher@csattorneys.com

**Dick Holley**
**West Alabama Appraisal**
James D. Turner
Turner & Turner
1426 22nd Avenue
Tuscaloosa, AL 35401

**Paul Toppins**
1308 Dearing Place
Tuscaloosa, AL 35401

**Barry V. Frederick**
**Brandi B. Frederick**
**The Frederick Firm**
5409 Trace Ridge Lane
Birmingham, AL 35244

**Mary Jane Watson**
**Green & Co. Real Estate Services**
2310 14th Street
Tuscaloosa, AL 35401

**Jeven R. Sloan**
**Loweinsohn Flegle Deary LLP**
12377 Merit Drive, Suite 900
Dallas, TX 75251

*s/ Todd Campbell*

11

## EXHIBIT A

The .DAT load file is for the loading of metadata and native files, and generally

should include the following fields:

| | |
|---|---|
| (1) | DocID |
| (2) | ParentID |
| (3) | FamilyID |
| (4) | BegAttach |
| (5) | EndAttach |
| (6) | ITEM_ID |
| (7) | Doclink |
| (8) | Attachment Count |
| (9) | Attachment List |
| (10) | Application Name |
| (11) | DocTitle |
| (12) | DocDate |
| (13) | Author |
| (14) | From |
| (15) | BCC |
| (16) | CC |
| (17) | Creation Date |
| (18) | Creation Time |
| (19) | Modified Date |
| (20) | Modified Time |
| (21) | Document Type |
| (22) | EM Relative path |
| (23) | Entry ID |
| (24) | File Extension |
| (25) | File Size |
| (26) | Hash Code |
| (27) | Message ID |
| (28) | FileName |
| (29) | Sent Date |
| (30) | Sent Time |
| (31) | Received Date |
| (32) | Received Time |
| (33) | Subject |
| (34) | Recipients |

(35)     Relative Path
(36)     Custodian
(37)     Language
(38)     AttachIDs
(39)     ConversationTopic
(40)     Orig Doc Path
(41)     Exception
(42)     EXPORTED_TEXT_FILE
(43)     DUPLICATE_LOCATIONS
(44)     Application Date Last Saved
(45)     Application Time Last Saved
(46)     Application Date Created
(47)     Application Time Created
(48)     Duplicate Custodians

FILED

2016 Sep-22  PM 02:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

**From:** John Guin [mailto:John.Guin@Campbellguin.com]
**Sent:** Thursday, August 18, 2016 12:56 PM
**To:** Will Gamble (8205)
**Cc:** Andy Campbell; Todd Campbell
**Subject:** Hutto & Carver Document Production

Will,

I just tried calling you, but did not get an answer. I'm writing to address Hutto & Carver's document production, which consisted of only 109, largely-redacted documents, and entirely omits important categories of documents (most notably, Hutto & Carver's work papers). Please produce un-redacted copies of your earlier production, along with supplemental production as described below, on or before Wednesday, August 24, 2016. Otherwise, we will take appropriate action with the Court.

First, Hutto & Carver needs to supplement its production with documents response to Requests Nos. 1, 2, 3, 4, 5, 6, 12, 15, 16, 17, 18, and 19 [Note that we reserve the right to address additional deficiencies in the future and after reviewing Hutto & Carver's forthcoming supplemental production]. Your alleged objections to these requests are addressed, in turn, below:

1

EXHIBIT
9

<u>Request No. 1</u>: You have objected on the basis that the word "services" is vague. To clarify, please "produce all files on all matters related to Your [auditing] services provided to Alabama One for the period of January 1, 2008 through the present." You have also objected based on the allegation that Alabama One's allegations in the Complaint are not sufficiently specific. That is not a valid objection to this Request for Production, and should instead be asserted in a Motion for More Definite Statement.

<u>Request No. 2</u>: You have objected on the basis that Alabama One did not specifically identify the audits requested. Alabama One clearly did so—those audits for the period of January 1, 2008 through the present. To be clear—the basis for Alabama One's claim is that Hutto & Carver negligently audited Alabama One from at least January 1, 2008 to the present. The requested audits are clearly related to Alabama One's claim that Hutto & Carver negligently conducted its audits of Alabama One (e.g., by failing to correctly detect that Alabama One's Allowance for Loan Losses as stated on its audited financial statements was incorrect and/or not calculated pursuant to GAAP) .

<u>Request No. 3</u>: See responses to Request Nos. 1 and 2 above.

<u>Request No. 4</u>: You have objected that the amount of money Hutto & Carver billed Alabama One is irrelevant. This information is clearly relevant to Alabama One's breach of contract claim (i.e., that Hutto & Carver should not retain money paid to it pursuant to a contract Hutto & Carver breached). Further, while you have provided contracts showing the monetary cap that Hutto & Carver would bill for its services, we need to know the actual amount that Hutto & Carver billed. Thus, we need the actual invoices Hutto & Carver sent Alabama One.

<u>Request No. 5</u>: See response to Request No. 4 above.

<u>Request No. 6</u>: See responses to Request Nos. 1 and 2 above.

<u>Request No. 12, 15, 16, 18, 19</u>: You have objected to producing documents on the basis that these implicate "regulatory information," insofar as they pertain to "Alabama One's actions." Regardless of whether this is true, this does not mean that such information should be kept confidential from Alabama One, as it is the actual subject of the alleged regulatory action. The Protective Order acknowledges is this, as it specifically allows only "the plaintiff" (i.e., Alabama One) to claim that certain documents are prohibited as "Regulatory Information." However, "Regulatory Information" should not be produced to other parties.

Please produce un-redacted copies of Hutto & Carver's earlier production in addition with the above-described supplemental documents on or before August 24, 2016. Thank you, and please feel free to contact me if you have any questions.

JOHN C. GUIN
Attorney

CAMPBELL | GUIN
WILLIAMS, GUY & GIDIERE, LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
john.guin@campbellguin.com
T: 205.224.0750
Birmingham | Tuscaloosa | Hoover

**Angela Ryals (8263)**

| | |
|---|---|
| **From:** | Will Gamble (8205) |
| **Sent:** | Thursday, September 22, 2016 2:51 PM |
| **To:** | Angela Ryals (8263) |
| **Subject:** | FW: Activity in Case 7:16-cv-01382-TMP Alabama One Credit Union  v. Toppins et al Response to Motion |

Fyi.

**William ("Will") J. Gamble, Jr.**
Phelps Dunbar LLP
101 Dauphin Street, Suite 1000
P.O. Box 2727
Mobile, AL 36652
Direct: 251-441-8205
Fax: 251-433-1820
Email: will.gamble@phelps.com

PHELPS DUNBAR

Louisiana · Mississippi · Florida
Texas | Alabama | North Carolina | London

CONFIDENTIALITY NOTICE – This e-mail message, including any attachments, is private communication sent by a law firm, Phelps Dunbar LLP, and may contain confidential, legally privileged information meant solely for the intended recipient. If you are not the intended recipient, any use, distribution, or copying of this communication is strictly prohibited. Please notify the sender immediately by replying to this message, then delete the e-mail and any attachments from your system. Thank you.

**From:** cmecf_ALND@alnd.uscourts.gov [mailto:cmecf_ALND@alnd.uscourts.gov]
**Sent:** Thursday, September 22, 2016 2:39 PM
**To:** ecfAdmin@alnd.uscourts.gov
**Subject:** Activity in Case 7:16-cv-01382-TMP Alabama One Credit Union v. Toppins et al Response to Motion

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

1

## Northern District of Alabama

**Notice of Electronic Filing**

The following transaction was entered by Gamble, William on 9/22/2016 at 2:38 PM CDT and filed on 9/22/2016

**Case Name:**      Alabama One Credit Union v. Toppins et al
**Case Number:**   7:16-cv-01382-TMP
**Filer:**             Hutto & Carver PA
**Document Number:** 6

**Docket Text:**
**RESPONSE to Motion re [2] MOTION to Quash filed by Hutto & Carver PA. (Attachments: # (1) Exhibit 1, # (2) Exhibit 2, # (3) Exhibit 3, # (4) Exhibit 4, # (5) Exhibit 5, # (6) Exhibit 6, # (7) Exhibit 7, # (8) Exhibit 8, # (9) Exhibit 9)(Gamble, William)**

**7:16-cv-01382-TMP Notice has been electronically mailed to:**

Joyce White Vance, US Attorney      usaaln.ecfusa@usdoj.gov

Andrew Phillip Campbell      andy.campbell@campbellguin.com

Anthony N Fox      afox@sssandf.com

Barry V Frederick      barry@frederickfirm.net

Gregory A Brockwell      gbrockwell@lsppc.com

Jack B Hood      jack.hood@usdoj.gov

James D Turner      jturner003@aol.com

Jonathan Michael Hooks      jmh@csattorneys.com

Joseph E Stott      jstott@sssandf.com

William J Gamble , Jr      will.gamble@phelps.com

**7:16-cv-01382-TMP Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1078951271 [Date=9/22/2016] [FileNumber=3847459-0
] [a0392100a0c3b685d3522292bba4e5595fac7d066c7b6dbd804796af4f66b56adfc
b8f640d949fe2a03eb74b7a0a41e7c6a471f09aacba21e8bfc1ed712318e4]]
**Document description:** Exhibit 1

**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1078951271 [Date=9/22/2016] [FileNumber=3847459-1
] [860c555bed94e71f33ae553635d3980d70e9a5d9d13a30ce6ecc105f81f80b5a8e5
8f7a3339f4e8a14779311d9c2e8e44058cd213065305a6b1fc2b180fda89d]]
**Document description:**Exhibit 2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1078951271 [Date=9/22/2016] [FileNumber=3847459-2
] [04e316a7d8af609628b29c753ba2c50df23b5d41a0187ef28d344ae71daa5cdb921
3da32f8bfbcca2d98814d5a11b9a60b5de5a3a6475bfe8204fdc74d05092e]]
**Document description:**Exhibit 3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1078951271 [Date=9/22/2016] [FileNumber=3847459-3
] [0113c62cf9bce75e0e8ff95d63a10275e30fd277eac5b060e8306eb491973f78f39
c7046a79b1553f7a5306a72633eb60bd088199eafea4cafdfc5c13755ef4e]]
**Document description:**Exhibit 4
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1078951271 [Date=9/22/2016] [FileNumber=3847459-4
] [8a55b2f169dd9e7e12c3195a7700fbc7c9b7c0da369c72ca624c24d160ccdb5fb01
4ea3569ebe766e29464f24fe01b34d8e85f3a05243b247e3bb75f7dc57aaa]]
**Document description:**Exhibit 5
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1078951271 [Date=9/22/2016] [FileNumber=3847459-5
] [950f07c56f7f4dd155f97c4bf1c01155591f032deecc348f35929f1d25343807580
d3ad750d3cf78e09cced8359364156510ed5eae156a0cf79617c49424cce0]]
**Document description:**Exhibit 6
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1078951271 [Date=9/22/2016] [FileNumber=3847459-6
] [86ff931b0466c36b90468edc75182ff55865e5ed163aaf6c5197bb7563063c11760
fc2b14624b066bd576965bbbbf1ec4cc8e34af9e85702e7216d4e53e28a0d]]
**Document description:**Exhibit 7
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1078951271 [Date=9/22/2016] [FileNumber=3847459-7
] [96ec4f8d61ff3313767857c750bf7e1b26e5a3a68c768955c724d97bbf75da07291
5040cebe7d201f07bfdaee9d19bf72462e241c4498cbb3a36bec507167562]]
**Document description:**Exhibit 8
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1078951271 [Date=9/22/2016] [FileNumber=3847459-8
] [bbf0692ada6afe6b3adce17e5b997d69f14d826c7e7b2049abef6797b9fb71c3a9e
fb42a55fefaeb7a0a9b4be09e58d2436a6b3ec3a62f169c6b2eac97aae32b]]
**Document description:**Exhibit 9
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1078951271 [Date=9/22/2016] [FileNumber=3847459-9

] [619f53048306229c7ee3580b7f20f95b6e6b6a9aaa137e43393f9f13dd7c676e0a0
afbf8086c2b6b0e6a708d8c93e009c841aa40c2ef2c2306213c3e9ccd97bf]]